**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| JUSTIN O'BRIEN, on behalf of himself and all others similarly situated, | |
| Plaintiff, | **CLASS AND COLLECTIVE ACTION COMPLAINT** |
| v. | **Jury Trial Demanded** |
| SMOOTHSTACK, INC., | **Civil Action No. _____** |
| Defendant. | |

Plaintiff Justin O'Brien ("Plaintiff"), individually and on behalf of all others similarly situated, by his attorneys, upon personal knowledge as to himself, and upon information and belief as to other matters, alleges as follows:

## NATURE OF THE ACTION

1.      Defendant Smoothstack Inc. ("Smoothstack" or "Defendant") is an employee-staffing agency based in McLean, Virginia, that recruits aspiring information technology ("IT") professionals at the beginning of their career ("Recruits") with promises to help them launch their careers with paid training and work assignments with one of their clients, a Fortune 500 firm.[1]

2.      Instead, Recruits are subject to training that is unpaid or underpaid and tailored narrowly towards Smoothstack's own needs.  And soon after they start the training, Recruits are trapped: pursuant to Smoothstack's Training Repayment Agreement Provision ("TRAP"), leaving the training before completing a mandatory billable hour requirement subjects Recruits to a crushing penalty upwards of $24,000.

---

[1]      *About*, Smoothstack, https://smoothstack.com/about/ (last visited Apr. 12, 2023).

3.      Once the training is completed, Recruits become consultants ("Consultants") and Smoothstack assigns them to work with Smoothstack clients.  On assignment, Consultants earn wages that are approximately half of the market rate for their work.  But yet again, Smoothstack ensures that its workers cannot leave to find a better-paying job.  Like Recruits, Consultants are subject to a TRAP that requires them to pay upwards of $24,000 if they resign before completing a mandatory billable hour requirement.  If Smoothstack removes them from their assignment for any reason, Consultants are left to wait indefinitely for a new assignment while earning minimum wage.

4.      This lawsuit seeks, first, on behalf of a putative class, to invalidate the unconscionable and unenforceable liquidated damages provision that Smoothstack requires its employees – all low-wage tech workers – to sign.

5.      Second, on behalf of a putative collective, this lawsuit seeks unpaid wages and damages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*, for minimum wages, overtime wages, unlawful kickbacks on wages, and violation of the FLSA's requirement that employers pay their workers wages "free and clear."

6.      Third, this lawsuit seeks compensatory and punitive damages under the FLSA, 29 U.S.C. § 215(a)(3) against Smoothstack for its unlawful retaliatory discharge of Plaintiff following his protected action of complaining about Smoothstack's unlawful wage scheme.

**Smoothstack's Training Program.**

7.      At the start of employment, Smoothstack requires Recruits to undergo an "intensive" training program lasting approximately six months ("Training Program") covering programming and other IT skills.

8.      During the Training Program, Recruits are required to attend presentations,

lectures, and/or training sessions with Smoothstack trainers every weekday.  Outside of these sessions, Smoothstack assigns the Recruits challenging and time-consuming assignments, which take many hours to complete.  Smoothstack requires Recruits to complete these assignments on short deadlines, some with next-day turnaround and others which must be completed over the weekend.

9.      Although Smoothstack claims to offer pay and full benefits during the Training Program on its website,[2] it does not, in fact, pay its Recruits *any* compensation for the first three weeks of the Training Program ("Unpaid Period").  Still, Recruits work very demanding hours, up to and beyond 80 hours in a workweek.

10.     For the remaining five months of the Training Program (the "Underpaid Period"), Recruits continue to work very demanding hours, up to and beyond 80 hours in a week. However, Smoothstack only pays Recruits for a maximum of 40 hours per week, even if they actually work many more hours, which they typically do.  During the Underpaid Period, Smoothstack pays Recruits the prevailing minimum wage in the state where they work.

11.     Smoothstack boasts that its Training Program has just an 8% completion rate on its website to its clients, as if that number is competitive because of high-quality training.[3]  In reality, Recruits are overworked and underpaid for a subpar Training Program.

12.     During the Unpaid Period, Smoothstack violates the Fair Labor Standards Act ("FLSA") by failing to pay Recruits any compensation for the work they perform.  During the Underpaid Period, Smoothstack violates the FLSA by failing to pay Recruits for any of the hours worked in excess of 40 in a workweek, which must be paid at a premium overtime rate of 1.5

---

[2]     *About*, Smoothstack, https://smoothstack.com/about/ (last visited Apr. 12, 2023).
[3]     *Clients*, Smoothstack, https://smoothstack.com/clients/ (last visited April 12, 2023).

times their hourly rate.

13.     Once a Recruit completes the Training Program and becomes a Consultant, they are available to take assignments with Smoothstack's clients in any of a variety of roles, such as software engineer, cybersecurity analyst, development operations engineer, or the like.

14.     According to its website, Smoothstack deploys Consultants to work on assignments with Smoothstack's clients that are Fortune 500 companies, in order to "launch" the Recruit's career.[4]  Among the companies, it lists: Accenture, Capital One, Morgan Stanley, Bloomberg, Johnson & Johnson, and Verizon.[5]

15.     Smoothstack controls when and whether to assign a Consultant to a particular client, including creating resumes for Consultants, marketing Consultants to clients, and arranging interviews.

16.     Once on assignment with a Smoothstack client, Consultants earn approximately $26.00 to $31.00 per hour.  When waiting for assignments, Consultants earn minimum wage and are not allowed to quit Smoothstack per the terms of the "TRAP" described below.

**The TRAP: Smoothstack's Training Repayment Agreement Provision Obligates Consultants to Pay Smoothstack Tens of Thousands of Dollars if They Resign Before Completing 4,000 Hours of Client Work.**

17.     Shortly after hire, Smoothstack requires each Recruit to sign an agreement ("Training Agreement") governing their continued participation in the Training Program.  *See* Exhibit 1.

18.     The Training Agreement is an adhesion contract presented on a take-it-or-leave-it basis.  It includes a Training Repayment Agreement Provision ("TRAP").  The TRAP obligates

---

[4]     *About*, Smoothstack, https://smoothstack.com/about/ (last visited Apr. 12, 2023).
[5]     *Clients*, Smoothstack, https://smoothstack.com/clients/ (last visited Apr. 12, 2023).

the Recruit to bill 4,000 hours of client work – the equivalent of approximately two years of full-time employment – before they are permitted to resign from Smoothstack ("Service Commitment Period").  If a Consultant resigns or is terminated for cause before the end of the Service Commitment Period, Smoothstack is entitled to require the Consultant to pay an outrageous penalty of $23,875.00 (or, in some cases, more).

19.     After completing the Training Program, and prior to placement on assignment with Smoothstack's clients, Smoothstack requires each Consultant to sign an employment agreement ("Employment Agreement") that governs the employment relationship.  *See* Exhibit 2.

20.     As with the Training Agreement, Smoothstack presents the Employment Agreement as an "all-or-nothing" offer that Consultants are required to accept in order to continue their employment with Smoothstack.

21.     The Employment Agreement contains yet another TRAP, which provides that Consultants cannot resign or be terminated by Smoothstack before billing 4,000 hours to Smoothstack clients.

22.     Smoothstack promises assignments with its Fortune 500 clients, and claims a 98% retention rate, but Consultants have no guarantee of steady employment.  If a Consultant's assignment ends for any reason, and the Consultant has not met the 4,000-hour billable requirement, Smoothstack "benches" the Consultant, holding them in limbo until they can be reassigned ("Bench Status").

