**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| JUSTIN O'BRIEN and SKYLAR REED, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | **SECOND AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT** |
| v. | **Jury Trial Demanded** |
| SMOOTHSTACK, INC., | **Civil Action No. 1-23-cv-00491** |
| Defendant. | |

Plaintiffs Justin O'Brien and Skylar Reed ("Plaintiffs"), individually and on behalf of all others similarly situated, by their attorneys, upon personal knowledge as to themselves, and upon information and belief as to other matters, allege as follows:

### NATURE OF THE ACTION

1.    Defendant Smoothstack Inc. ("Smoothstack" or "Defendant") is an employee-staffing agency based in McLean, Virginia, that recruits aspiring information technology ("IT") professionals at the beginning of their career ("Recruits") with promises to help them launch their careers with paid training and work assignments with one of their clients, a Fortune 500 firm.[1]

2.    Instead, Recruits are subject to training that is unpaid or underpaid and tailored narrowly towards Smoothstack's own needs.  And soon after they start the training, Recruits are trapped: pursuant to Smoothstack's Training Repayment Agreement Provision ("TRAP"), leaving the training before it is over subjects Recruits to a crushing penalty upwards of $29,000.

3.    Once the training is completed, Recruits become consultants ("Consultants") and

---

[1]    *About*, Smoothstack, https://smoothstack.com/about/ (last visited May 2, 2024).

Smoothstack assigns them to work with Smoothstack clients.  On assignment, Consultants earn wages that are approximately half of the market rate for their work.  But yet again, Smoothstack ensures that its workers cannot leave to find a better-paying job.  Like Recruits, Consultants are subject to the TRAP that requires them to pay upwards of $29,000 if they resign before completing a mandatory billable hour requirement.  If Smoothstack removes them from their assignment for any reason, or Smoothstack is unable to place them with a client, Consultants are left to wait indefinitely for a new assignment while earning minimum wage.  This lawsuit seeks, first, on behalf of a putative class, to invalidate the unlawful, unconscionable and unenforceable TRAP that Smoothstack requires its employees – all low-wage tech workers – to sign, and to recover damages for the harms that result from its use.

4.      Second, on behalf of a collective, this lawsuit seeks unpaid wages and damages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*, for minimum wages, overtime wages, and violation of the FLSA's requirement that employers pay their workers' wages "free and clear" and not subject to kickbacks of earned and paid wages to pay for the employers' costs of doing business.

5.      Third, this lawsuit seeks compensatory and punitive damages under the FLSA, 29 U.S.C. § 215(a)(3) against Smoothstack for its unlawful retaliatory discharge of Plaintiff O'Brien following his protected action of complaining about the Smoothstack's unlawful wage scheme.

6.      Fourth, this lawsuit seeks unpaid wages and damages under the FLSA, 29 U.S.C. § 201 *et seq*, for Smoothstack's failure to pay Plaintiff Reed and other similarly situated current and former employees who worked over 40 hours per week at a rate of 1.5x their "regular rate" of pay for each hour over 40, for the period Consultants spent working with Smoothstack clients ("Assignment Period").

7.      Fifth, on behalf of a putative class, this lawsuit seeks statutory damages under the Virginia Consumer Protection Act ("VCPA"), Va. Code  Ann. § 59.1-196 *et seq*, against Smoothstack for unlawfully using liquidated damages and penalty clauses in its TRAPs and for attempting to collect on unenforceable TRAPs in connection with its training program.

8.      Sixth, on behalf of a putative class, this lawsuit seeks statutory damages under the Virginia Consumer Protection Act ("VCPA"), Va. Code  Ann. § 59.1-196 et seq, against Smoothstack for unlawfully making false promises and misrepresentations in connection with its training program.

**Smoothstack's Training Program.**

9.      Smoothstack's website advertises that its "immersive training program kick starts IT careers and delivers a singular source of IT talent" and that it can help "young, ambitious software engineers" get "formal experience, mentors, and access to top employers."[2]

10.     At the start of employment, Smoothstack requires Recruits to undergo an "intensive" training program lasting as much as six months ("Training Program") covering programming and other IT skills.

11.     During the Training Program, Recruits are required to attend presentations, lectures, and/or training sessions with Smoothstack trainers every weekday.  Outside of these sessions, Smoothstack assigns the Recruits challenging and time-consuming assignments, which take many hours to complete.  Smoothstack requires Recruits to complete these assignments on short deadlines, some with next-day turnaround and others which must be completed over the weekend.

12.     Although Smoothstack claims to offer pay and full benefits during the Training

---

[2]      Smoothstack, https://smoothstack.com (last visited May 16, 2024).

Program on its website,[3] it does not, in fact, pay its Recruits *any* compensation for the first two to three weeks of the Training Program ("Unpaid Period").  Still, Recruits work very demanding hours, up to and beyond 40 hours in a workweek.

13.     For the remaining months of the Training Program (the "Underpaid Period"), Recruits continue to work very demanding hours, up to and beyond 40 hours in a week. However, Smoothstack only pays Recruits for a maximum of 40 hours per week, even if they actually work many more hours, which they typically do.  During the Underpaid Period, Smoothstack pays Recruits the prevailing minimum wage in the state where they work.

14.     Smoothstack boasts that its Training Program has just an 8% completion rate on its website to its clients, as if that number is competitive because of high-quality training.[4]  In reality, Recruits are overworked and underpaid for a subpar Training Program.

15.     During the Unpaid Period, Smoothstack violates the FLSA by failing to pay Recruits any compensation for the work they perform.  During the Underpaid Period, Smoothstack violates the FLSA by failing to pay Recruits for any of the hours worked in excess of 40 in a workweek, which must be paid at a premium overtime rate of 1.5 times their hourly rate.

16.     Once a Recruit completes the Training Program and becomes a Consultant, they are available to take assignments with Smoothstack's clients in any of a variety of roles, such as software engineer, cybersecurity analyst, development operations engineer, or the like.

17.     According to its website, Smoothstack deploys Consultants to work on assignments with Smoothstack's clients that are Fortune 500 companies, in order to "launch" the

---

[3]     *About*, Smoothstack, https://smoothstack.com/about/ (last visited May 2, 2024).
[4]     *Clients*, Smoothstack, https://smoothstack.com/clients/ (last visited May 2, 2024).

Recruit's career.[5]  Among the companies, it lists: Accenture, Capital One, Morgan Stanley, Bloomberg, Johnson & Johnson, and Verizon.[6]

18.     Smoothstack controls when and whether to assign a Consultant to a particular client, including creating resumes for Consultants, marketing Consultants to clients, and arranging interviews.

19.     Once on assignment with a Smoothstack client, Consultants earn approximately $26.00 to $31.00 per hour.  When waiting for assignments, Consultants earn minimum wage and are not allowed to quit Smoothstack per the terms of the "TRAP" described below.

**The TRAP: Smoothstack's Training Repayment Agreement Provision Obligates Consultants to Pay Smoothstack Tens of Thousands of Dollars if They Resign Before Completing 4,000 Hours of Client Work.**

20.     Shortly after hire, Smoothstack requires each Recruit to sign an agreement ("Agreement") that governs the employment relationship.  *See* Exhibit 4 (Reed – First Agreement); Ex. 5 (Reed – Second Agreement).[7]

21.     The Agreement is an adhesion contract presented on a take-it-or-leave-it basis.  It includes a Training Repayment Agreement Provision ("TRAP").  The TRAP obligates the Recruit to bill 4,000 hours of client work – the equivalent of approximately two years of full-time employment – before they are permitted to resign from Smoothstack ("Service Commitment

---

[5]     *About*, Smoothstack, https://smoothstack.com/about/ (last visited Apr. 12, 2023).
[6]     *Clients*, Smoothstack, https://smoothstack.com/clients/ (last visited Apr. 12, 2023).
[7]     Smoothstack previously required Recruits to sign an agreement – called a "training agreement" – that includes a TRAP shortly after hire and a near-identical agreement – called an "employment agreement" – after completing the Training Program and prior to placement on assignment with Smoothstack's clients.  *See* Ex.1 (O'Brien Training Agreement); Ex. 2 (O'Brien Employment Agreement).  Upon information and belief, Smoothstack's current practice is to require Recruits to sign only one agreement that contains a TRAP shortly after hire. As detailed below, Plaintiff O'Brien was required to sign two agreements whereas Plaintiff Reed was required to sign only one agreement.

Period").  If a Recruit and/or Consultant resigns or is terminated for cause before the end of the Service Commitment Period, Smoothstack is entitled to require the Recruit and/or Consultant to pay an outrageous penalty upwards of $29,000.00.  Smoothstack promises assignments with its Fortune 500 clients, and claims a 98% retention rate, but Consultants have no guarantee of steady employment.  If a Consultant's assignment ends for any reason, or Smoothstack is unable to place a Recruit with a client, and the worker has not met the 4,000-hour billable requirement, Smoothstack "benches" the worker, holding them in limbo until they can be reassigned ("Bench Status").

22.     On Bench Status, Smoothstack pays workers the minimum wage and none of their hours count toward the 4,000-hour Service Commitment Period – but they cannot quit because of the TRAP.

23.     Smoothstack's TRAP puts Smoothstack's minimum-wage workforce in an untenable position.  If a worker on Bench Status has not yet fulfilled their Service Commitment Period, they are functionally tied to a minimum wage position with Smoothstack indefinitely – because the only way for the worker to enter the job market is to put themself at risk of paying the TRAP penalty, which can have the economically devastating effect of undoing months or years of careful savings.

24.     The TRAP functions to suppress workers' wages both when they are on Bench Status and when they are working as a Consultant by penalizing them for quitting to find a higher-paying job. This allows Smoothstack to pay its workers well below market wages.

25.     Smoothstack's TRAP also violates the Fair Labor Standards Act, because it means that Smoothstack is not paying employee wages "finally and unconditionally" or "free and clear," as the FLSA requires.  Rather, employees are paid only on the condition that they do

not quit.

26.     If employees do quit, the TRAP requires them to pay back their earned wages (and then some) for the final pay period of employment in the form of a "kickback" of wages that is impermissible under the FLSA. The kickbacks reduce workers' wages in their final workweek to substantially less than the federal minimum wage—indeed, well into the negative numbers. Plaintiffs and other Consultants have reason to fear that Smoothstack will enforce the TRAP if they try to leave.  Upon information and belief, Smoothstack has brought litigation against its own employees several times to enforce the TRAP.  *See, e.g.*, *Smoothstack v. Crowell*, Nos. GV22006209, GV22012000 (Va. Gen. Dist. Ct.); *Smoothstack v. Hill*, No. GV22006208 (Va. Gen. Dist. Ct.); *Smoothstack v. Davtyan*, Nos. GV21010149, GV21015875 (Va. Gen. Dist. Ct.).

27.     Smoothstack drags its own minimum wage employees into court even though, on information and belief, a Virginia state court recently ruled at trial that Smoothstack's TRAP is unconscionable and an unenforceable liquidated damages penalty under Virginia law in a case Smoothstack brought against a former Consultant under the TRAP.  *Smoothstack v. Davtyan*, Nos. GV21010149, GV21015875 (Va. Gen. Dist. Ct.).

28.     Despite this merits finding by a court, Smoothstack continues to require its Recruits and Consultants to agree to the TRAP on a take-it-or-leave it basis, and continues to collect or attempt to collect from Recruits and Consultants on the basis that they have violated their TRAP.

**Plaintiff Justin O'Brien's Experience**

29.     Plaintiff Justin O'Brien is one of hundreds of Smoothstack employees who worked grueling hours at minimum wage, or no pay at all, and with no overtime wages, but was

unable to seek out a better opportunity because of the TRAP.

30.     Plaintiff O'Brien applied for a job in Spring 2020 with Smoothstack because, after working a low-paying job at a call center for nearly a year, he believed that a job with Smoothstack would jumpstart a new career that would bring him better pay and benefits.