23.     On Bench Status, Smoothstack pays Consultants the minimum wage and none of their hours count toward the 4,000-hour Service Commitment Period – but they cannot quit because of the TRAP.

24.     Smoothstack's TRAP is unconscionable and an unenforceable liquidated damages

penalty that puts Smoothstack's minimum-wage workforce in an untenable position.  If a Consultant on Bench Status has not yet fulfilled their Service Commitment Period, they are functionally tied to a minimum wage position with Smoothstack indefinitely – because the only way for the Consultant to enter the job market is to put themself at risk of paying the TRAP penalty, which can have the economically devastating effect of undoing months or years of careful savings.

25.     The TRAP also violates the Fair Labor Standards Act, because it functions as an unlawful kickback of wages to Smoothstack that brings employees' wages well below minimum wage – indeed, into negative numbers – if they leave their jobs before the Service Commitment Period is complete.  Moreover, it means that Smoothstack is not paying employee wages unconditionally or "free and clear," as the FLSA requires.  Rather, employees are paid only on the condition that they do not quit.  If they do quit, the TRAP requires them to pay back their earned wages and then some.

26.     Plaintiff and other Consultants have reason to fear that Smoothstack will enforce the TRAP if they try to leave.  Upon information and belief, Smoothstack has brought litigation against its own employees several times to enforce the TRAP.  *See, e.g.*, *Smoothstack v. Crowell*, Nos. GV22006209, GV22012000 (Va. Gen. Dist. Ct.); *Smoothstack v. Hill*, No. GV22006208 (Va. Gen. Dist. Ct.); *Smoothstack v. Davtyan*, Nos. GV21010149, GV21015875 (Va. Gen. Dist. Ct.).

27.     Smoothstack drags its own minimum wage employees into court even though, on information and belief, a Virginia state court recently ruled at trial that Smoothstack's TRAP is unconscionable and an unenforceable liquidated damages penalty under Virginia law in a case Smoothstack brought against a former Consultant under the TRAP.  *Smoothstack v. Davtyan*,

Nos. GV21010149, GV21015875 (Va. Gen. Dist. Ct.).

28.     Despite this merits finding by a court, Smoothstack continues to require its Recruits and Consultants to agree to the TRAP on a take-it-or-leave it basis.

**Plaintiff's Experience**

29.     Plaintiff is one of hundreds of Smoothstack employees who worked grueling hours at minimum wage, or no pay at all, and with no overtime wages, but was unable to seek out a better opportunity because of the TRAP.

30.     Plaintiff applied for a job in Spring 2020 with Smoothstack because, after working a low-paying job at a call center for nearly a year, he believed that a job with Smoothstack would jumpstart a new career that would bring him better pay and benefits.

31.     Indeed, Plaintiff saw Smoothstack's advertising that it offered programming assignments for pay starting at $55,000 per year and was persuaded that working for Smoothstack would be a good career move.

32.     Around the same time, the nation was starting to grapple with the harsh realities of the COVID-19 pandemic.  In or around early April 2020, lockdowns shuttered businesses nationwide, forcing widespread layoffs and hiring freezes as the economy teetered on the edge of collapse.  Plaintiff – like so many others during this time – found himself facing a historically bleak job market and he desperately needed the job with Smoothstack to be able to better support himself.

33.     Unfortunately for Plaintiff, as detailed above, and more below, the job with Smoothstack came at a steep price.

34.     He started the Unpaid Period of the Training Program and immediately began working extremely long hours, including overtime hours, none of which were paid.  Smoothstack

emphasized "grit" and told its Recruits things along the lines of: "you might have worked hard in college, but the real work starts now."  Plaintiff was concerned about the demands, but he needed the job.

35.    Approximately three weeks after Plaintiff started as a Recruit with Smoothstack, Smoothstack presented him with the Training Agreement to sign.  *See* Exhibit 1.

36.    As discussed above, and more below, the Training Agreement contained a TRAP, which functionally tied Plaintiff to Smoothstack for at least two years of work, or else he would be required to pay $23,895.00, a sum of money he did not have.

37.    Plaintiff immediately recognized the potential consequences that he faced under the TRAP, but Smoothstack presented the Training Agreement as an "all or nothing" offer that Plaintiff was required to accept in order to continue his employment with Smoothstack.

38.    Plaintiff desperately needed the job to be able to support himself and eventually earn a livable wage and, at that point, had worked for Smoothstack for nearly three weeks without any compensation whatsoever.  He felt that he had no choice but to sign the Training Agreement.

39.    Plaintiff executed the Training Agreement on or around April 30, 2020, and continued with Smoothstack's Training Program.

40.    Smoothstack subjected Plaintiff to grueling demands for the next five months, working around the clock on time-consuming assignments, which Smoothstack assigned, was aware of, and required him to do.

41.    Despite the grueling demands, Plaintiff stuck with the Training Program.  In or around October 2020, Smoothstack assigned him to work as a Junior Java Developer with Accenture Federal Service ("Accenture").

42.     In connection with this assignment, Smoothstack gave Plaintiff an Employment Agreement to sign.  *See* Exhibit 2.

43.     As with the Training Agreement, Smoothstack presented the Employment Agreement as an "all-or-nothing" offer that Plaintiff was required to accept in order to continue his employment with Smoothstack.

44.     Plaintiff identified immediately that he *had* to sign – or else he would be in violation of the Training Agreement.  This is because the TRAP in the Training Agreement bound Plaintiff to a Service Commitment Period of 4,000 hours of work *for a Smoothstack client*, which was not possible to perform until after he completed the Training Program.

45.     Accordingly, Plaintiff had no choice but to sign the Employment Agreement or else be required to pay the $23,895 penalty set forth in the Training Agreement.

46.     Worse still, the Employment Agreement contained yet another TRAP, which provided that Plaintiff could not resign or be terminated for cause by Smoothstack before billing 4,000 hours to Smoothstack clients.  Notably, the Service Commitment Period in the Employment Agreement was even more draconian than in the Training Agreement: the 4,000-hour requirement under the Employment Agreement was *billable* hours, whereas the Training Agreement contemplated both billable hours and Bench Status hours.

47.     At the time Smoothstack provided Plaintiff with the Employment Agreement, Smoothstack had not paid him more than the minimum wage for nearly six months.

48.     Without any other alternative, Plaintiff signed the Employment Agreement on or around October 20, 2020.

**Plaintiff's Efforts to Resolve this Action and Smoothstack's Retaliation.**

49.     Plaintiff attempted over months to resolve his disputes with Smoothstack without

resorting to litigation.

50.     At every turn, Smoothstack has rejected Plaintiff's counsel's reasonable, good-faith attempts to negotiate a class-wide settlement, including to toll the statute of limitations for him, the putative Class, and putative Collective Members, and in alarming fashion, ratcheted up the pressure on Plaintiff through inappropriate *ex parte* communications with Plaintiff before ultimately terminating him.

51.     Plaintiff, through counsel, first sent correspondence to Smoothstack in November 2022 alerting it to Smoothstack's wage violations and the TRAP claim and inviting Smoothstack to negotiate a resolution on behalf of Plaintiff and a proposed collective and class.