31.     Indeed, Plaintiff O'Brien saw Smoothstack's advertising that it offered programming assignments for pay starting at $55,000 per year and was persuaded that working for Smoothstack would be a good career move.

32.     Plaintiff O'Brien saw an opportunity, not only for a higher starting salary, but also a chance to work with a Fortune 500 company as Smoothstack's advertisements promote its assistance with finding their employees a job with one of those major companies. This convinced Plaintiff O'Brien that Smoothstack was the place to jumpstart his new career.

33.     Around the same time, the nation was starting to grapple with the harsh realities of the COVID-19 pandemic.  In or around early April 2020, lockdowns shuttered businesses nationwide, forcing widespread layoffs and hiring freezes as the economy teetered on the edge of collapse.  Plaintiff O'Brien – like so many others during this time – found himself facing a historically bleak job market and he desperately needed the job with Smoothstack to be able to better support himself.

34.     Unfortunately for Plaintiff O'Brien, as detailed above, and more below, the job with Smoothstack came at a steep price.

35.     He started the Unpaid Period of the Training Program and immediately began working extremely long hours, including overtime hours, none of which were paid.  Smoothstack emphasized "grit" and told its Recruits things along the lines of: "you might have worked hard in

college, but the real work starts now." Plaintiff was concerned about the demands, but he needed the job.

36.    Approximately three weeks after Plaintiff O'Brien started as a Recruit with Smoothstack, Smoothstack presented him with an agreement ("Training Agreement") to sign. *See* Exhibit 1 (O'Brien Training Agreement).

37.    As discussed above, and more below, the Training Agreement, like Smoothstack's Agreement, contained a TRAP, which functionally tied Plaintiff O'Brien to Smoothstack for at least two years of work, or else he would be required to pay $23,895.00, a sum of money he did not have.

38.    Plaintiff O'Brien immediately recognized the potential consequences that he faced under the TRAP, but Smoothstack presented the Training Agreement as an "all or nothing" offer that Plaintiff was required to accept in order to continue his employment with Smoothstack.

39.    Plaintiff O'Brien desperately needed the job to be able to support himself and eventually earn a livable wage and, at that point, had worked for Smoothstack for nearly three weeks without any compensation whatsoever. He felt that he had no choice but to sign the Training Agreement.

40.    Plaintiff O'Brien executed the Training Agreement on or around April 30, 2020 and continued with Smoothstack's Training Program.

41.    Smoothstack subjected Plaintiff O'Brien to grueling demands for the next five months, working around the clock on time-consuming assignments, which Smoothstack assigned, was aware of, and required him to do.

42.     Despite the grueling demands, Plaintiff O'Brien stuck with the Training Program. In or around October 2020, Smoothstack assigned him to work as a Junior Java Developer with Accenture Federal Service ("Accenture").

43.     In connection with this assignment, Smoothstack gave Plaintiff O'Brien another agreement ("Employment Agreement") to sign.  *See* Exhibit 2 (O'Brien Employment Agreement).

44.     As with the Agreements and Training Agreement, Smoothstack presented the Employment Agreement as an "all-or-nothing" offer that Plaintiff O'Brien was required to accept in order to continue his employment with Smoothstack.

45.     Plaintiff O'Brien identified immediately that he *had* to sign – or else he would be in violation of the Training Agreement.  This is because the TRAP in the Training Agreement bound Plaintiff O'Brien to a Service Commitment Period of 4,000 hours of work *for a Smoothstack client*, which was not possible to perform until after he completed the Training Program.

46.     Accordingly, Plaintiff O'Brien had no choice but to sign the Employment Agreement or else be required to pay the $23,895 penalty set forth in the Training Agreement.

47.     Worse still, the Employment Agreement contained yet another TRAP, which provided that Plaintiff O'Brien could not resign or be terminated for cause by Smoothstack before billing 4,000 hours to Smoothstack clients.  Notably, the Service Commitment Period in the Employment Agreement was even more draconian than in the Training Agreement: the 4,000-hour requirement under the Employment Agreement was *billable* hours, whereas the Training Agreement contemplated both billable hours and Bench Status hours. At the time

Smoothstack provided Plaintiff O'Brien with the Employment Agreement, Smoothstack had not paid him more than the minimum wage for nearly six months.

48.     Without any other alternative, Plaintiff O'Brien signed the Employment Agreement on or around October 20, 2020.

**Plaintiff O'Brien's Efforts to Resolve this Action and Smoothstack's Retaliation.**

49.     Plaintiff O'Brien attempted over months to resolve his disputes with Smoothstack without resorting to litigation.

50.     At every turn, Smoothstack has rejected Plaintiff's counsel's reasonable, good-faith attempts to negotiate settlement, including to toll the statute of limitations for him and the putative Collective Members, and in alarming fashion, ratcheted up the pressure on Plaintiff O'Brien through inappropriate *ex parte* communications with him before ultimately terminating him.

51.     Plaintiff O'Brien, through counsel, first sent correspondence to Smoothstack in November 2022 alerting it to Smoothstack's wage violations and Plaintiff's claim that the TRAP was unenforceable and inviting Smoothstack to negotiate a resolution on behalf of Plaintiff O'Brien and a proposed collective.

52.     Ten days later, at the request of Smoothstack's counsel, the parties spoke for the first time on a call, where Plaintiffs' counsel proposed a negotiation strategy and, in the interim, requested tolling of the statute of limitations for Plaintiff O'Brien and the putative collective.

53.     Following that call, Defendant's counsel went silent.  Despite Plaintiffs' counsel's repeated efforts to reengage Smoothstack's counsel, Smoothstack instead began to take retaliatory actions against Plaintiff O'Brien.

54.     First, Smoothstack's Chief Operating Officer, Boris Kuiper, contacted Plaintiff

O'Brien out of the blue in late January 2023 and, outside of the presence of counsel, asked him about his wage claims against the company, including estimates of how much he believed he was owed in unpaid wages and his view of the merits his claims.

55.     Next, in early March 2023, Smoothstack informed Plaintiff O'Brien that it was removing him from his assignment with Accenture.  Smoothstack placed Plaintiff O'Brien on Bench Status and reduced his hourly rate from $31.25 per hour to minimum wage.  Under the terms of the Employment Agreement, his working hours did not count toward his 4,000-hour Service Commitment Period, so he could not consider leaving for a better paying job.

56.     In response to each of these incidents, Plaintiff O'Brien, through counsel, promptly contacted Smoothstack and expressed concerns that Smoothstack was retaliating against him.  Plaintiff O'Brien also reiterated his interest in discussing settlement on behalf of himself and the proposed Collective, attempting to reengage settlement negotiations.  For weeks, Smoothstack failed to respond at all, and eventually simply refused to discuss a collective settlement.

57.     Left with no other option, on April 4, 2023, Plaintiff O'Brien notified Smoothstack through counsel that he planned to file a collective action lawsuit in the coming days.

58.     In what can only be retaliation, just three days later, on April 7, 2023, Smoothstack terminated Plaintiff O'Brien's employment.

### Plaintiff Skylar Reed's Experience

59.     Plaintiff Skylar Reed is one of hundreds of Smoothstack employees who worked significant hours at minimum wage, or no pay at all, and with no overtime wages, but was unable to seek out a better opportunity because of the TRAP.

60.     Plaintiff Reed graduated from Western Governors University in approximately June 2023 with B.S. degrees in Software Engineering and Computer Science.

61.     Plaintiff Reed applied to Smoothstack for a job in Fall 2022 because he believed Smoothstack's representations that it could jumpstart a career that would bring him good pay and benefits.

62.     As with hundreds of other Smoothstack employees, as detailed above, and more below, the job with Smoothstack came with a steep price.

63.     Plaintiff Reed applied to Smoothstack after seeing Smoothstack's advertising on LinkedIn. The advertisement boasted an apprenticeship and on-the-job quality training in tech that would set him up with a job with one of Smoothstack's Fortune 500 clients.

64.     Plaintiff Reed was required to complete a rigorous application before he was accepted into Smoothstack's Training Program.  He completed multiple rounds of interviews with Smoothstack employees in addition to an online coding challenge, which he was required to achieve a minimum score.

65.     Plaintiff Reed applied to the Java Spring Batch Training Program.

66.     In September 2022, Smoothstack notified Plaintiff Reed that he was accepted into the Training Program.  *See* Ex. 6 (Offer Letter).

67.     Plaintiff Reed started the Unpaid Period of the Training Program in approximately October 2022, and immediately began working long hours, including overtime hours, none of which were paid.  In or around October 2022, Plaintiff Reed attended an orientation session with others in his cohort, where Smoothstack employees, including representatives from Smoothstack's HR department, onboarded them.

68.     During the Unpaid Period, he attended mandatory classroom sessions and had to complete daily coding assignments.  In addition, he and other Recruits were also given longer assignments to complete over the weekend, which were due on the following Monday.  The assignments were time consuming and difficult to complete.  Plaintiff Reed estimates that on at least one occasion, he worked approximately 14 hours over the weekend to complete an assignment, none of which was paid.

69.     Plaintiff Reed and others in his cohort did not record their time during the Unpaid Period and to his knowledge, Smoothstack did not have a system for tracking their time.

70.     Approximately two weeks after Plaintiff Reed started as a Recruit with Smoothstack, Smoothstack presented him with an Offer Letter and Agreement to sign.  *See* Ex. 4 (S. Reed – First Agreement).

71.     As discussed above, and more below, the Agreement contained a TRAP, which functionally tied Plaintiff Reed to Smoothstack for at least two years of work, or else he would be required to pay nearly $30,000, a sum of money that he did not have.  *See* Ex. 4 (S. Reed – First Agreement).

72.     Pursuant to the terms of the Agreement, Reed would earn $7.25 an hour during the Training Program, $28.85 an hour during his first year of work for a Smoothstack client (or approximately $60,000 a year), and $33.65 an hour during his second year of work for a Smoothstack client (or approximately $70,000 a year).

73.     Plaintiff Reed recognized the potential consequences that he faced under the TRAP, but Smoothstack presented the Agreement as an "all or nothing" offer that Plaintiff was required to accept in order to continue his employment with Smoothstack.

74.     Plaintiff Reed needed a job and, at that point, had worked for Smoothstack for nearly three weeks without any compensation whatsoever.  He was given only a few days to consider the Agreement. He felt that he had no choice but to sign the Agreement in order to continue working for Smoothstack in hopes of receiving employment with one of Smoothstack's clients.

75.     Plaintiff Reed executed the Agreement on or around November 1, 2022, and continued Smoothstack's Training Program.

76.     Smoothstack subjected Plaintiff Reed to significant demands for the next approximately four months, attending mandatory classroom training and working around the clock on time-consuming assignments, which Smoothstack assigned, was aware of, and required him to do.

77.     Smoothstack instructed Plaintiff Reed and other Recruits to record only 40 hours per week in Smoothstack's timekeeping system.  Plaintiff Reed recorded 40 hours per week in Smoothstack's timekeeping system, regardless of how many hours he actually worked.  Plaintiff Reed frequently worked more than 40 hours per week, without receiving proper overtime pay.

78.     In approximately late February 2023, Plaintiff Reed completed Smoothstack's Training Program, but he and the other members of his cohort were told that the company had been unable to secure a client placement for them.  With the training completed but no job assignment, Plaintiff Reed and his cohort were required to wait indefinitely for a client placement.  They earned minimum wage during this time.

79.     In what it described as an attempt to expand the marketability of Plaintiff Reed and his cohort, Smoothstack required them to take online courses from Udemy, a website that

provide streaming videos in a variety of topics, including topics like leadership, nutrition, and coding. These online courses were often in subjects unrelated to their prior training.

80.     This long period of uncertainty and minimum-wage work was difficult for Plaintiff Reed.  He would have quit to find a better-paying job during this period, except that he was aware of the TRAP and that he would owe Smoothstack nearly $30,000 if he did so.