52.     Ten days later, at the request of Smoothstack's counsel, the parties spoke for the first time on a call, where Plaintiff's counsel proposed a negotiation strategy and, in the interim, requested tolling of the statute of limitations for Plaintiff and the putative class and collective.

53.     Following that call, Defendant's counsel went silent.  Despite Plaintiff's counsel's repeated efforts to reengage Smoothstack's counsel, Smoothstack instead began to take retaliatory actions against Plaintiff.

54.     First, Smoothstack's Chief Operating Officer, Boris Kuiper, contacted Plaintiff out of the blue in late January and, outside of the presence of counsel, asked Plaintiff about his wage claims against the company, including estimates of how much he believed he was owed in unpaid wages and his view of the merits his claims.

55.     Next, in early March, Smoothstack informed Plaintiff that it was removing him from his assignment with Accenture.  Smoothstack placed Plaintiff on Bench Status and reduced his hourly rate from $31.25 per hour to minimum wage.  Under the terms of the Employment Agreement, his working hours did not count toward his 4,000-hour Service Commitment Period,

so he could not consider leaving for a better paying job.

56.     In response to each of these incidents, Plaintiff, through counsel, promptly contacted Smoothstack and expressed concerns that Smoothstack was retaliating against Plaintiff.  Plaintiff also reiterated his interest in discussing settlement on behalf of himself and the proposed Class and Collective, attempting to reengage settlement negotiations.  For weeks, Smoothstack failed to respond at all, and eventually simply refused to discuss a class settlement.

57.     Left with no other option, on April 4, 2023, Plaintiff notified Smoothstack through counsel that he planned to file a class action lawsuit in the coming days.

58.     In what can only be construed as retaliation, just three days later, on April 7, 2023, Smoothstack terminated Plaintiff's employment.

## THE PARTIES

### Plaintiff Justin O'Brien

59.     Plaintiff is an adult individual who is a resident of Fort Collins, Colorado.

60.     Smoothstack hired Plaintiff as a Recruit on or around April 13, 2020.

61.     From approximately April 2020 to October 2020, Plaintiff participated in Smoothstack's Training Program.

62.     Throughout Plaintiff's employment in the Training Program, Plaintiff frequently worked more than 40 hours per week, including the weeks of April 20, 2020 and May 11, 2020.

63.     During the Unpaid Period, Plaintiff worked on average approximately 80 hours per week.

64.     During the Underpaid Period, Plaintiff worked on average approximately 80 hours per week.

65.     Pursuant to Smoothstack's policy and pattern or practice, Smoothstack did not pay Plaintiff any compensation during the Unpaid Period.

66.     Pursuant to Smoothstack's policy and pattern or practice, Smoothstack did not pay Plaintiff overtime premium pay when he worked more than 40 hours in a workweek during the Training Program.

67.     During the Underpaid Period, Plaintiff was paid minimum wage for 40 hours per week.

68.     Plaintiff was paid 40 hours per week during the Underpaid Period regardless of how many hours he actually worked.

69.     Plaintiff is a covered employee within the meaning of the FLSA.

70.     A written consent form signed by Plaintiff is attached hereto as Exhibit 3.

71.     Plaintiff executed the Training Agreement on or around April 30, 2020.

72.     Plaintiff executed the Employment Agreement on or around October 20, 2020.

73.     At the time Smoothstack provided Plaintiff with the Employment Agreement, Smoothstack was paying him the minimum wage for forty hours of work per week even if he worked in excess of 40, and had been doing so for months, since April 2020.

***Defendant Smoothstack***

74.     Smoothstack's principal executive office is located in McLean, Virginia.

75.     Smoothstack is a covered employer within the meaning of the FLSA.

76.     At all times relevant, Smoothstack maintained control, oversight, and direction over Plaintiff and similarly situated employees, including with respect to the compensation, timekeeping, payroll, and other employment practices that applied to them.

77.     Upon information and belief, Smoothstack applies the same employment policies,

practices, and procedures to all Recruits and Consultants, including policies, practices, and procedures with respect to compensation.

78.     At all times relevant, Smoothstack's annual gross volume of sales made or business done was not less than $500,000.

79.     Smoothstack executed a Training Agreement with Plaintiff on April 30, 2020 and an Employment Agreement with Plaintiff on October 20, 2020.

## JURISDICTION AND VENUE

80.     This Court has original subject matter jurisdiction over the FLSA claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

81.     Plaintiff's state law claims are so closely related to his FLSA claim that they form part of the same case or controversy under Article III of the United States Constitution.

82.     This Court has personal jurisdiction over Defendant because Smoothstack does business in this District and because some of the acts complained of and giving rise to the claims alleged occurred in and emanated from this District.

83.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District.

84.     Venue is also proper because the parties contractually agreed to venue in Fairfax County, VA under the Training Agreement and the Employment Agreement, *see* Exhibits 1 and 2, and the Alexandria Division of this District covers Fairfax County.

## FLSA COLLECTIVE ACTION ALLEGATIONS

85.     Plaintiff brings the First, Second, Third, and Fourth Causes of Action, pursuant to the FLSA, 29 U.S.C. § 216(b), on behalf of Plaintiff and similarly situated co-workers

nationwide who participate or participated in Defendant's Training Program and/or signed TRAPs between April 13, 2020, and the present and who elect to opt-in to this action (the "FLSA Collective").

86.     Defendant is liable under the FLSA for, *inter alia*, failing to properly compensate Plaintiff and other putative members of the FLSA Collective ("Collective Members") during the Training Program (comprised of the Unpaid and Underpaid Periods), unlawfully requiring them to kick back their wages, and failing to pay wages free and clear.

87.     Consistent with Defendant's policy and pattern or practice, Plaintiff and Collective Members are not paid a minimum wage for all hours worked during the Training Program.

88.     During the Training Program, Plaintiff and Collective Members are covered employees under the FLSA and entitled to minimum and overtime wages.

89.     Consistent with Defendant's policy and pattern or practice, Plaintiff and Collective Members are not paid an overtime premium when they work beyond 40 hours in a workweek during the Training Program.

90.     All of the work that Plaintiff and Collective Members have performed has been assigned by Defendant and/or Defendant has been or should have been aware of all of the work that Plaintiff and Collective Members have performed.

91.     The TRAP that Defendant requires Plaintiff and Collective Members to sign unlawfully requires them to kick back their earned wages to Defendant for training expenses that are primarily for Defendant's benefit if they leave or are fired for cause.

92.     Defendant's requirement that Plaintiff and Collective Members pay back a portion of their wages to Defendant if they leave or are terminated for cause constitutes a failure to pay

wages "free and clear," in violation of the FLSA.

93.     Instead of paying wages "finally and unconditionally," Defendant pays wages to employees every pay period conditionally, subject to the requirement that they not leave their jobs.

94.     As part of its regular business practice, Defendant has intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to Plaintiff and Collective Members.  This policy and pattern or practice includes, but is not limited to:

> (a)     Willfully failing to pay Plaintiff and Collective Members minimum wage for hours that they worked during the Unpaid Period;
>
> (b)     Willfully failing to pay Plaintiff and Collective Members overtime wages for hours that they worked in excess of 40 hours per workweek during the Unpaid and Underpaid Periods;
>
> (c)     Willfully failing to record all of the time that its employees, including Plaintiff and Collective Members, have worked for the benefit of Defendant;
>
> (d)     Willfully subjecting Plaintiff and Collective Members to unlawful kickbacks on their wages; and
>
> (e)     Willfully failing to pay Plaintiff and Collective Members their wages free and clear.