81.     After months of requiring employees to wait while earning minimum wage, Smoothstack terminated the employment of Plaintiff Reed and the rest of his cohort in or around May 2023 because it was unable to find them client placements.

82.     Due to Smoothstack's failure to secure them employment, Smoothstack waived the TRAPs for Plaintiff Reed and upon information and belief, for the other employees.

83.     Approximately a month later, in or around June 2023, Smoothstack contacted Plaintiff Reed and offered to re-hire him for a client placement with Accenture.  Upon information and belief, none of the other members of Plaintiff Reed's cohort received similar offers.  Plaintiff Reed believes he was re-hired by Smoothstack to work for Accenture due to his training in computer science and software engineering while working towards completing his degree at Western Govern University.

84.     The Agreement that Smoothstack presented to Plaintiff Reed when he was re-hired included a TRAP for $29,985.  *See* Exhibit 5 (Reed – Second Agreement).  Because Smoothstack had already waived enforcement of the TRAP he was subject to while receiving this training, Plaintiff Reed attempted to negotiate to have the TRAP removed.  However, Smoothstack refused, telling Plaintiff Reed that the TRAP was a non-negotiable condition of employment.

85.     The new Agreement had the same pay rates as the prior Agreement.

86.     Plaintiff Reed signed the new Agreement on June 14, 2023.  Exhibit 5 (Reed – Second Agreement).

87.     Plaintiff Reed found his work for Smoothstack at Accenture to be difficult and draining, and the pay was far below market.  In particular, he was required to move from his home in Bristol, Tennessee to San Antonio, Texas where Accenture had a physical location but where he was isolated from the rest of his team and his support network.  Again, Plaintiff Reed would have quit his job at this time if not for the TRAP and the potential consequences of leaving.

88.     In or around October 2023, Plaintiff Reed was authorized to work remotely and he moved back to Bristol, Tennessee.

89.     While working at Accenture, or his Assignment Period, Plaintiff Reed worked over 40 hours per week, including during the weeks of February 26, 2024, and March 4, 2024. Smoothstack did not pay Plaintiff Reed for these hours of work at a rate of 1.5x his regular rate of pay and instead only paid him at his regular rate of pay.

90.     Although Plaintiff Reed continued working for Smoothstack for as long as he could, in approximately April 2024, his situation became financially untenable when his partner became pregnant with their first child and the cost of Smoothstack's insurance premiums for employees doubled.

91.     On April 19, 2024, Plaintiff Reed resigned from Smoothstack effective immediately, having already given notice to his team at Accenture weeks before.

92.     On April 21, 2024, Gabriela Hower, Smoothstack's Human Resources Manager, left Plaintiff Reed a voicemail requesting that he call her back.

93.     Plaintiff Reed was aware that Smoothstack had sued other employees to enforce the TRAP in the past.

94.     When Plaintiff Reed returned Ms. Hower's call the following day, she told him that he was in breach of his Agreement and that he had three options: first, settle with Smoothstack in a lump sum for an amount smaller than the total TRAP amount; second, enter into a 6 to 12-month payment plan for the total amount of the TRAP debt; or third, have his case sent to Smoothstack's legal team, which could take his case to court and garnish his wages.

95.     In an email conversation on April 25, 2024, Ms. Hower repeated that that these were Plaintiff Reed's three options for the end of his employment with Smoothstack, including that Smoothstack "can do a settlement and include a payment plan."  If Plaintiff Reed did a "lump sum payment, the amount due would be $20,000," and "if [he] want[s] to make a payment plan, [Smoothstack] can do a down payment of 10k and split the difference in 10 months."

96.     Plaintiff Reed asked Ms. Hower "what happens if [he] do[es] not sign this agreement," to which Ms. Hower replied that Plaintiff Reed is "in breach of the agreement," and "if [Plaintiff Reed] decide[s] not to sign the settlement, then this case goes to [Smoothstack's] legal department."

97.     Ms. Hower attached the proposed settlement agreement to this email, which would require Plaintiff Reed to pay Smoothstack $20,000 in a lump sum in exchange for a mutual general release of claims.  The settlement agreement included a non-disclosure provision that provided liquidated damages of $10,000 for breach.  It also included a cooperation provision that required Plaintiff Reed to provide Smoothstack with reasonable cooperation in any pending or future lawsuit in which Smoothstack requested his help.

98.     Plaintiff Reed did not sign the settlement agreement.

## THE PARTIES

*Plaintiff Justin O'Brien*

99.     Plaintiff O'Brien is an adult individual who is a resident of Fort Collins, Colorado.

100.     During March 2020, Plaintiff O'Brien began seeking out a new career path, and applied for Smoothstack's Training Program after he saw an advertisement online that promised training in technology and a pathway to a new lucrative career with Fortune 500 companies.

101.     Smoothstack hired Plaintiff O'Brien as a Recruit on or around April 13, 2020.

102.     From approximately April 2020 to October 2020, Plaintiff O'Brien participated in Smoothstack's Training Program.

103.     Throughout Plaintiff O'Brien's employment in the Training Program, Plaintiff O'Brien frequently worked more than 40 hours per week, including the weeks of April 20, 2020 and May 11, 2020.

104.     During the Unpaid Period, Plaintiff O'Brien worked on average approximately 80 hours per week.

105.     During the Underpaid Period, Plaintiff O'Brien worked on average approximately 80 hours per week.

106.     Pursuant to Smoothstack's policy and pattern or practice, Smoothstack did not pay Plaintiff O'Brien any compensation during the Unpaid Period.

107.     Pursuant to Smoothstack's policy and pattern or practice, Smoothstack did not pay Plaintiff O'Brien overtime premium pay when he worked more than 40 hours in a workweek during the Training Program.

108.    During the Underpaid Period, Plaintiff O'Brien was paid minimum wage for 40 hours per week.

109.    Plaintiff O'Brien was paid 40 hours per week during the Underpaid Period regardless of how many hours he actually worked.

110.    Plaintiff O'Brien is a covered employee within the meaning of the FLSA.

111.    A written consent form signed by Plaintiff O'Brien was filed on April 13, 2023. ECF No. 1, at Ex. 3.

112.    Plaintiff O'Brien executed the Training Agreement on or around April 30, 2020.

113.    Plaintiff O'Brien executed the Employment Agreement on or around October 20, 2020.

114.    At the time Smoothstack provided Plaintiff O'Brien with the Employment Agreement, Smoothstack was paying him the minimum wage for forty hours of work per week even if he worked in excess of 40, and had been doing so for months, since April 2020.

### Plaintiff Skylar Reed

115.    Plaintiff Reed is an adult individual who is a resident of Bristol, Tennessee.

116.    Plaintiff Reed applied for Smoothstack's Training Program around September 2022 after seeing an advertisement for the Training Program on LinkedIn. The advertisement boasted high quality training that would prepare him for a career in technology and a job with one of Smoothstack's Fortune 500 clients.

117.    Smoothstack hired Plaintiff Reed on or around October 17, 2022.

118.    From approximately October 2022 to February 2023, Plaintiff Reed participated in Smoothstack's Training Program.

119.    Throughout Plaintiff Reed's employment in the Training Program, Plaintiff O'Brien frequently worked more than 40 hours per week, including the weeks of October 31, 2022 and February 6, 2023.

120.    During the Unpaid Period, Plaintiff Reed worked on average approximately 46 to 66 hours per week.

121.    During the Underpaid Period, Plaintiff Reed worked on average approximately 45 to 60 hours per week.

122.    Pursuant to Smoothstack's policy and pattern or practice, Smoothstack did not pay Plaintiff Reed any compensation during the Unpaid Period.

123.    Pursuant to Smoothstack's policy and pattern or practice, Smoothstack did not pay Plaintiff Reed overtime premium pay when he worked more than 40 hours in a workweek during the Training Program

124.    During the Underpaid Period, Plaintiff Reed was paid minimum wage for 40 hours per week.

125.    Plaintiff Reed was not permitted to record more than 40 hours per week and was paid 40 hours per week during the Underpaid Period regardless of how many hours he actually worked. Plaintiff Reed is a covered employee within the meaning of the FLSA.

126.    Plaintiff Reed was not paid one and half times his regular rate for all hours worked over 40 per week during his assignment with Accenture.

127.    A written consent form signed by Plaintiff Reed was filed on April 30, 2024. ECF No. 47-1.

128.    Plaintiff Reed executed the first Agreement on or around November 1, 2022.

129.    Plaintiff Reed executed the second Agreement on or around June 14, 2023.

21

Defendant Smoothstack

130.   Smoothstack's principal executive office is located in McLean, Virginia.

131.   Smoothstack is a covered employer within the meaning of the FLSA.

132.   Smoothstack is a supplier within the meaning of VCPA.

133.   At all times relevant, Smoothstack maintained control, oversight, and direction over Plaintiff and similarly situated employees, including with respect to the compensation, timekeeping, payroll, and other employment practices that applied to them.

134.   Upon information and belief, Smoothstack applies the same employment policies, practices, and procedures to all Recruits and Consultants, including policies, practices, and procedures with respect to compensation.

135.   At all times relevant, Smoothstack's annual gross volume of sales made or business done was not less than $500,000.

136.   Upon information and belief, Smoothstack uses advertisements via social media and its own website to promote its training program as one of high quality that will lead to a job with a Fortune 500 company.

137.   Smoothstack trains and assists employees with resume writing to maximize their chance at employment with one of Smoothstack's clients.

138.   Smoothstack executed an Agreement with Plaintiff Reed on or around November 1, 2022 and on or around June 14, 2023.

## JURISDICTION AND VENUE

139.   This Court has original subject matter jurisdiction over the FLSA claims pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

140.     This Court has personal jurisdiction over Defendant because Smoothstack does business in this District and because some of the acts complained of and giving rise to the claims alleged occurred in and emanated from this District.

141.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District.

142.     Venue is also proper because the parties contractually agreed to venue in Fairfax County, Virginia under the Agreement, Training Agreement and the Employment Agreement, *see* Exhibits 1, 2, 4, 5, and the Alexandria Division of this District covers Fairfax County.

<u>**NATIONWIDE CLASS ACTION ALLEGATIONS**</u>

143.     Plaintiff Reed brings the Fifth, Sixth, Seventh, Tenth, Eleventh, and Twelfth Causes of Action, contract claims under Virginia law, under Rule 23 of the Federal Rules of Civil Procedure, on behalf of himself and a class of persons consisting of:

> All persons nationwide who work or have worked as a Recruit or Consultant for Defendant and signed a TRAP within the statute of limitations (the "Class").

144.     Excluded from the Class are Defendant, Defendant's legal representatives, officers, directors, assigns, and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Defendant; the Judge(s) to whom this case is assigned and any member of the Judge(s)' immediate family; and all persons who will submit timely and otherwise proper requests for exclusion from the Class.

145.     The members of the Class ("Class Members") are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is not known to Plaintiff Reed, the facts on which the calculation of that number can be based are presently within the sole control of Defendant.

146.    Upon information and belief, the size of the Class is more than 40 individuals.

147.    Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

148.    Common questions of law and fact exist as to the Class that predominate over any questions solely affecting them individually and include, but are not limited to, the following:

        (a)    whether Smoothstack's TRAP in the Agreement is unconscionable;

        (b)    whether the TRAP in the Agreement is an unenforceable penalty;

        (c)    whether the TRAP in the Agreement is an unlawful non-compete;

        (d)    whether the TRAP in the Agreement includes unlawful acts in connection with a consumer transaction;

        (e)    the proper measure of damages and/or other forms of relief.

149.    The claims of Plaintiff Reed are typical of the claims of the Class he seeks to represent.

150.    Smoothstack's Agreement has a Virginia choice of law provision.  *See* Exhibit 4 (Reed – First Agreement) at 7; Exhibit 5 (Reed – Second Agreement) at 7; *see also* Exhibit 1 (O'Brien Training Agreement) at 3; Exhibit 2 (O'Brien Employment Agreement) at 12.