95.     Defendant is aware or should have been aware that federal law required it to pay Plaintiff and Collective Members minimum wage for regular hours worked and overtime premium for all hours worked in excess of 40 hours per workweek, as well as that it cannot take kickbacks on paid wages and wages must be paid free and clear.

96.     Defendant's unlawful conduct has been widespread, repeated, and consistent.

97.     There are many similarly situated current and former Recruits and Consultants who have been subject to the above violations of the FLSA who would benefit from the issuance of court-supervised notice of this lawsuit and the opportunity to join it.

98.     Similarly situated employees are known to Defendant, are readily identifiable, and can be located through Defendant's records.

99.     Notice should be sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

## NATIONWIDE CLASS ACTION ALLEGATIONS

100.    Plaintiff brings the Fifth and Sixth Causes of Action, contract claims under Virginia law, under Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and a class of persons consisting of:

> All persons nationwide who work or have worked as a Recruit or Consultant for Defendant and signed a TRAP within the statute of limitations (the "Class").

101.    Excluded from the Class are Defendant, Defendant's legal representatives, officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendant; the Judge(s) to whom this case is assigned and any member of the Judge(s)' immediate family; and all persons who will submit timely and otherwise proper requests for exclusion from the Class.

102.    The members of the Class ("Class Members") are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is not known to Plaintiff, the facts on which the calculation of that number can be based are presently within the sole control of Defendant.

103.    Upon information and belief, the size of the Class is at least 40 individuals.

104.    Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

105.    Common questions of law and fact exist as to the Class that predominate over any

questions solely affecting them individually and include, but are not limited to, the following:

> (a)    whether Smoothstack's TRAP in the Training Agreement and the Employment Agreement is unconscionable;

> (b)    whether the TRAP in the Training Agreement and the Employment Agreement is an unenforceable penalty;

> (c)    the proper measure of damages and/or other forms of relief.

106.    The claims of Plaintiff are typical of the claims of the Class he seeks to represent.

107.    Smoothstack's Training Agreement and Employment Agreement have a Virginia choice of law provision. *See* Exhibit 1 at 3; Exhibit 2 at 12.

108.    Plaintiff and Class Members work, or have worked, for Defendant as Recruits or Consultants who signed either a Training Agreement or an Employment Agreement, or both.

109.    Plaintiff and Class Members enjoy the same statutory rights under Virginia law, including freedom from contracts of adhesion. Plaintiff and Class Members have all been injured in that they have entered into a contract containing one-sided terms that functionally ties them to Smoothstack indefinitely because, by way of example, if Defendant is unable to place them with a client, they must choose between minimum wage pay for an undefined period of time or paying the prohibitive penalty to leave the company.

110.    Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff understands that as a class representative, he assumes a fiduciary responsibility to the class to represent its interests fairly and adequately. Plaintiff recognizes that as a class representative, he must represent and consider the interests of the Class just as he would represent and consider his own interests. Plaintiff understands that in decisions regarding the conduct of the litigation and its possible settlement, he must not favor his own interests over the Class. Plaintiff recognizes that any resolution of a class action lawsuit, including any

settlement or dismissal thereof, must be in the best interests of the Class.  Plaintiff understands

that in order to provide adequate representation, he must be informed of developments in the

litigation, cooperate with class counsel by providing them with information and any relevant

documentary material in his possession, and testify at deposition and/or trial.

111.    Plaintiff has retained counsel competent and experienced in complex class actions

and employment litigation.  There is no conflict between Plaintiff and Class Members.

112.    A class action is superior to other available methods for the fair and efficient

adjudication of this litigation.  Class Members have been damaged and are entitled to recovery as

a result of Defendant's violations of Virginia law, as well as their common and uniform policies,

practices, and procedures.  In addition, class litigation is superior because it will obviate the need

for unduly duplicative litigation that might result in inconsistent judgments about Defendant's

practices.

113.    This action is properly maintainable as a class action under Federal Rule of Civil

Procedure 23(b)(3).

## COMMON COLLECTIVE FACTUAL ALLEGATIONS

114.    Plaintiff and Collective Members work or have worked for Defendant as Recruits

and Consultants.

115.    Defendant classifies Plaintiff and Collective Members as hourly non-exempt

workers.

116.    Plaintiff and Collective Members participate or participated in Smoothstack's

Training Program.

117.    Defendant's policy and practice is not to compensate Plaintiff and Collective

Members for any hours during the Unpaid Period, regardless of the number of hours and overtime

hours actually worked.  *See* Exhibit 4 at 1 (stating "Do I get paid for the first three weeks? No, payment will start week 4 (pending acceptance of the Offer Letter and signed Training Agreement).").

118.    Defendant's policy and practice is to compensate Plaintiff and Collective Members for 40 hours per week during the Underpaid Period, regardless of the amount of overtime hours actually worked.  *See* Exhibit 4 at 1 ("Do I get paid for extra work on weekdays/weekends? No. Your hours are capped at 40 hours per week, including weekends.").

119.    In actuality, while Plaintiff's and Collective Members' *pay* is capped at 40 hours of the minimum wage rate of pay per week, their *hours of work* are not capped.  Accordingly, when Plaintiff and Collective Members work more than 40 hours of work, they earn less than the minimum wage and do not earn overtime pay for hours in excess of 40.

120.    During Smoothstack's Training Program – in both the Unpaid Period and Underpaid Period – Plaintiff and Collective Members consistently work more than 40 hours per week.

121.    Specifically, during the Training Program, Smoothstack requires Plaintiff and Collective Members to attend presentations, lectures, and/or training sessions with Smoothstack trainers for approximately one to two hours every weekday, for a total of approximately five to ten hours per week, and occasionally on holidays and the weekend.

122.    The subject matter of the Training Program includes IT training, programming, and other technology skills.

123.    As part of the Training Program, Smoothstack assigns challenging and time-consuming assignments to Plaintiff and Collective Members, which take many hours to complete. When not attending presentations, lectures, and/or training sessions with Smoothstack trainers,

Recruits are working around the clock to complete these assignments.  Recruits also meet with Smoothstack trainers 1:1 to discuss their completed assignments and progress during the Training Period.

124.    The assignments are typically writing code for a variety of different software programs.  The assignments increase in size and complexity as the Training Program progresses, beginning with creating simple webpage interfaces with limited functionality or writing code for small programs and data bases using different programming languages, and then scaling up to more complicated, interactive programs and webpage interfaces, with both front-end and back-end capabilities.

125.    At the start of the Training Program, Smoothstack frequently sets quick turnaround deadlines for assignments, sometimes within 24 hours.  Upon information and belief, the submission deadlines are often at or around 12:00 a.m. so that Plaintiff and Collective Members can spend as much time as possible completing the assignments.

126.    Smoothstack also gives Plaintiff and Collective Members assignments that they are required to complete over the weekend.  At the beginning of the week, Plaintiff and Collective members often meet with Smoothstack trainers to discuss their weekend assignments.

127.    By the end of the Training Program, Smoothstack's required assignments become so complex that Plaintiff and Collective Members are given several days or weeks to complete the assignments.  They are required to give presentations on their completed assignments in front of their cohort of Recruits and trainers.  Plaintiff and Collective Members are still assigned and expected to complete additional short-term assignments concurrently with the larger assignments.