151.    Plaintiff Reed and Class Members work, or have worked, for Defendant as Recruits or Consultants who signed either a Training Agreement or an Employment Agreement, or both.

152.    Plaintiff Reed and Class Members enjoy the same statutory rights under the Virginia law, including freedom from contracts of adhesion.  Plaintiff Reed and Class Members have all been injured in that they have entered into a contract containing one-sided terms that functionally ties them to Smoothstack indefinitely because, by way of example, if Defendant is

unable to place them with a client, they must choose between minimum wage pay for an undefined period of time or paying the prohibitive penalty to leave the company.

153.    Plaintiff Reed will fairly and adequately represent and protect the interests of Class Members.  Plaintiff Reed understands that as a class representative, he assumes a fiduciary responsibility to the class to represent its interests fairly and adequately.  Plaintiff Reed recognizes that as a class representative, he must represent and consider the interests of the Class just as he would represent and consider his own interests.  Plaintiff Reed understands that in decisions regarding the conduct of the litigation and its possible settlement, he must not favor his own interests over the Class.  Plaintiff Reed recognizes that any resolution of a class action lawsuit, including any settlement or dismissal thereof, must be in the best interests of the Class.  Plaintiff Reed understands that in order to provide adequate representation, he must be informed of developments in the litigation, cooperate with class counsel by providing them with information and any relevant documentary material in his possession, and testify at deposition and/or trial.

154.    Plaintiff Reed has retained counsel competent and experienced in complex class actions and employment litigation.  There is no conflict between Plaintiff Reed and Class Members.

155.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Class Members have been damaged and are entitled to recovery as a result of Defendant's violations of Virginia law, as well as their common and uniform policies, practices, and procedures.  In addition, class litigation is superior because it will obviate the need for unduly duplicative litigation that might result in inconsistent judgments about Defendant's practices.

156.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3).

## FLSA COLLECTIVE ACTION ALLEGATIONS

157.     Plaintiffs bring the First and Second Causes of Action, and Plaintiff Reed the Third and Fourth Causes of Action, pursuant to the FLSA, 29 U.S.C. § 216(b), on behalf of Plaintiffs and similarly situated co-workers nationwide who participate or participated in Defendant's Training Program and/or signed TRAPs between April 13, 2020 and the present and who elect to opt-in to this action (the "FLSA Collective").

158.     Plaintiff Reed brings the Ninth Cause of Action, pursuant to the FLSA, 29 U.S.C. § 216(b), on behalf of himself and similarly situated co-workers nationwide who worked over 40 hours per week during the Assignment Period.

159.     Defendant is liable under the FLSA for, *inter alia*, failing to properly compensate Plaintiffs and other putative members of the FLSA Collective ("Collective Members") during the Training Program (comprised of the Unpaid and Underpaid Periods) and the Assignment Period and failing to pay wages free and clear.

160.     Consistent with Defendant's policy and pattern or practice, Plaintiffs and Collective Members are not paid a minimum wage for all hours worked during the Training Program.

161.     During the Training Program, Plaintiffs and Collective Members are covered employees under the FLSA and entitled to minimum and overtime wages.

162.     Consistent with Defendant's policy and pattern or practice, Plaintiffs and Collective Members are not paid an overtime premium when they work beyond 40 hours in a workweek during the Training Program.

163.    During the Assignment Period, Smoothstack failed to pay Plaintiff Reed and Collective Members for all hours over 40 in a workweek at a rate of 1.5x their "regular rate" of pay.

164.    All of the work that Plaintiffs and Collective Members have performed has been assigned by Defendant and/or Defendant has been or should have been aware of all of the work that Plaintiffs and Collective Members have performed.

165.    Defendant's requirement under the TRAP that Plaintiffs and Collective Members pay back a portion of their wages to Defendant if they leave or are terminated for cause prior to the end of their commitment period constitutes a failure to pay wages "free and clear," in violation of the FLSA.

166.    Instead of paying wages "finally and unconditionally," Defendant pays wages to employees every pay period conditionally, subject to the requirement that they not leave their jobs.

167.    The payments that Defendant requires of employees who leave their jobs before their Commitment Period ends are kickbacks for costs that primarily benefit Smoothstack, and bring employees' wages below the minimum wage in their last workweek in violation of the FLSA.

168.    As part of its regular business practice, Defendant has intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA with respect to Plaintiffs and Collective Members.  This policy and pattern or practice includes, but is not limited to:

        (a)    Willfully failing to pay Plaintiffs and Collective Members minimum wage for hours that they worked during the Unpaid Period;

(b)     Willfully failing to pay Plaintiffs and Collective Members overtime wages for hours that they worked in excess of 40 hours per workweek during the Unpaid and Underpaid Periods;

(c)     Willfully failing to pay Plaintiff Reed and Collective Members overtime wages at 1.5x their regular rate of pay during the Assignment Period;

(d)     Willfully failing to record all of the time that its employees, including Plaintiffs and Collective Members, have worked for the benefit of Defendant;

(e)     Willfully failing to pay Plaintiff Reed and Collective Members their wages free and clear;

169.    Defendant is aware or should have been aware that federal law required it to pay Plaintiffs and Collective Members minimum wage for regular hours worked and overtime premium for all hours worked in excess of 40 hours per workweek, and that wages must be paid free and clear.

170.    Defendant's unlawful conduct has been widespread, repeated, and consistent.

171.    There are many similarly situated current and former Recruits and Consultants who have been subject to the above violations of the FLSA who would benefit from the issuance of court-supervised notice of this lawsuit and the opportunity to join it.

172.    Similarly situated employees are known to Defendant, are readily identifiable, and can be located through Defendant's records.

173.    Notice should be sent to the FLSA Collective pursuant to 29 U.S.C. § 216(b).

## COMMON COLLECTIVE FACTUAL ALLEGATIONS

174.    Plaintiffs and Collective Members work or have worked for Defendant as Recruits and Consultants.

175.    Defendant classifies Plaintiffs and Collective Members as hourly non-exempt workers.

28

176.   Plaintiffs and Collective Members participate or participated in Smoothstack's Training Program.

177.   Defendant's policy and practice is not to compensate Plaintiffs and Collective Members for any hours during the Unpaid Period, regardless of the number of hours and overtime hours actually worked.  *See* Exhibit 6 (Offer letter) at 2 (first few weeks of training are "Unpaid"); Exhibit 3 at 1 (stating "Do I get paid for the first three weeks? No, payment will start week 4 (pending acceptance of the Offer Letter and signed Training Agreement).").

178.   Defendant's policy and practice is to compensate Plaintiffs and Collective Members for 40 hours per week during the Underpaid Period, regardless of the amount of overtime hours actually worked.  *See* Exhibit 3 at 1 ("Do I get paid for extra work on weekdays/weekends? No. Your hours are capped at 40 hours per week, including weekends.").

179.   In actuality, while Plaintiffs' and Collective Members' *pay* is capped at 40 hours of the minimum wage rate of pay per week, their *hours of work* are not capped.  Accordingly, when Plaintiffs and Collective Members work more than 40 hours of work, they earn less than the minimum wage and do not earn overtime pay for hours in excess of 40.

180.   During Smoothstack's Training Program – in both the Unpaid Period and Underpaid Period – Plaintiffs and Collective Members consistently work more than 40 hours per week.

181.   Specifically, during the Training Program, Smoothstack requires Plaintiffs and Collective Members to attend presentations, lectures, and/or training sessions with Smoothstack trainers for between one to four hours every weekday, for a total of approximately five to twenty hours per week, and occasionally on holidays and the weekend.

182.    The subject matter of the Training Program includes IT training, programming, and other technology skills.

183.    As part of the Training Program, Smoothstack assigns challenging and time-consuming assignments to Plaintiffs and Collective Members, which take many hours to complete.  When not attending presentations, lectures, and/or training sessions with Smoothstack trainers, Recruits are working around the clock to complete these assignments.  Recruits also meet with Smoothstack trainers 1:1 to discuss their completed assignments and progress during the Training Program.

184.    The assignments are typically writing code for a variety of different software programs.  The assignments increase in size and complexity as the Training Program progresses, beginning with creating simple webpage interfaces with limited functionality or writing code for small programs and data bases using different programming languages, and then scaling up to more complicated, interactive programs and webpage interfaces, with both front-end and back-end capabilities.

185.    Smoothstack's offer letter tells Recruits that assignments are "project-based, and designed to mimic client environment(s)."  Ex. 6 (Offer Letter) at 1.

186.    At the start of the Training Program, Smoothstack frequently sets quick turnaround deadlines for assignments, sometimes within 24 hours.  Upon information and belief, the submission deadlines are often at or around 12:00 a.m. so that Collective Members can spend as much time as possible completing the assignments.

187.    Smoothstack also gives Plaintiffs and Collective Members assignments that they are required to complete over the weekend.  At the beginning of the week, Plaintiffs and Collective members often meet with Smoothstack trainers to discuss their weekend assignments.

188.    By the end of the Training Program, Smoothstack's required assignments become so complex that Plaintiffs and Collective Members are given several days or weeks to complete the assignments.  They are required to give presentations on their completed assignments in front of their cohort of Recruits and trainers.  Plaintiffs and Collective Members are still assigned and expected to complete additional short-term assignments concurrently with the larger assignments.

189.    Upon information and belief, Recruits do not obtain any credential, license, or degree upon completion of Smoothstack's Training Program.

190.    Smoothstack's Training Program curriculum is tailored to meet the needs of Smoothstack's corporate clients.

191.    The specific techniques and skills covered during the Training Program are informed by what skill sets are highly in-demand within the industries Smoothstack's corporate clients served.

192.    In fact, Smoothstack's offer letter tells Recruits that its training program is "curated specifically for [its] clients with respect to curriculum input, technology stacks, technology environments, unique requirements, etc."  Ex. 6 (Offer Letter) at 1.

193.    The offer letter states that the client-specific nature of Smoothstack's training allows Smoothstack to "deliver a capable workforce" to its clients.  Ex. 6 (Offer Letter) at 1.

194.    Smoothstack markets the techniques and skills covered during the Training Program to its clients in order to secure placements for Recruits with one of their clients.

195.    Smoothstack creates and revises Recruits' resumes prior to sending to Smoothstack's clients and, on information and belief, Smoothstack revises Recruits' resumes to present Smoothstack's training curriculum in a favorable light.

196.     Additionally, upon information and belief, when drafting and revising Recruits' resumes to send to clients, Smoothstack often markets and advertises its Recruits as being trained on and possessing skills that are not covered during the Training Program.

197.     Upon information and belief, Smoothstack designed its Training Program as an accelerated program in order to churn out Recruits as quickly as possible and to secure placements with its clients, which generates revenue for Smoothstack.

198.     As a result, Smoothstack does not prepare and equip Recruits with a strong foundation and mastery of the skills and techniques covered during the Training Program.

199.     Recruits are also frequently unable to complete their assignments using only the techniques and skills covered during the Training Program.

200.     Instead, Recruits rely heavily on external sources, such as Google, to complete their assignments.  Recruits' overreliance on external sources – more than is typical in the IT field – as well as a trial-and-error approach to completing assignments, is a substitute for Smoothstack actually training them on the fundamentals of the skills they needed to develop.

201.     On information and belief, Smoothstack knew or should have known that Recruits are not trained on the techniques required to complete these assignments.

202.     Defendant is aware that Plaintiffs and Collective Members worked more than 40 hours per workweek, yet Defendant has failed to pay them an overtime premium for any of the hours worked over 40 in a workweek.

203.     Throughout the Training Program, Plaintiffs and Collective Members are expected to work the same general schedule from week to week, including attending all presentations, lectures, and/or training sessions with Smoothstack trainers, and working around the clock to complete assignments.

32

204.   Throughout the Training Program, the schedule of Plaintiffs and Collective Members does not vary significantly from week to week.

205.   Defendant does not keep accurate records of hours worked by Plaintiffs or Collective Members.

206.   That is, although Plaintiffs and Collective Members routinely work or worked more than 40 hours, Defendant does not record those hours.