128.    Upon information and belief, Recruits do not obtain any credential, license, or degree upon completion of Smoothstack's Training Program.

129.    Smoothstack's Training Program curriculum is tailored to meet the needs of Smoothstack's corporate clients.

130.    The specific techniques and skills covered during the Training Program are informed by what skill sets are highly in-demand within the industries Smoothstack's corporate clients served.

131.    Smoothstack markets the techniques and skills covered during the Training Program to its clients in order to secure placements for Recruits with one of their clients.

132.    Smoothstack creates and revises Recruits' resumes prior to sending to Smoothstack's clients and, on information and belief, Smoothstack revises Recruits' resumes to present Smoothstack's training curriculum in a favorable light.

133.    Additionally, upon information and belief, when drafting and revising Recruits' resumes to send to clients, Smoothstack often markets and advertises its Recruits as being trained on and possessing skills that are not covered during the Training Program.

134.    Upon information and belief, Smoothstack designed its Training Program as an accelerated program in order to churn out Recruits as quickly as possible and to secure placements with its clients, which generates revenue for Smoothstack.

135.    As a result, Smoothstack does not prepare and equip Recruits with a strong foundation and mastery of the skills and techniques covered during the Training Program.

136.    Recruits are also frequently unable to complete their assignments using only the techniques and skills covered during the Training Program.

137.    Instead, Recruits rely heavily on external sources, such as Google, to complete their assignments.  Recruits' overreliance on external sources – more than is typical in the IT field – as

well as a trial-and-error approach to completing assignments, is a substitute for Smoothstack actually training them on the fundamentals of the skills they needed to develop.

138.    On information and belief, Smoothstack knew or should have known that Recruits are not trained on the techniques required to complete these assignments.

139.    Defendant is aware that Plaintiff and Collective Members worked more than 40 hours per workweek, yet Defendant has failed to pay them an overtime premium for any of the hours worked over 40 in a workweek.

140.    Throughout the Training Program, Plaintiff and Collective Members are expected to work the same general schedule from week to week, including attending all presentations, lectures, and/or training sessions with Smoothstack trainers, and working around the clock to complete assignments.

141.    Throughout the Training Program, the schedule of Plaintiff and Collective Members does not vary significantly from week to week.

142.    Defendant does not keep accurate records of hours worked by Plaintiff or Collective Members.

143.    That is, although Plaintiff and Collective Members routinely work more than 40 hours, Defendant does not record those hours.

144.    Due to Smoothstack's TRAP, Plaintiff and Collective Members are required to kick back wages to Smoothstack if they resign before completing the "Service Commitment Period," bringing Plaintiff and Collective Members' pay into the negative.

145.    The TRAP provides that the penalty for leaving is intended to compensate Smoothstack for the costs of training, as well as "marketing[] and on-boarding," the "cost to train replacements, the cost associated with interruption of work on a project, loss of goodwill, and

potentially, loss of income generating projects." *See* Exhibit 2 at 11; *see also* Exhibit 1 at 2.

146.    These expenses are primarily for the benefit of the employer, and FLSA prohibits the employer from charging employees for them.

147.    The effect of the TRAP is that every paycheck Plaintiffs and Collective Members receive is conditional on their remaining employed with the company through the following pay period.  This failure to pay wages free and clear violates the FLSA.

## COMMON CLASS FACTUAL ALLEGATIONS

148.    Smoothstack requires Recruits to sign a Training Agreement, *see* Exhibit 1, shortly after hire and, upon completion of the Training Program and placement with a Smoothstack client, requires Consultants to sign an Employment Agreement, *see* Exhibit 2.

149.    Both the Training Agreement and the Employment Agreement contain TRAPs.

150.    Upon information and belief, all Recruits and Consultants are subject to Smoothstack's TRAPs.

151.    Upon information and belief, the Training Agreement requires Recruits to perform the "Service Commitment Terms" for the duration of the "Service Commitment Period."  Exhibit 1 at 1.

152.    Upon information and belief, under the Service Commitment Terms, Smoothstack requires Recruits to "put forth a good faith effort to perform during the entire duration of the Service Commitment Period all duties as required by [Smoothstack]."  Exhibit 1 at 1.

153.    The Service Commitment Period is 4,000 hours of work – approximately two years – from the date of the Recruit's first assignment with a Smoothstack client.

154.    The plain language of the Training Agreement does not require that the hours towards the Service Commitment Period be "billable" hours to a client.

155.    If the Recruit resigns for any reason, fails to fulfill the Service Commitment Terms, or Smoothstack terminates them for cause, the TRAP in the Training Agreement requires the Recruit to pay $23,895 in "liquidated damages" to Smoothstack.  Exhibit 1 at 2.

156.    Upon information and belief, Smoothstack presents the Training Agreement as an "all or nothing" offer that Recruits are required to accept in order to continue their employment with Smoothstack.

157.    Generally, the Training Agreements are presented to Recruits approximately three weeks after they have started working at Smoothstack, a period during which Smoothstack does not pay Recruits *any* compensation.

158.    When Smoothstack places a Consultant with a client for an assignment, Smoothstack presents the Consultant with an Employment Agreement to sign.  *See* Exhibit 2.

159.    The Employment Agreement contains another TRAP, which provides that Consultants cannot resign or be terminated for cause by Smoothstack before billing 4,000 hours to Smoothstack clients.

160.    Notably, the Service Commitment Period in the Employment Agreement is even more draconian than in the Training Agreement; the 4,000-hour requirement under the Employment Agreement is *billable* hours, whereas the Training Agreement simply contemplates hours of work, which could include Bench Status hours.

161.    Upon information and belief, Smoothstack presents the Employment Agreement as an "all-or-nothing" offer that Consultants are required to accept in order to continue their employment with Smoothstack and earn more than minimum wage on an assignment with one of Smoothstack's clients.

162.    Consultants have no choice but to sign the Employment Agreement because they have already agreed to Smoothstack's TRAP in the Training Agreement.

163.    Specifically, the TRAP in the Training Agreement cannot be performed until after the Training Program is complete, at which point the Consultant can begin counting hours towards the 4,000 Service Commitment Period.  In fact, if Consultants refuse to sign the Employment Agreement, they would be in violation of the Training Agreement and forced to pay the $23,895 penalty in the Training Agreement.

164.    The Training Agreement and Employment Agreement are standard-form agreements.

165.    Upon information and belief, Smoothstack created the Training Agreement and Employment Agreement with the assistance of sophisticated counsel.

166.    Plaintiff and Class Members are in a significantly weaker bargaining position compared to Smoothstack with respect to the Training Agreement and the Employment Agreement.

167.    The liquidated damages amount under the Training Agreement and Employment Agreement is a sum equal to multiple times the amount Smoothstack pays a given Recruit during the Training Period.

168.    For example, if Smoothstack paid Consultants the federal minimum wage of $7.25 per hour in 2020 when Plaintiff was a Consultant, for 40 hours a week, for 15 weeks, that amounts to $4,350.00, which covers less than one fifth of what a Consultant would be forced to pay if Smoothstack enforced the liquidated damages penalty.

169.    Upon information and belief, neither Plaintiff nor any Class Member could modify or change any of the terms in the Training Agreement or Employment Agreement prior to signing.

170.    The Employment Agreement provides that the "resources, time, and expenses" associated with "training, marketing, and on-boarding the Employee" have the "collective value of $23,875." Exhibit 2 at 9.