207.   Prior to 2022, Defendant did not permit Recruits to record any of their time worked in the Unpaid and Underpaid Periods.  After 2022, Defendant did not permit Recruits to record any of their time worked during the Unpaid Period, and strongly discouraged Recruits from recording more than 40 hours during the Underpaid Period.

208.   When Smoothstack places a Consultant with a client, and the Assignment Period begins, Smoothstack continues to employ and pay the Consultant, not the client.

209.   When a Consultant records more than 40 hours per week during the Assignment Period, Smoothstack does not pay Consultants at a rate of 1.5x their regular rate of pay for these hours, it only pays them at their regular rate.

210.   Smoothstack's TRAP provides that the penalty for leaving is intended to compensate Smoothstack for the costs of training as well as costs associated with "placement" or "marketing[] and on-boarding."  *See* Exhibit 2 (O'Brien Employment Agreement) at 11; *see also* Exhibit 1 (O'Brien Training Agreement) at 2; Exhibit 4 (Reed – First Agreement) at 5; Exhibit 5 (Reed – Second Agreement) at 5.

211.   These expenses are primarily for the benefit of the employer, and the FLSA prohibits the employer from charging employees for them.

212.   The effect of the TRAP is that every paycheck Plaintiffs and Collective Members

receive is conditional on their remaining employed with the company through the following pay period throughout the duration of the TRAP.  This failure to pay wages free and clear violates the FLSA.

213.    Smoothstack requires Recruits to sign an Agreement shortly after hire.  *See* Ex. 4 (S. Reed – First Agreement).[8]

214.    The Agreement contains a TRAP, which provides that Recruits and Consultants cannot resign or be terminated for cause by Smoothstack before billing 4,000 hours to Smoothstack clients.

215.    Upon information and belief, all Recruits and Consultants are subject to Smoothstack's TRAP.

216.    Upon information and belief, the Agreement requires Recruits to work for Smoothstack for the duration of the "Service Commitment Period."  Exhibit 4 (Reed – First Agreement) at 5.

217.    The Service Commitment Period is 4,000 hours of work – approximately two years – from the date of the Recruit's assignment with a Smoothstack client.

218.    If the Recruit resigns for any reason, fails to fulfill the Service Commitment Terms, or Smoothstack terminates them for cause, the TRAP in the Agreement requires the

---

[8]    As discussed above (at 5 n.7), Smoothstack required Recruits earlier in the Collective Period to sign two near-identical Agreements – one shortly after hire (Training Agreement) and one prior to placement on assignment (Employment Agreement).  The Agreement, Training Agreement, and Employment Agreement all contain a TRAP. In this instance, Recruits have no choice but to sign the Employment Agreement because they have already agreed to Smoothstack's TRAP in the Training Agreement. Specifically, the TRAP in the Training Agreement cannot be performed until after the Training Program is complete, at which point the Consultant can begin counting hours towards the 4,000 Service Commitment Period.  In fact, if Consultants refuse to sign the Employment Agreement, they would be in violation of the Training Agreement and forced to pay the penalty in the Training Agreement.

Recruit to pay as much as $29,000 or more in "liquidated damages" or "reimbursement" to Smoothstack.  Exhibit 4 (Reed – First Agreement) at 5; Exhibit 5 (S. Reed – Second Agreement) at 5; Exhibit 1 (O'Brien Training Agreement) at 2;

219.    Upon information and belief, Smoothstack presents the Agreement as an "all or nothing" offer that Recruits are required to accept in order to continue their employment with Smoothstack and earn more than minimum wage on an assignment with one of Smoothstack's clients.

220.    The Agreement is a standard-form agreement.

221.     The liquidated damages amount under the Agreement is a sum equal to multiple times the amount Smoothstack pays a given Recruit during the Training Program.

222.    For example, if Smoothstack paid Consultants the federal minimum wage of $7.25 per hour in 2020 when Plaintiff was a Consultant, for 40 hours a week, for 15 weeks, that amounts to $4,350.00, which covers less than one fifth of what a Consultant would be forced to pay if Smoothstack enforced the liquidated damages penalty.

223.    These costs are primarily for the benefit of the employer.

224.    Smoothstack represents that the TRAP amount reflects the cost to Smoothstack to train its employees and place them with Smoothstack clients. Exhibit 1 (O'Brien Training Agreement) at 1 ("The Training Agreement provides that "the cost incurred by the Company in providing the Training to [a Recruit] is approximately $23,895."); Ex. 4 at 5 ("Smoothstack will spend and/or invest more than $29,895 in Training & Placement Costs to provide Employee this Training & Placement Program."); Ex. 5 at 5 ("Smoothstack will spend and/or invest more than $29,895 in Training & Placement Costs to provide Employee this Training & Placement Program.").

35

225.    The effect of the TRAP is that every paycheck Plaintiffs and Collective Members receive is conditional on their remaining employed with the company through the following pay period.  This failure to pay wages free and clear violates the FLSA.

226.    Moreover, the TRAP penalty of up to $29,895 constitutes an unlawful kickback on wages, because it seeks to recover an expense that primarily benefits Smoothstack in violation of the FLSA.  The amount of the penalty dwarfs the amount of pay received by workers in their final workweek, bringing their wages not only below the minimum wage but well into the negatives.

## COMMON CLASS FACTUAL ALLEGATIONS

227.    Smoothstack requires Recruits to sign an Agreement shortly after hire that contains a TRAP.  *See* Exhibit 1 (O'Brien Training Agreement); Exhibit 4 (Reed – First Agreement).

228.    Upon information and belief, all Recruits and Consultants are subject to Smoothstack's TRAPs.

229.    Upon information and belief, the Agreement requires Recruits to perform the "Service Commitment Terms" for the duration of the "Service Commitment Period."  Ex. 4 at 5; Exhibit 5 at 5.

230.    Upon information and belief, under the Service Commitment Terms, Smoothstack requires Recruits to "make a good faith effort to perform all duties required by Smoothstack and Smoothstack Clients during the Service Commitment Period that are reasonable and customary for the position."  Exhibit 4 (Reed – First Agreement) at 5; Exhibit 5 (Reed – Second Agreement) at 5.

231.    The Service Commitment Period is 4,000 hours of work – approximately two years – from the date of the Recruit's first assignment with a Smoothstack client.

232.    If the Recruit resigns for any reason, fails to fulfill the Service Commitment Terms, or Smoothstack terminates them for cause, the TRAP in the Agreement requires the Recruit to pay as much as $29,985 to Smoothstack.  *See* Ex. 4 at 5; Exhibit 5 at 5.

233.    Upon information and belief, Smoothstack presents the Agreement as an "all or nothing" offer that Recruits are required to accept in order to continue their employment with Smoothstack.

234.    Generally, the Agreement is presented to Recruits approximately two to three weeks after they have started working at Smoothstack, a period during which Smoothstack does not pay Recruits *any* compensation.[9]

235.    The Agreement is a standard-form agreement.

---

[9]    As detailed above (at 5 n.7), Smoothstack previously required Recruits to sign an Employment Agreement, a second near-identical Agreement prior to placing Recruits with a client for an assignment.  The Employment Agreement contained another TRAP, which provided that Consultants could not resign or be terminated for cause by Smoothstack before billing 4,000 hours to Smoothstack clients.  Notably, the Service Commitment Period in the Employment Agreement was even more draconian than in the first Agreement (or "Training Agreement"); the 4,000-hour requirement under the Employment Agreement was billable hours, whereas the Training Agreement simply contemplated hours of work, which could include Bench Status hours.  Upon information and belief, Smoothstack presented the Employment Agreement as an "all-or-nothing" offer that Consultants were required to accept in order to continue their employment with Smoothstack and earn more than minimum wage on an assignment with one of Smoothstack's clients.  Consultants had no choice but to sign the Employment Agreement because they had already agreed to Smoothstack's TRAP in the Training Agreement. Specifically, the TRAP in the Training Agreement could not be performed until after the Training Program was complete, at which point the Consultant could begin counting hours towards the 4,000 Service Commitment Period.  In fact, if Consultants refused to sign the Employment Agreement, they would be in violation of the Training Agreement and forced to pay the penalty of approximately $23,895 to $29,895 in the Training Agreement.

236.     Upon information and belief, Smoothstack created the Agreement (including the Training Agreement and Employment Agreement) with the assistance of sophisticated counsel.

237.     Plaintiff Reed and Class Members are in a significantly weaker bargaining position compared to Smoothstack with respect to the Agreement.

238.     The liquidated damages amount under the Agreement is a sum equal to multiple times the amount Smoothstack pays a given Recruit during the Training Program.

239.     For example, if Smoothstack paid Consultants the federal minimum wage of $7.25 per hour in 2022 when Plaintiff was a Consultant, for 40 hours a week, for 15 weeks, that amounts to $4,350.00, which covers less than one fifth of what a Consultant would be forced to pay if Smoothstack enforced the liquidated damages penalty.

240.     Upon information and belief, neither Plaintiff Reed nor any Class Member could modify or change any of the terms in the Agreement (including the Training Agreement or Employment Agreement) prior to signing.

241.     The Agreement provides that the "time and expense" associated with the Training Program has a value of "more than $29,895."  Exhibit 4 (Reed – First Agreement) at 5.

242.     In a later provision, the Agreement provides that the $23,875 or $29,898 payment due in the event of breach, is intended to cover damages including "the cost to train replacements, the cost associated with interruption of work on a project, loss of goodwill, and, potentially, loss of income generating projects."  Exhibit 2 (O'Brien Employment Agreement) at 11; *see also* Exhibit 3 (O'Brien Employment Agreement) at 11; Exhibit 4 (Reed – First Agreement) at 5 (damages penalty of $29,895 covers "background checks, curriculum development, proprietary agile training in an enterprise environment, use of paid systems and tools, resume building, interview preparation, client marketing, training, and bench pay, client

38

onboarding coordination, relocation cost, Employee progress tracking, program administration.").

243. These costs are primarily for the benefit of the employer.

244. The Agreement provides that "the cost incurred by the Company in providing the Training to [a Recruit] is approximately $23,895" Exhibit 1 (O'Brien Training Agreement) at 1, or "29,895," Exhibit 4 (Reed - First Agreement) at 5.

245. The liquidated damages provision under the Agreement provides that the $23,895 and/or $29,895 payment, due in the event of breach, is for "any and all training costs" incurred by Smoothstack, is "necessary and reasonable for the Company's protection," Exhibit 1 (O'Brien Training Agreement) at 2, and "to recover Training & Placement Costs from Employee," Exhibit 4 (Reed - First Agreement) at 5.

246. Upon information and belief, the liquidated damages amounts are far in excess of Smoothstack's actual damages incurred in the event a Recruit or Consultant resigns or is terminated for cause by Smoothstack prior to the expiration of the Service Commitment Period.

247. With respect to the cost of training, Plaintiff Reed and Class Members attend or attended training sessions led by instructors for approximately five to ten hours per week.

248. These training sessions are group sessions, with multiple Recruits attending the same session at the same time.

249. Upon information and belief, since Spring 2020, all of these sessions have been conducted virtually by a live instructor.

250. Upon information and belief, Smoothstack's Training Program does not vary significantly from program cohort to program cohort.

251.    The vast majority of the time Plaintiff Reed and the Class spent during the Training Program was on complex, time-consuming programming assignments required by Smoothstack, which cost nothing to Smoothstack.

252.    Plaintiff Reed and the Class use their own personal laptops and cellphones during the Training Program.

253.    Upon information and belief, the actual cost of training to Smoothstack is far lower than the amount of the liquidated damages provision.

254.    Smoothstack recruited and sold Recruits and Consultants the false hope that they would receive high-quality training and a prestigious job with a Fortune 500 company upon completion of the Training Program.  Smoothstack's deceptive advertising falsely promised that Plaintiff Reed and Collective Members would receive proper compensation and benefits.