171.    In a later provision, the Employment Agreement provides that the $23,875.00 "liquidated damages" payment, due in the event of breach, is intended to cover damages including "the cost to train replacements, the cost associated with interruption of work on a project, loss of goodwill, and, potentially, loss of income generating projects." Exhibit 2 at 11.

172.    These costs are primarily for the benefit of the employer.

173.    The Training Agreement provides that "the cost incurred by the Company in providing the Training to [a Recruit] is approximately $23,895." Exhibit 1 at 1.

174.    The "liquidated damages" provision under the Training Agreement provides that the $23,895.00 payment, due in the event of breach, is for "any and all training costs" incurred by Smoothstack and is "necessary and reasonable for the Company's protection." Exhibit 1 at 2.

175.    Upon information and belief, the liquidated damages amounts are far in excess of Smoothstack's actual damages incurred in the event a Recruit or Consultant resigns or is terminated for cause by Smoothstack prior to the expiration of the Service Commitment Period.

176.    With respect to the cost of training, Plaintiff and Class Members attend or attended training sessions led by instructors for approximately five to ten hours per week.

177.    These training sessions are group sessions, with multiple Recruits attending the same session at the same time.

178.    Upon information and belief, since Spring 2020, all of these sessions have been conducted virtually by a live instructor.

179.     Upon information and belief, Smoothstack's Training Program does not vary significantly from program cohort to program cohort.

180.     The vast majority of the time Plaintiff and the Class spent during the Training Program was on complex, time-consuming programming assignments required by Smoothstack, which cost nothing to Smoothstack.

181.     Plaintiff and the Class use their own personal laptops and cellphones during the Training Period.

182.     Upon information and belief, the actual cost of training to Smoothstack is far lower than the amount of the liquidated damages provision.

183.     Smoothstack recruited and sold Recruits and Consultants the false hope that they would receive high-quality training and a prestigious job with a Fortune 500 company upon completion of the Training Program.  Smoothstack's deceptive advertising falsely indicated the Plaintiff and Collective Members would receive proper compensation and benefits.

## <u>PLAINTIFF O'BRIEN'S INDIVIDUAL RETALIATION ALLEGATIONS</u>

184.     Upon completion of the Training Program, on or around October 20, 2020, Smoothstack placed Plaintiff with Accenture to work as a Junior Java Developer.

185.     Plaintiff began working as a Junior Java Developer with Accenture on or around October 29, 2020.

186.     Between approximately October 29, 2020 to January, 9, 2022, Smoothstack paid Plaintiff $26.44 per hour for Plaintiff's work for Accenture, well below average market wage rate of $46.46 for computer programmers.[6]

---

[6]      *Occupational Employment and Wages, May 2021 – 15-1251 Computer Programmers*, Bureau of Lab. Stats., https://www.bls.gov/oes/current/oes151251.htm (last updated Mar. 31, 2022).

187.    From January 10, 2022 to March 23, 2023, Smoothstack paid Plaintiff $31.25 per hour for Plaintiff's work for Accenture.

188.    Plaintiff performed his job duties for Accenture satisfactorily.

189.    Accenture provided positive feedback regarding Plaintiff's job performance.  On one occasion, Plaintiff's manager at Accenture told him during a check-in call that he was performing excellent work.

190.    In fact, within just a few months, Accenture recognized Plaintiff's excellent technical capabilities and began treating him as a senior developer and assigning him to work on teams with the express instruction to assist other developers with their work.

191.    Neither Smoothstack nor Accenture disciplined or reprimanded Plaintiff for performance issues or any other reason at any point during his employment with Smoothstack or his assignment with Accenture.

192.    On November 14, 2022, through counsel, Plaintiff sent correspondence to Smoothstack alerting it to Smoothstack's wage violations and the TRAP claim and inviting Smoothstack to negotiate a resolution on behalf of Plaintiff and a proposed collective and class. Plaintiff requested a response from Smoothstack by December 5, 2022.

193.    Ten days later, on December 15, 2022, counsel for Smoothstack contacted Plaintiff's counsel and notified them that he represented Smoothstack and requested a call.

194.    After that call, Smoothstack went silent.  On January 11, 2023, through counsel, Plaintiff contacted Smoothstack and requested a response regarding Plaintiff's claims. Smoothstack did not respond.

195.    On January 24, 2023, through counsel, Plaintiff contacted Smoothstack again and requested a response.  Smoothstack did not respond.

196.     On January 30, 2023, Smoothstack's Chief Operating Officer, Boris Kuiper, contacted Plaintiff out of the blue in late January and, outside of the presence of counsel, asked Plaintiff about his wage claims against the company, including estimates of how much he believed he was owed in unpaid wages and his view of the merits his claims.

197.     Before this conversation, Plaintiff had never spoken with Mr. Kuiper before.

198.     Before this conversation, Plaintiff had never directly interacted with Mr. Kuiper in any aspect of his training or work with Smoothstack.

199.     It is unusual that a C-Suite Executive for Smoothstack would contact a Recruit or Consultant to discuss hours worked or compensation.

200.     Upon information and belief, Mr. Kuiper's *ex parte* phone call to Plaintiff was an attempt by Smoothstack to intimidate and harass Plaintiff for complaining about his unpaid wages and/or to pressure Plaintiff to conceding facts relating to his claim, such as the amount he is entitled to in damages.

201.     On January 31, 2023, through counsel, Plaintiff contacted Smoothstack to discuss Mr. Kuiper's *ex parte* phone call to Plaintiff.  Counsel for both parties spoke by phone on February 1, 2023.

202.     During that phone call, the parties discussed Mr. Kuiper's *ex parte* phone call and Plaintiff's concerns regarding retaliation.  Plaintiff again requested a response from Smoothstack regarding his claims.

203.     On February 17, 2023, Plaintiff, through counsel, contacted Smoothstack yet again, requesting a response on his claims, and provided information regarding Smoothstack's litigation and liability exposure.  Smoothstack did not respond.

204.     Instead, on March 6, 2023, Smoothstack informed Plaintiff that he was being

- 29 -

removed from his assignment with Accenture.

205.    The effect of Smoothstack's removal of Plaintiff from his assignment was that Smoothstack converted Plaintiff to Bench Status, which meant that Plaintiff no longer had an assignment with a Smoothstack client.

206.    On Bench Status, Smoothstack no longer paid Plaintiff the hourly rate he earned while working for Accenture, which was $31.25 per hour, and instead Smoothstack decreased his pay to the minimum wage.

207.    In March and April 2023, the Colorado minimum wage was $13.65.

208.    On Bench Status, Plaintiff could not bill hours towards his 4,000-hour Service Commitment Period because, under the terms of the Employment Agreement, Plaintiff was not billing a Smoothstack client for an assignment.

209.    Despite the fact that Smoothstack was only paying Plaintiff minimum wage – and made no guarantee that it would secure another assignment for Plaintiff with another client – Plaintiff could not resign to look for a better paying job because of Smoothstack's TRAP.

210.    Upon information and belief, Smoothstack removed Plaintiff from the Accenture assignment – decreasing his pay and converting him to Bench Status indefinitely – because he complained to Smoothstack regarding his unpaid wages.

211.    On March 7, 2023, through counsel, Plaintiff again contacted Smoothstack raising concerns that it was retaliating against Plaintiff by removing him from the Accenture assignment. Plaintiff also requested a response from Smoothstack on his demand letter, which, at this point, had been sent nearly four months prior and Smoothstack had not provided any substantive response.