255.    Upon information and belief, Smoothstack's Training Program is advertised on one of Smoothstack's online mediums (Instagram, LinkedIn, or Smoothstack's website). Smoothstack's advertisements sell the training program as one that provides skills and techniques that will secure job placement with one of Smoothstack's prestigious clients.

256.    Upon information and belief, Smoothstack offers its training services to individuals who apply to Smoothstack, so that they can acquire the skills necessary for the jobs with Smoothstack's high-profile clients.  The offer letter provides the nature of the training and how it is tailored to Smoothstack's particular clients. The offer letter states that the training is for 12-14 weeks when it actually lasts upwards of six months.

257.    Upon information and belief, throughout the training process Smoothstack provides the services of resume editing and requires employees to maintain a LinkedIn profile so that they can better attract employment with one of Smoothstack's clients.

258.     Also, upon information and belief, as a part of the services Smoothstack provides, when assisting with Plaintiff's and Class members' resumes to send to clients, Smoothstack often markets and advertises its employees as being trained on and possessing skills that are not covered during the Training Program.

259.     Upon information and belief, the TRAP is used to ensure that the employees complete the training program, and the required number of work hours while being employed by Smoothstack. This excludes any hours where the employee may not have an assignment with one of Smoothstack's clients.

260.     The TRAP does not provide a calculation that illustrates how Smoothstack determined its damages upon an employee's departure to add up to some $30,000.00, rather Smoothstack only states that the value comes from various sources, such as curriculum development, resume building, interview preparation, client marketing, training, and bench pay, Employee progress tracking, and program administration.  *See* Exhibit 4 (Reed – First Agreement) at 5.

261.     Plaintiff and Class were misled by the advertisements regarding the number of hours they would need to work in order to complete the training and the possibility of finding a job with a Fortune 500 company, since many people end up in Bench Status waiting to be assigned to a client of Smoothstack's.

262.     The TRAP serves as a de facto non-compete that allows Smoothstack to retain its workforce while paying them well under market wages by prohibiting employees from moving to another employer, including an employer in competition with Smoothstack, without paying a penalty worth tens of thousands of dollars.

263.     This restraint on employees' ability to compete with Smoothstack suppresses their wages, forcing them to accept wages that fall far below market rate—and in some circumstances, wages as low as the legal minimum wage—or else pay a penalty to accept a job with a competitor for higher wages.

264.     For example, Smoothstack is able to keep employees waiting in the wings for months earning only minimum wage in case it is able to secure a client to hire them because employees are restricted from quitting to find a better-paying job by the threat of financial consequences for doing so.

## PLAINTIFF O'BRIEN'S INDIVIDUAL RETALIATION ALLEGATIONS

265.     Upon completion of the Training Program, on or around October 20, 2020, Smoothstack placed Plaintiff O'Brien with Accenture to work as a Junior Java Developer.

266.     Plaintiff O'Brien began working as a Junior Java Developer with Accenture on or around October 29, 2020.

267.     Between approximately October 29, 2020 to January, 9, 2022, Smoothstack paid Plaintiff O'Brien $26.44 per hour for Plaintiff O'Brien's work for Accenture, well below average market wage rate of $46.46 for computer programmers.[10]

268.     From January 10, 2022 to March 23, 2023, Smoothstack paid Plaintiff O'Brien $31.25 per hour for Plaintiff's work for Accenture.

269.     Plaintiff O'Brien performed his job duties for Accenture satisfactorily.

270.     Accenture provided positive feedback regarding Plaintiff O'Brien's job performance.  On one occasion, Plaintiff's manager at Accenture told him during a check-in call

---

[10]     *Occupational Employment and Wages, May 2021 – 15-1251 Computer Programmers*, Bureau of Lab. Stats., https://www.bls.gov/oes/current/oes151251.htm (last updated Mar. 31, 2022).

that he was performing excellent work.

271.    In fact, within just a few months, Accenture recognized Plaintiff O'Brien's excellent technical capabilities and began treating him as a senior developer and assigning him to work on teams with the express instruction to assist other developers with their work.

272.    Neither Smoothstack nor Accenture disciplined or reprimanded Plaintiff O'Brien for performance issues or any other reason at any point during his employment with Smoothstack or his assignment with Accenture.

273.    On November 14, 2022, through counsel, Plaintiff O'Brien sent correspondence to Smoothstack alerting it to Smoothstack's wage violations and the TRAP claim and inviting Smoothstack to negotiate a resolution on behalf of Plaintiff O'Brien and a proposed collective action.  Plaintiff requested a response from Smoothstack by December 5, 2022.

274.    Ten days later, on December 15, 2022, counsel for Smoothstack contacted Plaintiff's counsel and notified them that he represented Smoothstack and requested a call.

275.    After that call, Smoothstack went silent.  On January 11, 2023, through counsel, Plaintiff contacted Smoothstack and requested a response regarding Plaintiff O'Brien's claims. Smoothstack did not respond.

276.    On January 24, 2023, through counsel, Plaintiff O'Brien contacted Smoothstack again and requested a response.  Smoothstack did not respond.

277.    On January 30, 2023, Smoothstack's Chief Operating Officer, Boris Kuiper, contacted Plaintiff O'Brien out of the blue in late January and, outside of the presence of counsel, asked Plaintiff O'Brien about his wage claims against the company, including estimates of how much he believed he was owed in unpaid wages and his view of the merits his claims.

278.    Before this conversation, Plaintiff O'Brien had never spoken with Mr. Kuiper

before.

279.    Before this conversation, Plaintiff O'Brien had never directly interacted with Mr. Kuiper in any aspect of his training or work with Smoothstack.

280.    It is unusual that a C-Suite Executive for Smoothstack would contact a Recruit or Consultant to discuss hours worked or compensation.

281.    Upon information and belief, Mr. Kuiper's *ex parte* phone call to Plaintiff O'Brien was an attempt by Smoothstack to intimidate and harass Plaintiff O'Brien for complaining about his unpaid wages and/or to pressure Plaintiff O'Brien to conceding facts relating to his claim, such as the amount he is entitled to in damages.

282.    On January 31, 2023, through counsel, Plaintiff O'Brien contacted Smoothstack to discuss Mr. Kuiper's *ex parte* phone call to Plaintiff O'Brien.  Counsel for both parties spoke by phone on February 1, 2023.

283.    During that phone call, the parties discussed Mr. Kuiper's *ex parte* phone call and Plaintiff O'Brien's concerns regarding retaliation.  Plaintiff O'Brien again requested a response from Smoothstack regarding his claims.

284.    On February 17, 2023, Plaintiff O'Brien, through counsel, contacted Smoothstack yet again, requesting a response on his claims, and provided information regarding Smoothstack's litigation and liability exposure.  Smoothstack did not respond.

285.    Instead, on March 6, 2023, Smoothstack informed Plaintiff O'Brien that he was being removed from his assignment with Accenture.

286.    The effect of Smoothstack's removal of Plaintiff O'Brien from his assignment was that Smoothstack converted Plaintiff O'Brien to Bench Status, which meant that Plaintiff O'Brien no longer had an assignment with a Smoothstack client.

287.    On Bench Status, Smoothstack no longer paid Plaintiff the hourly rate he earned while working for Accenture, which was $31.25 per hour, and instead Smoothstack decreased his pay to the minimum wage.

288.    In March and April 2023, the Colorado minimum wage was $13.65.

289.    On Bench Status, Plaintiff O'Brien could not bill hours towards his 4,000-hour Service Commitment Period because, under the terms of the Employment Agreement, Plaintiff O'Brien was not billing a Smoothstack client for an assignment.

290.    Despite the fact that Smoothstack was only paying Plaintiff O'Brien minimum wage – and made no guarantee that it would secure another assignment for Plaintiff with another client – Plaintiff O'Brien could not resign to look for a better paying job because of Smoothstack's TRAP.

291.    Upon information and belief, Smoothstack removed Plaintiff O'Brien from the Accenture assignment – decreasing his pay and converting him to Bench Status indefinitely – because he complained to Smoothstack regarding his unpaid wages.

292.    On March 7, 2023, through counsel, Plaintiff O'Brien again contacted Smoothstack raising concerns that it was retaliating against Plaintiff O'Brien by removing him from the Accenture assignment.  Plaintiff O'Brien also requested a response from Smoothstack on his demand letter, which, at this point, had been sent nearly four months prior and Smoothstack had not provided any substantive response.

293.    Plaintiff O'Brien's last day on the Accenture assignment was on or around March 23, 2023, at which point he began a period of Bench Status with Smoothstack.

294.    Despite Plaintiff O'Brien's repeated appeals – for months – Smoothstack rejected all attempts to negotiate a collective-wide settlement, including to toll the statute of limitations

for him and putative Collective Members.

295.    Left with no other option, on April 4, 2023, Plaintiff O'Brien notified

Smoothstack through counsel that he planned to file a collective action lawsuit in the coming

days.

296.    Just three days later, on April 7, 2023, Smoothstack terminated Plaintiff O'Brien's

employment.

297.    Smoothstack admits that it did not have cause to terminate Plaintiff O'Brien's

employment.

298.    Upon information and belief, Smoothstack terminated Plaintiff O'Brien's

employment because he complained to Smoothstack regarding his unpaid wages.

**FIRST CAUSE OF ACTION**
**Fair Labor Standards Act: Minimum Wages**
**(Brought on behalf of Plaintiffs and the FLSA Collective)**

299.    Plaintiffs reallege and incorporate by reference all allegations in all preceding

paragraphs.

300.    Defendant has engaged in a widespread pattern and practice of violating the

FLSA, as described in this Complaint.

301.    At all relevant times, Plaintiffs and other similarly situated current and former

employees were engaged in commerce and/or the production of goods for commerce within the

meaning of 29 U.S.C. §§ 206(a) and 207(a).

302.    At all relevant times, Defendant employed Plaintiffs and the FLSA Collective.

303.    The minimum wage provisions set forth in 29 U.S.C. § 201 *et seq.* of the FLSA

apply to Defendant.

304.     At all relevant times, Defendant has been an employer engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

305.     At all relevant times, Plaintiffs and the FLSA Collective were employees within the meaning of 29 U.S.C. §§ 203(e) and 207(a).

306.     Defendant failed to pay Plaintiffs and the FLSA Collective the minimum wages to which they are entitled under the FLSA.

307.     Defendant's violations of the FLSA have been willful and intentional.  Defendant failed to make a good faith effort to comply with the FLSA with respect to its compensation of Plaintiffs and other similarly situated current and former employees.

308.     Because Defendant's violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

309.     As a result of Defendant's willful violations of the FLSA, Plaintiffs and all other similarly situated employees have suffered damages by being denied minimum wages in accordance with 29 U.S.C. §§ 201 *et seq.*

310.     As a result of the unlawful acts of Defendant, Plaintiffs and other similarly situated current and former employees have been deprived of minimum wage compensation and in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs and other compensation pursuant to 29 U.S.C. § 216(b).

### SECOND CAUSE OF ACTION
**Fair Labor Standards Act: Overtime Wages**
**(Brought on behalf of Plaintiffs and the FLSA Collective)**

311.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

312.    Defendant has engaged in a widespread pattern and practice of violating the FLSA, as described in this Complaint.

313.    At all relevant times, Plaintiffs and other similarly situated current and former employees were engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

314.    At all relevant times, Defendant employed Plaintiffs and the FLSA Collective.

315.    The overtime wage provisions set forth in 29 U.S.C. §§ 201 *et seq.* of the FLSA apply to Defendant.

316.    At all relevant times, Defendant has been an employer engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

317.    At all relevant times, Plaintiffs and the FLSA Collective were employees within the meaning of 29 U.S.C. §§ 203(e) and 207(a).

318.    Defendant failed to pay Plaintiffs and the FLSA Collective the overtime wages to which they are entitled under the FLSA.

319.    Plaintiffs and other similarly situated current and former employees do not qualify for any FLSA exemption because they are not paid on a salary basis, are paid less than the threshold to qualify for an exemption, 29 U.S.C. § 213(a)(17), and do not perform exempt job duties.