212.    Plaintiff's last day on the Accenture assignment was on or around March 23,

2023, at which point he began a period of Bench Status with Smoothstack.

213.    Despite Plaintiff's repeated appeals – for months – Smoothstack rejected all attempts to negotiate a class-wide settlement, including to toll the statute of limitations for him, the Class, and putative Collective Members.

214.    Left with no other option, on April 4, 2023, Plaintiff notified Smoothstack through counsel that he planned to file a class action lawsuit in the coming days.

215.    Just three days later, on April 7, 2023, Smoothstack terminated Plaintiff's employment.

216.    Upon information and belief, Smoothstack terminated Plaintiff's employment because he complained to Smoothstack regarding his unpaid wages.

## FIRST CAUSE OF ACTION
### Fair Labor Standards Act: Minimum Wages
### (Brought on behalf of Plaintiff and the FLSA Collective)

217.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

218.    Defendant has engaged in a widespread pattern and practice of violating the FLSA, as described in this Complaint.

219.    At all relevant times, Plaintiff and other similarly situated current and former employees were engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

220.    At all relevant times, Defendant employed Plaintiff and the FLSA Collective.

221.    The minimum wage provisions set forth in 29 U.S.C. § 201 *et seq.* of the FLSA apply to Defendant.

222.    At all relevant times, Defendant has been an employer engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

223.    At all relevant times, Plaintiff and the FLSA Collective were employees within the meaning of 29 U.S.C. §§ 203(e) and 207(a).

224.    Defendant failed to pay Plaintiff and the FLSA Collective the minimum wages to which they are entitled under the FLSA.

225.    Defendant's violations of the FLSA have been willful and intentional.  Defendant failed to make a good faith effort to comply with the FLSA with respect to its compensation of Plaintiff and other similarly situated current and former employees.

226.    Because Defendant's violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

227.    As a result of Defendant's willful violations of the FLSA, Plaintiff and all other similarly situated employees have suffered damages by being denied minimum wages in accordance with 29 U.S.C. §§ 201 *et seq.*

228.    As a result of the unlawful acts of Defendant, Plaintiff and other similarly situated current and former employees have been deprived of minimum wage compensation and in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs and other compensation pursuant to 29 U.S.C. § 216(b).

### SECOND CAUSE OF ACTION
**Fair Labor Standards Act: Overtime Wages**
**(Brought on behalf of Plaintiff and the FLSA Collective)**

229.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

230.     Defendant has engaged in a widespread pattern and practice of violating the FLSA, as described in this Complaint.

231.     At all relevant times, Plaintiff and other similarly situated current and former employees were engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

232.     At all relevant times, Defendant employed Plaintiff and the FLSA Collective.

233.     The overtime wage provisions set forth in 29 U.S.C. §§ 201 *et seq.* of the FLSA apply to Defendant.

234.     At all relevant times, Defendant has been an employer engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

235.     At all relevant times, Plaintiff and the FLSA Collective were employees within the meaning of 29 U.S.C. §§ 203(e) and 207(a).

236.     Defendant failed to pay Plaintiff and the FLSA Collective the overtime wages to which they are entitled under the FLSA.

237.     Plaintiff and other similarly situated current and former employees do not qualify for any FLSA exemption because they are not paid on a salary basis, are paid less than the threshold to qualify for an exemption, 29 U.S.C. § 213(a)(17), and do not perform exempt job duties.

- 33 -

238.     Defendant's violations of the FLSA have been willful and intentional.  Defendant failed to make a good faith effort to comply with the FLSA with respect to its compensation of Plaintiff and other similarly situated current and former employees.

239.     Because Defendant's violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

240.     As a result of Defendant's willful violations of the FLSA, Plaintiff and all other similarly situated employees have suffered damages by being denied overtime wages in accordance with 29 U.S.C. §§ 201 *et seq.*

241.     As a result of the unlawful acts of Defendant, Plaintiff and other similarly situated current and former employees have been deprived of overtime compensation and other wages in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs and other compensation pursuant to 29 U.S.C. § 216(b).

### THIRD CAUSE OF ACTION
### Fair Labor Standards Act: Illegal Kickback
### (Brought on behalf of Plaintiff and the FLSA Collective)

242.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

243.     Defendant has engaged in a widespread pattern and practice of violating the FLSA, as described in this Complaint.

244.     At all relevant times, Plaintiff and other similarly situated current and former employees were engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

245.     At all relevant times, Defendant employed Plaintiff and the FLSA Collective.

246.    The overtime wage provisions set forth in §§ 201 *et seq.* of the FLSA apply to Defendant.

247.    At all relevant times, Defendant has been an employer engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

248.    At all relevant times, Plaintiff and the FLSA Collective were employees within the meaning of 29 U.S.C. §§ 203(e) and 207(a).

249.    Repayment of alleged costs under the TRAP that Defendant has imposed on Plaintiff and the FLSA Collective, including costs of training employees, training replacements, marketing and on-boarding employees, the costs of interruption of work on a project, loss of goodwill, and loss of income-generating projects, is an illegal kickback of wages to Defendant, because these costs are primarily for Defendant's benefit.

250.    Kicking back these costs to Defendant takes employees' wages below minimum wage, resulting in a minimum wage violation.

251.    Plaintiff and the FLSA Collective were not paid at least the minimum wage for all hours worked, because they were required to kick back those wages to Defendant under the TRAP.

252.    Defendant's violations of the FLSA have been willful and intentional.  Defendant failed to make a good faith effort to comply with the FLSA with respect to its compensation of Plaintiff and other similarly situated current and former employees.

253.    Because Defendant's violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

- 35 -

254.    Plaintiff and the FLSA Collective are entitled to recover unpaid minimum wages plus an additional equal amount in liquidated damages and declaratory relief that the purported costs of the debt are not reimbursable pursuant to the FLSA, costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

## FOURTH CAUSE OF ACTION
### Fair Labor Standards Act: Failure To Pay Wages Free and Clear
### (Brought on behalf of Plaintiff and the FLSA Collective)

255.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

256.    Defendant has engaged in a widespread pattern and practice of violating the FLSA, as described in this Complaint.

257.    At all relevant times, Plaintiff and other similarly situated current and former employees were engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

258.    At all relevant times, Defendant employed Plaintiff and the FLSA Collective.

259.    The overtime wage provisions set forth in §§ 201 *et seq.* of the FLSA apply to Defendant.

260.    At all relevant times, Defendant has been an employer engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

261.    At all relevant times, Plaintiff and the FLSA Collective were employees within the meaning of 29 U.S.C. §§ 203(e) and 207(a).

262.     Defendant violated 29 U.S.C. § 206 by unlawfully requiring Plaintiff and the FLSA Collective to repay their earned and taxed wages to Defendant once their employment with Defendant ended (including under some circumstances if Defendant chose to fire them).

263.     Rather than paying Plaintiff and the FLSA Collective their wages "free and clear," Defendant maintained and enforced a policy under which the wages paid to employees during every pay period were paid conditionally, subject to the requirement that they not leave their jobs.  If they did leave their jobs, they would have to repay all of the wages earned during the pending pay period, plus tens of thousands of additional dollars.

264.     By requiring Plaintiff and other similarly situated employees to return their wages to Defendant if they left their jobs, Defendant failed to pay wages "finally and unconditionally," as required by the FLSA.