320.     Defendant's violations of the FLSA have been willful and intentional.  Defendant failed to make a good faith effort to comply with the FLSA with respect to its compensation of Plaintiffs and other similarly situated current and former employees.

321.     Because Defendant's violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

322.     As a result of Defendant's willful violations of the FLSA, Plaintiffs and all other similarly situated employees have suffered damages by being denied overtime wages in accordance with 29 U.S.C. §§ 201 *et seq*.

323.     As a result of the unlawful acts of Defendant, Plaintiffs and other similarly situated current and former employees have been deprived of overtime compensation and other wages in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs and other compensation pursuant to 29 U.S.C. § 216(b).

### THIRD CAUSE OF ACTION
**Fair Labor Standards Act: Failure To Pay Wages Free and Clear**
**(Brought on behalf of Plaintiff Reed and the FLSA Collective)**

324.     Plaintiff Reed realleges and incorporates by reference all allegations in all preceding paragraphs.

325.     Defendant has engaged in a widespread pattern and practice of violating the FLSA, as described in this Complaint.

326.     At all relevant times, Plaintiff Reed and other similarly situated current and former employees were engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

327.    At all relevant times, Defendant employed Plaintiff Reed and the FLSA Collective.

328.    The overtime wage provisions set forth in §§ 201 *et seq.* of the FLSA apply to Defendant.

329.    At all relevant times, Defendant has been an employer engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

330.    At all relevant times, Plaintiff Reed and the FLSA Collective were employees within the meaning of 29 U.S.C. §§ 203(e) and 207(a).

331.    Defendant violated 29 U.S.C. § 206 by unlawfully requiring Plaintiff Reed and the FLSA Collective to repay their earned and taxed wages to Defendant once their employment with Defendant ended (including under some circumstances if Defendant chose to fire them).

332.    Rather than paying Plaintiff Reed and the FLSA Collective their wages "free and clear," Defendant maintained and enforced a policy under which the wages paid to employees during every pay period were paid conditionally, subject to the requirement that they not leave their jobs.  If they did leave their jobs, they would have to repay all of the wages earned during the pending pay period, plus tens of thousands of additional dollars.

333.    By requiring Plaintiff Reed and other similarly situated employees to return their wages to Defendant if they left their jobs, Defendant failed to pay wages "finally and unconditionally," as required by the FLSA.

334.    Because Defendant failed to pay wages "finally and unconditionally," Defendant cannot be deemed to have met the wage requirements of the FLSA, which includes the requirement to pay no less than the federal minimum wage for each hour worked free and clear.

335.    Defendant's violations of the FLSA have been willful and intentional.  Defendant failed to make a good faith effort to comply with the FLSA with respect to its compensation of Plaintiff Reed and other similarly situated current and former employees.

336.    Because Defendant's violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

337.    Plaintiff Reed and others similarly situated are entitled to recover all unpaid minimum wages plus an additional equal amount in liquidated damages, costs of suit, declaratory relief, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

**FOURTH CAUSE OF ACTION**
**Fair Labor Standards Act: Illegal Kickback**
**(Brought on behalf of Plaintiff Reed and the FLSA Collective)**

338.    Plaintiff Reed realleges and incorporates by reference all allegations in all preceding paragraphs.

339.    Defendant has engaged in a widespread pattern and practice of violating the FLSA, as described in this Complaint.

340.    At all relevant times, Plaintiff Reed and other similarly situated current and former employees were engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

341.    At all relevant times, Defendant employed Plaintiff Reed and the FLSA Collective.

342.    The overtime wage provisions set forth in §§ 201 *et seq.* of the FLSA apply to Defendant.

343.    At all relevant times, Defendant has been an employer engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

344.    At all relevant times, Plaintiff Reed and the FLSA Collective were employees within the meaning of 29 U.S.C. §§ 203(e) and 207(a).

345.    Repayment of alleged costs under the TRAP that Defendant has imposed on Plaintiff Reed and the FLSA Collective, including costs of training employees, training replacements, marketing and on-boarding employees, the costs of interruption of work on a project, loss of goodwill, and loss of income-generating projects, is an illegal kickback of wages to Defendant, because these costs are primarily for Defendant's benefit.

346.    Kicking back these costs to Defendant takes employees' wages below minimum wage, resulting in a minimum wage violation.

347.    Plaintiff Reed and the FLSA Collective were not paid at least the minimum wage for all hours worked, because they were required to kick back those wages to Defendant under the TRAP.

348.    Defendant's violations of the FLSA have been willful and intentional. Defendant failed to make a good faith effort to comply with the FLSA with respect to its compensation of Plaintiff Reed and other similarly situated current and former employees.

349.    Because Defendant's violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

350.    Plaintiff Reed and the FLSA Collective are entitled to recover unpaid minimum wages plus an additional equal amount in liquidated damages and declaratory relief that the purported costs of the debt are not reimbursable pursuant to the FLSA, costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

**FIFTH CAUSE OF ACTION**
**Virginia Common Law: Unconscionable Contract Provision**
**(Brought on Behalf of Plaintiff Reed and the Class)**

351.     Plaintiff Reed realleges and incorporates by reference all allegations in all preceding paragraphs.

352.     A contract provision is unconscionable when it reflects an inequitable and unconscionable bargain sufficient to shock the conscience.

353.     Contracts of adhesion, specifically, are unconscionable and therefore invalid under Virginia law if they contain one-sided terms that put an unfair obligation on the party in a weaker bargaining position.

354.     Smoothstack's TRAP is an unconscionable contract provision.

355.     The inequality created by Smoothstack's TRAP provision is so gross as to shock the conscience.

356.     Plaintiff Reed and the Class have been harmed by this unlawful penalty, as set forth above. They seek a declaration that the TRAP is unconscionable and void, injunctive relief, costs and necessary attorneys' fees, and all other relief available under Virginia law.

**SIXTH CAUSE OF ACTION**
**Virginia Common Law: Unenforceable Contract Provision**
**(Brought on Behalf of Plaintiff Reed and the Class)**

357.     Plaintiff Reed realleges and incorporates by reference all allegations in all preceding paragraphs.

358.     Liquidated damages clauses constitute unenforceable penalties when they fail to meet either of the following requirements: (1) the damages resulting from the breach are susceptible to definite measurement; or (2) the stipulated damages are in excess of the actual damages suffered by the nonbreaching party.

359.     Smoothstack's TRAP is an unenforceable penalty. The harm caused by Recruits and Consultants who leave Smoothstack before fulfilling the 4,000-hour Service Commitment Period is susceptible to definite measurement.

360.     Further, the amount of liquidated damages in the TRAP is in excess of the actual damages suffered by Smoothstack.

361.     Plaintiff Reed and the Class have been harmed by this unlawful penalty, as set forth above. They seek a declaration that the TRAP is unlawful and unenforceable against them, an award equal to actual damages sustained (including but not limited to the monies that the Class has paid to Smoothstack under the TRAP, or to any collections agency on Smoothstack's behalf), injunctive relief, costs and necessary attorneys' fees, and all other relief available under Virginia law.

### SEVENTH CAUSE OF ACTION
**Virginia Code § 40.1-28.7:8: Unlawful Non-Compete**
**(Brought on behalf of Plaintiff Reed and the Class)**

362.     Plaintiff Reed realleges and incorporates by reference all allegations in all preceding paragraphs.

363.     Plaintiff Reed and the Class are "low-wage employees" under Virginia Code § 40.1-28.7:8.A because they are employees of Smoothstack whose average weekly earnings are below the statutory thresholds for the relevant period.

364.     Smoothstack is an employer under Virginia Code § 40.1-28.7:8.A.

365.     The TRAP is a covenant not to compete under Virginia Code § 40.1-28.7:8.A because is a provision of a contract of employment that restrains, prohibits, or restricts employees' ability to compete with Smoothstack following the termination of employment by

imposing a penalty of up to almost $30,000 for employees who quit their jobs to work for a competitor.

366.    Smoothstack unlawfully enters into, enforces, and threatens to enforce TRAPs with its low-wage employees.

367.    Plaintiff Reed and the Class have been harmed by Smoothstack's use of the TRAP, including *inter alia* damages via wage suppression and all money that Smoothstack has demanded or received in payment of the purported debt.

368.    They seek a declaration that the TRAP is unlawful and unenforceable against them, an award equal to actual damages sustained (including but not limited to the monies that the Class has paid to Smoothstack under the TRAP, or to any collections agency on Smoothstack's behalf, wage suppression damages, and lost compensation), liquidated damages, injunctive relief, costs and necessary attorneys' fees, and all other relief available under Virginia law.

**EIGHTH CAUSE OF ACTION**
**Fair Labor Standards Act: Retaliation**
**(Brought on Behalf of Plaintiff O'Brien Individually)**

369.    Plaintiff O'Brien realleges and incorporates by reference all allegations in all preceding paragraphs.

370.    The FLSA, 29 U.S.C. § 215(a)(3), prohibits retaliation against employees who complain about an employer's wage practices.

371.    Plaintiff O'Brien complained to Defendant about his and putative Collective Members' unpaid minimum and overtime wages.

372.     After and as a result of Plaintiff O'Brien's complaints, on or around March 24, 2023, Defendant retaliated against him by removing him from his contract with Accenture and reducing his wages from $31.25 per hour to minimum wage.

373.     After and as a result of Plaintiff O'Brien's complaints, on or around April 7, 2023, Defendant retaliated against him by terminating his employment.

374.     Defendant's retaliatory conduct was in direct violation of 29 U.S.C. § 215(a)(3) and, as a direct result, Plaintiff O'Brien has been damaged.

375.     Plaintiff O'Brien is entitled to compensatory and punitive damages under the FLSA, 29 U.S.C. § 215(a)(3) against Smoothstack for its unlawful retaliatory discharge, declaratory relief that Defendant's conduct violated the FLSA, costs of suit, and reasonable attorneys' fees under the FLSA.

## NINTH CAUSE OF ACTION
**Fair Labor Standards Act: Regular Rate Violation**
**(Brought on Behalf of Plaintiff Reed and the FLSA Collective)**

376.     Plaintiff Reed realleges and incorporates by reference all allegations in all preceding paragraphs.

377.     The FLSA, 29 U.S.C. § 207(1)-(2), requires employers to pay employees who work over 40 hours per week at a rate of 1.5x their "regular rate" of pay for each hour over 40.

378.     Defendant has engaged in a widespread pattern and practice of violating the FLSA, as described in this Complaint.

379.     At all relevant times, Plaintiff Reed and other similarly situated current and former employees were engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

380.    At all relevant times, Defendant employed Plaintiff Reed and other similarly situated current and former employees.

381.    The overtime wage provisions set forth in 29 U.S.C. § 201 *et seq.* of the FLSA apply to Defendant.

382.    At all relevant times, Defendant has been an employer engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 206(a) and 207(a).

383.    At all relevant times, Plaintiff Reed and other similarly situated current and former employees were employees within the meaning of 29 U.S.C. §§ 203(e) and 207(a).

384.    Defendant failed to pay Plaintiff Reed and other similarly situated current and former employees at a rate of 1.5x their "regular rate" of pay for each hour over 40 worked per week to which they are entitled under the FLSA.

385.    Defendant's violations of the FLSA have been willful and intentional.  Defendant failed to make a good faith effort to comply with the FLSA with respect to its compensation of Plaintiff Reed and other similarly situated current and former employees.

386.    Because Defendant's violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

387.    As a result of Defendant's willful violations of the FLSA, Plaintiff Reed and other similarly situated current and former employees have suffered damages by being denied overtime wages in accordance with 29 U.S.C. §§ 201 *et seq*.

388.    As a result of the unlawful acts of Defendant, Plaintiff Reed and other similarly situated current and former employees have been deprived of overtime wage compensation and in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated

damages, prejudgment interest, attorneys' fees, costs and other compensation pursuant to 29 U.S.C. § 216(b).