265.     Because Defendant failed to pay wages "finally and unconditionally," Defendant cannot be deemed to have met the wage requirements of the FLSA, which includes the requirement to pay no less than the federal minimum wage for each hour worked free and clear.

266.     Defendant's violations of the FLSA have been willful and intentional.  Defendant failed to make a good faith effort to comply with the FLSA with respect to its compensation of Plaintiff and other similarly situated current and former employees.

267.     Because Defendant's violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

268.     Plaintiff and others similarly situated are entitled to recover all unpaid minimum wages plus an additional equal amount in liquidated damages, costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

**FIFTH CAUSE OF ACTION**
**Virginia Common Law: Unconscionable Contract Provision**
**(Brought on Behalf of Plaintiff and the Class)**

269.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

270.    A contract provision is unconscionable when it reflects an inequitable and unconscionable bargain sufficient to shock the conscience.

271.    Contracts of adhesion, specifically, are unconscionable and therefore invalid under Virginia law if they contain one-sided terms that put an unfair obligation on the party in a weaker bargaining position.

272.    Smoothstack's TRAP is an unconscionable contract provision.

273.    The inequality created by Smoothstack's TRAP provision is so gross as to shock the conscience.

274.    Plaintiff and the Class have been harmed by this unlawful penalty, as set forth above.  They seek a declaration that the TRAP is unconscionable and void, injunctive relief, costs and necessary attorney's fees, and all other relief available under Virginia law.

**SIXTH CAUSE OF ACTION**
**Virginia Common Law: Unenforceable Contract Provision**
**(Brought on Behalf of Plaintiff and the Class)**

275.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

276.    Liquidated damages clauses constitute unenforceable penalties when they fail to meet either of the following requirements: (1) the damages resulting from the breach are susceptible to definite measurement; or (2) the stipulated damages are in excess of the actual damages suffered by the nonbreaching party.

277.     Smoothstack's TRAP is an unenforceable penalty.  The harm caused by Recruits and Consultants who leave Smoothstack before fulfilling the 4,000-hour Service Commitment Period is susceptible to definite measurement.

278.     Further, the amount of liquidated damages in the TRAP is in excess of the actual damages suffered by Smoothstack.

279.     Plaintiff and the Class have been harmed by this unlawful penalty, as set forth above.  They seek a declaration that the TRAP is unlawful and unenforceable against them, an award equal to actual damages sustained (including but not limited to the monies that the Class has paid to Smoothstack under the TRAP, or to any collections agency on Smoothstack's behalf), injunctive relief, costs and necessary attorney's fees, and all other relief available under Virginia law.

### SEVENTH CAUSE OF ACTION
**Fair Labor Standards Act - Retaliation**
**(Brought on Behalf of Plaintiff Individually)**

280.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

281.     The FLSA, 29 U.S.C. § 215(a)(3), prohibits retaliation against employees who complain about an employer's wage practices.

282.     Plaintiff complained to Defendant about his and putative Collective Members' unpaid minimum and overtime wages.

283.     After and as a result of Plaintiff's complaints, on or around March 24, 2023, Defendant retaliated against him by removing him from his contract with Accenture and reducing his wages from $31.25 per hour to minimum wage.

284.    After and as a result of Plaintiff's complaints, on or around April 7, 2023, Defendant retaliated against him by terminating his employment.

285.    Defendant's retaliatory conduct was in direct violation of 29 U.S.C. § 215(a)(3) and, as a direct result, Plaintiff has been damaged.

286.    Plaintiff is entitled to compensatory and punitive damages under the FLSA, 29 U.S.C. § 215(a)(3) against Smoothstack for its unlawful retaliatory discharge, declaratory relief that Defendant's conduct violated the FLSA, costs of suit, and reasonable attorneys' fees under the FLSA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all other similarly situated persons, seeks the following relief:

A.    Conditional Certification of this collective action pursuant to 29 U.S.C. § 216(b) of the FLSA and that, at the earliest possible time, Plaintiff be allowed to give notice of this collective action, or that the Court issue such notice, to all Recruits and Consultants and similarly situated employees who are presently, or have at any time since April 13, 2020, up through and including the date of this Court's issuance of court-supervised notice, worked for Smoothstack. Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied proper wages;

B.    Unpaid minimum wages and an additional and equal amount as liquidated damages pursuant to the FLSA and the supporting United States Department of Labor regulations;

C.    Unpaid overtime pay and an additional and equal amount as liquidated damages pursuant to the FLSA and the supporting United States Department of Labor regulations;

D.      Certification of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

E.      Designation of Plaintiff as a Class Representative for the Class and counsel of record as Class Counsel;

F.      Issuance of a declaratory judgment that the practices complained of in Counts I through IV, and VII of this Complaint are unlawful;

G.      Issuance of a declaratory judgment that the provision complained of in Counts V and VI of this Complaint is void, or in the alternative, unenforceable;

H.      Award Plaintiff backpay, damages and equitable relief, including restitution, reinstatement, and disgorgement, in an amount subject to proof at trial;

I.      Pre-judgment interest and post-judgment interest;

J.      Appropriate equitable and injunctive relief to remedy violations, including preliminarily and permanently enjoining Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them from engaging in the unlawful practices set forth in this Complaint;

K.      A reasonable service award for Plaintiff to compensate him for the time and effort he has spent and will spend protecting the interests of putative Class and Collective Members, and the risks he is undertaking;

L.      Reasonable attorneys' fees and costs of the action; and

M.      Such other relief as this Court shall deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 13, 2023

Respectfully submitted,

By: _____
    Molly Elkin

Molly Elkin (Va. Bar No. 40967)
Rachel Lerner*
**McGillivary, Steele, & Elkin LLP**
1101 Vermont Ave NW, Suite 1000
Washington, D.C. 20005
Phone: (202) 833-8855
Email: mae@mselaborlaw.com
Email: rbl@mselaborlaw.com

Rachel W. Dempsey*
David Seligman*
**Towards Justice**
PO Box 371680, PMB 44465
Denver, CO 80237
Telephone: (720) 441-2236
Email: rachel@towardsjustice.org
Email: david@towardsjustice.org

Jahan C. Sagafi*
**Outten & Golden LLP**
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8837
Email: jsagafi@outtengolden.com

Hannah Cole-Chu*
Courtney J. Hinkle*
**Outten & Golden LLP**
1225 New York Ave, NW Suite 1200B
Washington, D.C. 20005
Telephone: (202) 915-5810
Email: hcolechu@outtengolden.com
Email: chinkle@outtengolden.com

Persis Yu**
Khandice Lofton***
**Student Borrower Protection Center**
(a fiscally sponsored project of the Shared
Ascent Fund)

1025 Connecticut Ave NW, #717
Washington, D.C. 20036
Telephone: (202) 670-3871
Email: persis@protectborrowers.org
Email: khandice@protectborrowers.org

*Pro hac vice* application forthcoming

** *Pro hac vice* application forthcoming. Not yet admitted to the Bar of the District of Columbia, but admitted to practice law in Massachusetts and New York. Practice limited to federal court matters.

*** *Pro hac vice* application forthcoming. Not admitted to the Bar of the District of Columbia, but admitted to practice law in Ohio and West Virginia. Practice limited to federal court matters.

*Attorneys for Plaintiff, the Putative FLSA Collective, and the Putative Class*