## TENTH CAUSE OF ACTION
**Virginia Consumer Protection Act: Unlawful Use of Liquidated Damages Clause**
**(Brought on Behalf of Plaintiffs and the Class)**

389.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

390.    The VCPA, Va. Code Ann. § 59.1-200(13), prohibits suppliers of consumer transactions from using, in connection with such transactions, any contract with a liquidated damage or penalty clauses.

391.    At all relevant times, the Defendant was a seller or professional that advertised, solicited, or engaged in consumer transactions, and was therefore a "supplier" within the meaning of Va. Code Ann. § 59.1-198.

392.    Defendant's training and placement with clients of Plaintiffs and the Class was work performed in its business or occupation, and was therefore a "service" within the meaning of Va. Code Ann. § 59.1-198.

393.    At all relevant times, Defendant's service related to Plaintiffs' and the Class's finding or obtaining employment, and was therefore a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.  Smoothstack advertised and offered to Plaintiffs and the Class that its training would help them find and obtain employment.  Smoothstack advertised that Plaintiffs and Class would obtain work with one of its clients by offering extensive training as well as resume writing assistance tailored to the specific client's job requirements.

394.    At all relevant times, Defendant represented that its service was primarily offered for personal, family, or household purposes, and was therefore a "consumer transaction" within

the meaning of Va. Code Ann. § 59.1-198.  Smoothstack offered an educational program for which it required repayment through a specified number of work hours for a Smoothstack client or through a cash payment.

395.    At all relevant times, Plaintiffs and the Class were persons within the meaning of Va. Code Ann. § 59.1-198.

396.    Defendant's use of a liquidated damages or penalty clause within the TRAP is a violation of the VCPA within the meaning of Va. Code Ann. § 59.1-200(A)(13) by including a provision in the TRAP that requires Plaintiffs and Class to repay up to $30,000 if they fail to complete the training or the 4,000 hour work requirement.

397.    Plaintiffs and the Class have suffered a loss by the use of this unlawful liquidated damages clause, as they received no payment or underpayment because of this clause, as set forth above.  They seek a declaration that the use of the liquidated damages clause in the TRAP is unlawful and that the liquidated damages clause is unenforceable against them.  They also seek an award equal to actual or statutory damages sustained, reasonable court costs and attorney's fees, and all other relief available under Virginia law.

**ELEVENTH CAUSE OF ACTION**
**Virginia Consumer Protection Act: Attempting to Collect Unlawful Liquidated Damages**
**(Brought on Behalf of Plaintiff Reed and the Class)**

398.    Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs.

399.    The VCPA, Va. Code Ann. § 59.1-200(13), prohibits suppliers of consumer transactions from attempting to collect, in connection with such transactions, any contract with an unlawful liquidated damage clause or penalty clause.

400.    At all relevant times, the Defendant was a seller or professional that advertised, solicited, or engaged in consumer transactions, and was therefore a "supplier" within the meaning of Va. Code Ann. § 59.1-198.

401.    At all relevant times, Defendant's training and placement with clients of Plaintiffs and the Class was work performed in its business or occupation, and was therefore a "service" within the meaning of Va. Code Ann. § 59.1-198.

402.    At all relevant times, Defendant's service related to Plaintiff Reed and the Class's finding or obtaining employment, and was therefore a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.  Upon information and belief, Smoothstack advertised and offered to Plaintiff Reed and the Class that its training would help them find and obtain employment.  Smoothstack advertised that Plaintiff Reed and Class would obtain work with one of its clients by offering extensive training as well as resume writing assistance tailored to the specific client's job requirements.

403.    At all relevant times, Defendant represented that its service was primarily offered for personal, family, or household purposes, and was therefore a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.  Smoothstack offered an educational program for which it required repayment through a specified number of work hours for a Smoothstack client or through a cash payment.

404.    At all relevant times, Plaintiff Reed and the Class were persons within the meaning of Va. Code Ann. § 59.1-198.

405.    Defendant violated the VCPA by attempting to collect on an unlawful liquidated damages or penalty clause from Plaintiff Reed, and other similarly situated Class Members, within the meaning of Va. Code Ann. § 59.1-200(A)(13).

406.    Under the VCPA, the amount within the liquidated damages clause must be a reasonable estimation of actual damages that are naturally difficult to ascertain. The clause must not function as a penalty to ensure performance.

407.    Smoothstack's TRAP, charging employees almost $30,000, is not a reasonable estimation of actual damages that Smoothstack claims to have suffered, rather it functions as a penalty to ensure employees complete the training and 4,000-hour work requirement. Thus, it is an unlawful liquidated damages clause.

408.    Smoothstack attempted to collect on the unlawful liquidated damages clause contained within the TRAP in violation of the VCPA.

409.    Plaintiff Reed and the Class have suffered loss by Smoothstack's attempt to collect on the TRAP, as set forth above. They seek a declaration that the attempt to collect on an unlawful liquidated damages clause included in the TRAP is a violation of the VCPA and that the liquidated damages clause is unenforceable against them. They also seek an award equal to actual or statutory damages sustained, reasonable court costs and attorney's fees, and all other relief available under Virginia law.

### TWELFTH CAUSE OF ACTION
**Virginia Consumer Protection Act: Misrepresentation**
**(Brought on Behalf of Plaintiffs and the Class)**

410.    Plaintiffs realleges and incorporates by reference all allegations in all preceding paragraphs.

411.    The VCPA, Va. Code Ann. § 59.1-200(14), prohibits suppliers of consumer transactions from making false promises or misrepresentations in connection with such transactions.

412.    At all relevant times, the Defendant was a seller or professional that advertised, solicited, or engaged in consumer transactions, and was therefore a "supplier" within the meaning of Va. Code Ann. § 59.1-198.

413.    At all relevant times, Defendant's training and placement with clients of Plaintiffs and the Class was work performed in its business or occupation, and was therefore a "service" within the meaning of Va. Code Ann. § 59.1-198.

414.    At all relevant times, Defendant's service related to Plaintiffs' and the Class's finding or obtaining employment, and was therefore a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.  Upon information and belief, Smoothstack advertised and offered to Plaintiffs and the Class that its training would help them find and obtain employment.  Smoothstack advertised that Plaintiffs and Class would obtain work with one of its clients by offering extensive training as well as resume writing assistance tailored to the specific client's job requirements.

415.    At all relevant times, Defendant represented that its service was primarily offered for personal, family, or household purposes, and was therefore a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.  Smoothstack offered an educational program for which it required repayment through a specified number of work hours for a Smoothstack client or through a cash payment.

416.    At all relevant times, Plaintiffs and the Class were persons within the meaning of Va. Code Ann. § 59.1-198.

417.    Defendant's use of false promises and misrepresentations throughout its engagement in the consumer transactions violated the VCPA within the meaning of Va. Code Ann. § 59.1-200(A)(14).

418.    Defendant violated Va. Code Ann. § 59.1-200(A)(14) by misrepresenting the nature and quality of the Training Program as Plaintiffs and Class Members often used Google to assist them in completing assignments during training.  Defendant also misrepresented the actual cost of the Training Program in violation of the VCPA.

419.    Defendant misrepresented the number of hours and weeks it would take to complete the program as many employees worked extensive overtime for six months without proper compensation.

420.    Defendant misrepresented that Plaintiffs and the Class Members would be assigned to a Fortune 500 company when training was complete, when many would be placed in Bench Status awaiting assignment and being their home state's paid minimum wage.

421.    In reliance upon the misrepresentations, Plaintiffs and the Class applied for positions with Smoothstack only to learn that they would be subjected to extensive working hours with no pay and overtime pay, as well as time periods where they may be only paid their home state's minimum wage while waiting for an assignment that does not count towards the billable hours requirement in the TRAP.

422.    Plaintiffs and the Class have suffered loss by the Defendant's false promises and misrepresentations in violation of Va. Code Ann. § 59.1-200(A)(14), as set forth above. They seek a declaration that the TRAP is an unlawful consumer transaction based on misrepresentations. They also seek an award for actual or statutory damages sustained, reasonable court costs and attorneys' fees, and all other relief available under Virginia law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all other similarly situated persons, seeks the following relief:

A.      Conditional Certification of this collective action pursuant to 29 U.S.C. § 216(b) of the FLSA and that, at the earliest possible time, Plaintiffs be allowed to give notice of this collective action, or that the Court issue such notice, to all Recruits and Consultants and similarly situated employees who are presently, or have at any time since April 13, 2020, up through and including the date of this Court's issuance of court-supervised notice, worked for Smoothstack. Such notice shall inform them that this civil action has been filed, of the nature of the action, and of their right to join this lawsuit if they believe they were denied proper wages;

B.      Unpaid minimum wages and an additional and equal amount as liquidated damages pursuant to the FLSA and the supporting United States Department of Labor regulations;

C.      Unpaid overtime pay and an additional and equal amount as liquidated damages pursuant to the FLSA and the supporting United States Department of Labor regulations;

D.      Certification of the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

E.      Designation of Plaintiff Reed as a Class Representative for the Class and counsel of record as Class Counsel;

F.      Issuance of a declaratory judgment that the practices complained of in Counts I through XII of this Complaint are unlawful;

G.      Award Plaintiff O'Brien backpay, damages and equitable relief, including restitution, reinstatement, and disgorgement, in an amount subject to proof at trial;

H.      Award Plaintiffs and the Class actual damages or statutory damages in the amount of $500 each, whichever is determined to be greater for Defendant's violation of the VCPA;

I.      Pre-judgment interest and post-judgment interest;

J.      Appropriate equitable and injunctive relief to remedy violations, including preliminarily and permanently enjoining Defendant and its officers, agents, successors, employees, representatives, and any and all persons acting in concert with them from engaging in the unlawful practices set forth in this Complaint;

K.      A reasonable service award for Plaintiffs to compensate them for the time and effort they have spent and will spend protecting the interests of putative Collective and Class Members, and the risks they are undertaking;

L.      Reasonable attorneys' fees and costs of the action; and

M.      Such other relief as this Court shall deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Date: July 16, 2024                         Respectfully submitted,


By:    /s/*Molly Elkin*
Molly Elkin (Va. Bar No. 40967)
Rachel Lerner*
**McGillivary Steele Elkin LLP**
1101 Vermont Ave NW, Suite 1000
Washington, D.C. 20005
Phone: (202) 833-8855
Email: mae@mselaborlaw.com
Email: rbl@mselaborlaw.com

Rachel W. Dempsey*
**Towards Justice**
PO Box 371680, PMB 44465
Denver, CO 80237
Telephone: (720) 441-2236
Email: rachel@towardsjustice.org

Jahan C. Sagafi*
**Outten & Golden LLP**
One California Street, 12th Floor
San Francisco, CA 94111
Telephone: (415) 638-8837
Email: jsagafi@outtengolden.com

Hannah Cole-Chu*
Courtney J. Hinkle*
**Outten & Golden LLP**
1225 New York Ave, NW Suite 1200B
Washington, D.C. 20005
Telephone: (202) 915-5810
Email: hcolechu@outtengolden.com
Email: chinkle@outtengolden.com

Persis Yu*
**Student Borrower Protection Center**
(a fiscally sponsored project of the Shared
Ascent Fund)
1025 Connecticut Ave NW, #717
Washington, D.C. 20036
Telephone: (202) 670-3871
Email: persis@protectborrowers.org

* Admitted *Pro hac vice*

*Attorneys for Plaintiff and the FLSA
Collective*

**CERTIFICATE OF SERVICE**

I certify that on July 16, 2024, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system which will send notification of such filing to the following:

Dirk Harris McClanahan
Zachary Charles Miller
McClanahan Powers, PLLC
3160 Fairview Park Drive, Suite 410
Falls Church, VA 22042
Telephone: (703) 520-1326
Email: dmcclanahan@mcplegal.com
Email: zmiller@mcplegal.com

/s/ Molly A. Elkin