IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JUSTIN O'BRIEN and SKYLAR REED,      )
on behalf of themselves and all others      )
similarly situated,      )
      )
        Plaintiffs,      )
      )
            v.      )      Civil Action No. 1:23-cv-491 (RDA/LRV)
      )
SMOOTHSTACK, INC.,      )
      )
        Defendant.      )
_____      )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Smoothstack Inc.'s ("Defendant" or "Smoothstack") Motion to Dismiss Plaintiffs' Second Amended Complaint (Dkt. 88) ("Motion"). This matter has been fully briefed and oral argument was heard on May 14, 2025. Accordingly, the matter is now ripe for disposition. Having considered the Motion together with the Second Amended Class and Collective Action Complaint (Dkt. 79) (the "SAC"), Defendant's Memorandum in Support (Dkt. 89), Plaintiffs' Opposition (Dkt. 95), and Defendant's Reply (Dkt. 96), this Court GRANTS-IN-PART and DENIES-IN-PART Defendant's Motion for the reasons that follow.

## I. BACKGROUND

### A. Factual Background[1]

Plaintiffs Justin O'Brien and Skylar Reed ("Plaintiffs") bring a Second Amended Complaint ("SAC") on behalf of themselves, and all other similarly situated individuals, seeking: (i) unpaid minimum wages and unpaid overtime pay pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, (the "FLSA"); (ii) a declaratory judgment that Defendant's practices are unlawful; (iii) backpay; and (iv) damages.  Dkt. 79.  Defendant is an employee-staffing agency that recruits information technology ("IT") professionals ("Recruits") who are in the early stages of their careers, provides them with training, and then places them with new clients mainly in Fortune 500 companies.  *Id.* ¶ 1.

#### 1.  Defendant's Training Program, Assignment System, and Employee Agreements

At the start of employment, Defendant requires Recruits to participate in a training program covering programming and other IT skills which can last up to six months.  *Id.* ¶ 10.  During the training program, Recruits attend presentations, lectures, and training sessions every weekday, and are also assigned "challenging and time-consuming assignments, which take many hours to complete" and have short deadlines.  *Id.* ¶ 11.  On its website, Defendant claims to offer pay and full benefits during the training program, however, Recruits are not compensated for the first two to three weeks of the program (the "Unpaid Period").  *Id.* ¶ 12.  Recruits still work up to and beyond 40 hours in each workweek during this Unpaid Period.  *Id.*  For the remainder of the training program, Recruits are paid "the prevailing minimum wage in the state where they work,"

---

[1]For purposes of considering the instant Motion to Dismiss, the Court accepts all facts contained within Plaintiff's SAC as true, as it must at the motion-to-dismiss stage.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

subject to a payment cap of 40 hours per week (the "Underpaid Period"). *Id.* ¶ 13. Nonetheless, Recruits often work beyond 40 hours in a week. *Id.* Plaintiffs thus assert that Defendant violates FLSA by failing to compensate Recruits for work performed during the Unpaid Period and by failing to compensate Recruits for any hours worked in excess of 40 hours, "which must be paid at a premium overtime rate of 1.5 times their hourly rate." *Id.* ¶ 15.

After training is complete, Recruits become "Consultants" and "are available to take assignments with Smoothstack's clients in any of a variety of roles, such as [a] software engineer, cybersecurity analyst, development operations engineer, or the like." *Id.* ¶ 16. Defendant determines when and whether to assign a Consultant to a particular client. *Id.* ¶ 18. When on assignment, Consultants earn between $26.00 to $31.00 per hour. *Id.* ¶ 19. When awaiting assignments, however, Consultants earn minimum wage and are prevented from leaving employment without paying a penalty relating to the terms of their employment agreement, as described below. *Id.*

At various stages of employment, Defendant requires each Recruit to sign an agreement governing the employment relationship that includes a Training Repayment Agreement Provision ("TRAP"). *Id.* ¶¶ 20-21. Recruits are first required to sign a TRAP shortly after they are hired as a condition of their continued employment. *Id.* ¶ 20. The TRAP requires a Recruit to bill 4,000 hours of client work—approximately two years of full-time work—before being permitted to resign (the "Service Commitment Period"). *Id.* ¶ 21. Pursuant to the TRAP, if a Recruit resigns or is terminated for cause prior to the end of the Service Commitment Period, Defendant can require them to pay a penalty upwards of $29,000. *Id.* Once Recruits become Consultants, and before they are placed with one of Defendant's clients, they must sign an employment agreement that contains another TRAP that is nearly identical to the initial TRAP. *See id.* ¶¶ 43-47, 83-86.

While employed with Defendant, Consultants have no guarantee of steady employment or assignments. *Id.* ¶ 21. If a Consultant's assignment ends or if Defendant is unable to place the Consultant in an assignment, then the Consultant is placed on "Bench Status" until they can be reassigned. *Id.* While on Bench Status, none of the Consultant's hours count toward the 4,000-hour Service Commitment Period, they are paid minimum wage, and they are unable to quit without paying the TRAP penalty. *Id.* ¶ 22.

Plaintiffs therefore assert that Defendant's TRAP violates the FLSA because it results in Defendant "not paying employee wages 'finally and unconditionally' or 'free and clear,' as [the] FLSA requires. Rather, employees are paid only on the condition that they do not quit" and "[i]f employees do quit, the TRAP requires them to pay back their earned wages (and then some)." *Id.* ¶¶ 25-26. Further, Plaintiffs and other Consultants have reason to fear that Defendant will enforce the TRAP if they quit because Defendant has previously brought litigation against employees to enforce it. *Id.* ¶ 26 (citing *Smoothstack v. Crowell*, Nos. GV22006209, GV22012000 (Va. Gen. Dist. Ct.); *Smoothstack v. Hill*, No. GV22006208 (Va. Gen. Dist. Ct.); *Smoothstack v. Davtyan*, Nos. GV21010149, GV21015875 (Va. Gen. Dist. Ct.)).

### *2. Plaintiff O'Brien's Allegations*

Plaintiff O'Brien alleges that he began employment with Defendant in Spring 2020. *Id.* ¶¶ 29, 35. During the Unpaid Period of his training program, O'Brien worked long hours, including overtime hours, for which he was not paid. *Id.* ¶ 35. Three weeks after the program began, O'Brien was presented with a training agreement containing a TRAP that "functionally tied" him to Defendant "for at least two years of work, or else he would be required to pay $23,895.00, a sum of money he did not have." *Id.* ¶ 37; *see also id.*, Ex. 1 ("O'Brien Training Agreement"). While O'Brien recognized the potential consequences of the TRAP, Defendant

4

presented the agreement as an "all or nothing" offer and O'Brien was required to sign it to continue his employment. *Id.* ¶ 38. O'Brien signed the training agreement on April 30, 2020. *Id.* ¶ 40. Over the next five months, O'Brien worked "around the clock on time-consuming assignments" that Defendant required him to do. *Id.* ¶ 41.

In October 2020, Defendant assigned O'Brien to work as a Junior Java Developer with Accenture Federal Service ("Accenture"). *Id.* ¶ 42. In connection with the Accenture assignment, Defendant presented O'Brien with an employment agreement to sign. *Id.* ¶ 43; *see also id.*, Ex. 2 ("O'Brien Employment Agreement"). Like the training agreement, the employment agreement contained a TRAP stating that O'Brien could not resign or be terminated for cause prior to billing 4,000 hours to Defendant's clients without paying the TRAP penalty. *Id.* ¶ 47. Unlike the training agreement TRAP, however, the employment agreement TRAP stated that the required 4,000 hours had to be *billable* hours—that is, hours billed to one of Defendant's clients. *Id.* In contrast, the training agreement TRAP allowed O'Brien to receive credit for Bench Status hours as well. *Id.* O'Brien believed he *had* to sign the employment agreement to avoid running afoul of the TRAP in his training agreement, which bound him to complete a 4,000-hour Service Commitment Period. *Id.* ¶ 45. Thus, O'Brien signed the employment agreement on October 20, 2020, to avoid the TRAP penalty in his training agreement. *Id.* ¶¶ 46, 48.

In November 2022, O'Brien, through counsel, sent correspondence to Defendant about Defendant's wage violations and the unenforceable TRAP, and invited Defendant to negotiate a resolution for Plaintiff and a proposed collective. *Id.* ¶ 51. Soon after a phone call between the parties' counsel, O'Brien alleges that Defendant began to retaliate against him. *Id.* ¶ 53. In late January 2023, Defendant's Chief Operating Officer, Boris Kuiper, asked O'Brien about his wage claims against Defendant outside the presence of counsel. *Id.* ¶ 54. In early March 2023,

Defendant removed O'Brien from the Accenture assignment, placed him on Bench Status, and reduced his hourly rate from $31.25 to minimum wage. *Id.* ¶ 55. As a result, O'Brien's working hours did not count toward the 4,000-hour Service Commitment Period under his employment agreement, and he could not leave for a better paying job due to the TRAP penalty. *Id.*

On April 4, 2023, after attempting to engage in negotiations with Defendant and Defendant failing to respond, O'Brien's counsel notified Defendant that he would file a collective action lawsuit. *Id.* ¶¶ 56-57. On April 7, 2023, Defendant terminated O'Brien's employment. *Id.* ¶ 58.

### 3. Plaintiff Reed's Allegations

Plaintiff Reed alleges that he applied to Defendant's Java Spring Batch Training Program in Fall 2022 after seeing advertisements on LinkedIn for Defendant's quality training and job placement with Fortune 500 clients. *Id.* ¶¶ 61, 63. Defendant accepted Reed into the training program in September 2022. *Id.* ¶ 66; *see also id.*, Ex. 6 ("Offer Letter"). Reed began the Unpaid Period as a Recruit in the training program in October 2022, and "immediately began working long hours, including overtime hours, none of which were paid." *Id.* ¶ 67. Reed attended classroom sessions, completed daily coding assignments, and was given even longer difficult assignments to complete over weekends. *Id.* ¶ 68. Reed and others similarly situated did not record their time during the Unpaid Period and Defendant did not track it. *Id.* ¶ 69. Two weeks after starting as a Recruit, Reed was presented with an offer letter and an agreement to sign. *Id.* ¶ 70; *see also id.*, Ex. 4 ("Reed First Agreement"). The agreement contained a TRAP that "functionally tied" Reed to Defendant "for at least two years of work, or else he would be required to pay nearly $30,000." *Id.* ¶ 71. The agreement also provided for Reed to earn "$7.25 an hour during the Training Program, $28.85 an hour during his first year of work for a Smoothstack client (or approximately $60,000 a year), and $33.65 an hour during his second year of work for a

Smoothstack client (or approximately $70,000 a year)." *Id.* ¶ 72. Although Reed recognized the potential consequences that stemmed from the TRAP, Defendant presented the agreement as an "all or nothing" offer and Reed was required to sign it to continue his employment. *Id.* ¶ 73. Reed signed the agreement on November 1, 2022. *Id.* ¶ 75.

Over the next four months, Reed was subject to "significant demands," "attending mandatory classroom training and working around the clock on time-consuming assignments" that Defendant required him to do. *Id.* ¶ 76. Due to Defendant's 40-hour pay cap, Reed recorded 40 hours of work on Defendant's timekeeping system regardless of how many hours he actually worked. *Id.* ¶ 77. As such, Reed was not paid overtime pay during the weeks he worked more than 40 hours. *Id.*

In late February 2023, after completing the training program, Reed and others similarly situated were told that Defendant had been unable to secure client placement for them. *Id.* ¶ 78. As a result, Reed and others waited indefinitely for client assignments and earned minimum wage at that time. *Id.* Reed wanted to quit to find a better paying job during this period, however fear of the $30,000 TRAP penalty prevented him from doing so. *Id.* ¶ 80. In May 2023, Defendant terminated Reed and others after months of requiring them to wait for assignment while earning minimum wage. *Id.* ¶ 81. Defendant waived the TRAPs for Reed and, "upon information and belief," the other employees due to Defendant's failure to secure employment for them. *Id.* ¶ 82.

In June 2023, Defendant offered to rehire Reed and place him with Accenture. *Id.* ¶ 83. Upon Reed's rehiring, Defendant presented a second agreement containing the same pay rates as the previous agreement and a TRAP with a $29,985 penalty. *Id.* ¶ 84; *see also id.*, Ex. 5 ("Reed Second Agreement"). Reed attempted to negotiate to remove the TRAP, but Defendant stated it

was a non-negotiable condition of employment. *Id.* Thus, Reed signed the new agreement on June 14, 2023. *Id.* ¶ 86.

Reed's work for Accenture was "difficult and draining, and the pay was far below market." *Id.* ¶ 87. It also required him to move to San Antonio, Texas, from his home in Bristol, Tennessee. *Id.* Reed wanted to quit; however, the potential consequences from the TRAP prevented him from doing so. *Id.* Reed moved back to Bristol, Tennessee in October 2023, after being authorized to work remotely. *Id.* ¶ 88. During his assignment with Accenture, "Reed worked over 40 hours per week, including during the weeks of February 26, 2024, and March 4, 2024." *Id.* ¶ 89. During that time, Defendant paid Reed only the regular rate of pay, and did not pay an overtime rate. *Id.* In April 2024, the cost of Defendant's insurance premiums for employees doubled and Reed's partner became pregnant with their first child. *Id.* ¶ 90. Reed's situation thus became financially untenable, and he resigned on April 19, 2024. *Id.* ¶ 91.

On April 21, 2024, Defendant's Human Resources ("HR") Manager, Gabriela Hower, left Reed a voice message, requesting that he call her back. *Id.* ¶ 92. Reed called Hower the next day and, on the call, Hower explained that Reed was in breach of his agreement, and that he had three options:

> first, settle with Smoothstack in a lump sum for an amount smaller than the total TRAP amount; second, enter into a 6 to 12-month payment plan for the total amount of the TRAP debt; or third, have his case sent to Smoothstack's legal team, which could take his case to court and garnish his wages.

*Id.* ¶ 94. On April 25, 2024, Hower repeated these three options to Reed over email and added that Defendant could "do a settlement and include a payment plan." *Id.* ¶ 95. She further explained that, if Reed did a "lump sum payment, the amount due would be $20,000," and, if Reed wanted to make a payment plan, "[Smoothstack] can do a down payment of 10k and split the difference in 10 months." *Id.* Reed asked what would happen if he did not sign the settlement agreement,

and Hower responded that the case would go to Defendant's legal department. *Id.* ¶ 96. The proposed settlement agreement attached to Hower's email would require Reed to pay Defendant $20,000 in a lump sum in exchange for a mutual general release of claims. *Id.* ¶ 97. It also included a non-disclosure provision that provided for liquidated damages of $10,000 for breach and a cooperation provision that required Reed to provide Defendant with "reasonable cooperation" in pending and future lawsuits. *Id.* ¶ 97. Reed did not sign the agreement. *Id.* ¶ 98.

### B. Procedural Background

Plaintiff O'Brien filed his initial complaint on April 13, 2023, on behalf of himself and all other similarly situated workers. Dkt. 1. On May 12, 2023, Defendant filed its first motion to dismiss. Dkt. 13. On May 23, 2023, the parties jointly stipulated to dismiss Counts III, V, and VI of the initial complaint, Dkt. 18, and, on May 25, 2023, Plaintiff filed his First Amended Complaint ("FAC"), Dkt. 19. Plaintiff O'Brien asserted four claims under the FLSA against Defendant: (1) failure to pay minimum wages; (2) failure to pay overtime wages; (3) failure to pay wages free and clear; and (4) retaliation. *Id.* ¶¶ 186-231. On June 6, 2023, Defendant filed a Motion to Dismiss Count III of the FAC. Dkts. 21, 22. Following briefing, this Court granted the motion to dismiss on March 28, 2024. Dkt. 44.

On May 23, 2024, Plaintiff O'Brien moved to file the instant SAC, adding Reed as a named Plaintiff. Dkts. 50, 51-2. On June 6, 2024, Defendant "confirmed [via email] that Mr. Reed was released from the service commitment period and any claim for breach of the commitment period was released." Dkt. 89 at 13; Dkt. 96-1 (stating that "Smoothstack stipulates that the Service Commitment Period for Skylar Reed is waived along with any claim for breach of that Service Commitment Period"). On July 12, 2024, U.S. Magistrate Judge Lindsey R. Vaala granted the motion to file the SAC. Dkt. 77. On July 16, 2024, Plaintiff O'Brien, joined by Plaintiff Reed,

filed the SAC, asserting the same four claims under the FLSA, as well as eight additional claims, including illegal kickback and regular rate violations under the FLSA.  Dkt. 79 ¶¶ 299-421.

On July 10, 2024, the Secretary of Labor, United States Department of Labor, initiated a government enforcement action under the FLSA against Defendant Smoothstack and Boris Kuiper, the Chief Operating Officer and Chief Financial Officer of Defendant, in the Eastern District of New York.  *See Chavez-DeRemer v. Smoothstack, Inc., et al.*, 1:24-cv-2295 (E.D. Va.) (the "*DOL Lawsuit*"), Dkt. 1.[2]  The Secretary's complaint alleged that, "[i]n brazen contravention of the [FLSA]," Defendants Smoothstack and Kuiper have engaged in a scheme that "exploits the disparate bargaining power between Defendants and their employees and traps employees in their jobs." *Id.* ¶ 1.  The complaint asserted five claims under the FLSA against Defendants: (1) failure to pay minimum wage; (2) failure to pay overtime; (3) retaliation; (4) interference of the Secretary's Investigation; and (5) failure to keep accurate records.  *Id.* ¶¶ 152-170.

On August 29, 2024, in the case at bar, Defendant filed the instant Motion to Dismiss the SAC.  Dkts. 88, 89.  Defendant primarily argues that the SAC is barred by the termination-of-rights provision under the FLSA, 29 U.S.C. § 216.  Section 216 states that the filing of a complaint by the Department of Labor in specified circumstances terminates the right to bring an action by or on behalf of any employee and the right of any employee to become a party plaintiff to any such action. Dkt. 89 at 4-5.  Defendant further asserts that, to the extent that any claims in the SAC are not dismissed pursuant to Section 216, the matter should be stayed pending resolution of the *DOL Lawsuit*.  *Id.* at 6.  Plaintiffs filed their opposition on September 19, 2024, Dkt. 95, and Defendant filed its reply on September 25, 2024,  Dkt. 96.

---

[2] Because the case was ultimately transferred to the Eastern District of Virginia, the Court refers only to the docket and case number in this District.

On December 18, 2024, the *DOL Lawsuit* was transferred to the Eastern District of Virginia and assigned to this District Judge. *DOL Lawsuit*, Dkt. 17. On January 17, 2025, Defendants Smoothstack and Kuiper filed a motion to dismiss the Secretary's complaint for failure to state a claim. *DOL Lawsuit*, Dkts. 31, 32. The Secretary filed an opposition on February 14, 2025, Dkt. 38, and Defendants filed their reply on March 3, 2025, Dkt. 40.

Recognizing the related nature and the potential for an overlapping of issues under the FLSA between the case at bar and the DOL Lawsuit, this Court requested additional briefing to address whether the motions to dismiss pending in each case should be considered together. Dkt. 99. The parties filed their positions on the issue on April 9, 2025. Dkt. 100; *DOL Lawsuit*, Dkts. 46, 47. On May 14, 2025, the Court held a hearing on the issue, during which the parties in the *DOL Lawsuit* informed the Court that they reached a settlement and would submit a notice of dismissal. *DOL Lawsuit*, Dkt. 54. The Court then heard argument on the pending motion to dismiss in the instant lawsuit. Dkt. 104. On February 16, 2025, the Secretary filed a Notice of Voluntary Dismissal in the *DOL Lawsuit*, and the action was dismissed with prejudice on May 21, 2025. *DOL Lawsuit*, Dkts. 55, 56.

## II. STANDARD OF REVIEW

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). In reviewing a Rule 12(b)(6) motion, the Court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du*

*Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).

To be sure, "the [C]ourt 'need not accept the [plaintiff's] legal conclusions drawn from the facts,'

nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'"

*Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v.*

*Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)).  Typically, "courts may not look beyond the

four corners of the complaint in evaluating a Rule 12(b)(6) motion."  *Linlor v. Polson*, 263 F. Supp.

3d 613, 618 (E.D. Va. 2017) (citing *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d

500, 508 (4th Cir. 2015)).  Nonetheless, "courts may consider . . . documents attached to the

complaint . . . 'so long as they are integral to the *complaint* and authentic.'"  *Hugler v. Vinoskey*,

2017 WL 1653725, at *5 (W.D. Va. May 2, 2017) (quoting *Philips v. Pitt Cty. Mem'l Hosp.*, 572

F.3d 176, 180 (4th Cir. 2009)).

## III.  ANALYSIS

Plaintiffs assert twelve Counts against Defendant in the SAC.  In its Motion to Dismiss,

Defendant raises a number of challenges.  The Court will begin by addressing Defendant's

standing arguments as to Counts 3-6.  Next, the Court will address Defendant's failure-to-state-a-

claim arguments as to Counts 7, and 10-12.  Finally, the Court will address Defendant's argument

that the SAC is barred by the FLSA termination-of-rights provision, 29 U.S.C. § 216.[3]

---

[3] In its Motion, Defendant also argues that, to the extent any new claims in the SAC are not dismissed, then the matter should be stayed pending the resolution of the *DOL Lawsuit*.  Dkt. 89 at 8.  Because the *DOL Lawsuit* was dismissed with prejudice on May 21, 2025, *DOL Lawsuit*, Dkts. 55, 56, this argument is moot.

Additionally, Defendant argues that Count 12 is preempted.  Dkt. 89 at 10-11.  Because the Court finds that Plaintiffs fail to state a claim for Count 12, the Court declines to address this argument.  Similarly, Defendant argues that Counts 3-4 fail to state a claim, *id.* at 16-17, that Plaintiffs cannot recover attorneys' fees as to Counts 5-6, *id.* at 17-18, and that Counts 4-6 are barred by judicial estoppel, *id.* at 16-18.  Because the Court finds that Plaintiffs lack standing to assert Counts 3-6, the Court also declines to address these arguments.

### A. Plaintiffs Lack Standing to Assert Counts 3-4.

Counts 3 and 4 assert a "failure to pay wages free and clear" claim and an "illegal kickback" claim under the FLSA brought on behalf of Plaintiff Reed and the FLSA collective. *See Morris v. King Oak Enters., Inc.*, 2024 WL 4476303 (D. Md. Oct. 11, 2024) (explaining that the FLSA has a "long-standing requirement that an employee's wages must be free and clear, and an employer violates the FLSA where kickbacks directly or indirectly to the employer . . . reduce the employee's compensation below the minimum wage" (internal quotation marks and citations omitted)). Count 3 alleges that Defendant failed to pay wages free and clear by "requiring Plaintiff Reed and the FLSA collective to repay their earned and taxed wages to Defendant once their employment with Defendant ended," such that Plaintiffs were paid wages upon the condition that they did not leave their jobs. Dkt. 79 ¶ 331. Count 4 alleges that the required repayment of costs "is an illegal kickback of wages to Defendant." *Id.* ¶ 345. Both Counts are based on the TRAP provision in the employment agreement which states that "[i]n the event that the Employee resigns or is terminated for Cause prior to Commitment Period . . . , the Employee shall pay $23,875 to the Company to reimburse the Company for the Training, Marketing, and On-Boarding Cost." Dkt. 79-2 at 12. Plaintiffs previously withdrew Count 3, which was then asserted on behalf of O'Brien, pursuant to a joint stipulation, Dkt. 18, and the Court previously dismissed Count 4, which was then asserted on behalf of O'Brien, for lack of standing, Dkt. 44. Those counts are now reiterated in the SAC on behalf of Reed and the collective and, in support of dismissal here, Defendant again argues that Plaintiffs have failed to establish standing for both counts and that both counts fail to state a claim. Dkt. 89 at 11-15.

With respect to standing, Article III requires a plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to

be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560). To be "concrete," the injury "must actually exist"—meaning that it is "real" and "not abstract." *Spokeo, Inc.*, 578 U.S. at 340. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* at 339. "And while it is true that threatened rather than actual injury can satisfy Article III standing requirements, not all threatened injuries constitute an injury-in-fact. Rather, as the Supreme Court has emphasized repeatedly, an injury-in-fact must be concrete in both a qualitative and temporal sense." *Beck v. McDonald*, 848 F.3d 262, 271 (4th Cir. 2017) (internal quotation marks and citations omitted).

Defendant asserts that Reed lacks standing to bring Counts 3 and 4 on behalf of himself or others similarly situated because he has not suffered an injury-in-fact. *Id.* at 12-14. According to Defendant, Reed's allegations present only a hypothetical scenario because he "never actually returned any wages, made any payment to Smoothstack, or had any wages deducted upon leaving employment." *Id.* at 13. Additionally, Defendant states that it has stipulated that no repayment is due. *Id.* at 13. Therefore, Defendant contends that Reed has not demonstrated injury-in-fact to support Article III standing. *Id.*

Plaintiffs respond by distinguishing Reed's circumstances from those of O'Brien, who this Court previously found lacked standing to bring Count 4. Plaintiffs assert that Defendant threatened Reed, unlike O'Brien, with litigation to recover payment pursuant to the TRAP provision, and that threats of litigation are sufficient to establish Article III standing. Dkt. 95 at

18.  Separately, Plaintiffs also assert that Reed has standing because incurring a debt, or believing that one has incurred a debt, is an injury-in-fact itself.  *Id.* at 18-19.  With regard to Defendant's statement that it has stipulated that no repayment is due, Plaintiffs argue that this voluntary cessation does not create a lack of standing because "Smoothstack's non-binding statement that they do not intend to enforce the TRAP against Plaintiff Reed" and its vigorous defense of the TRAP show that the allegedly wrongful behavior could be reasonably expected to recur.  *Id.* at 19-20.

In reply, Defendant states that it has expressly released Reed from the Service Commitment Period and waived any claims against Reed for breach of the same, and attaches a June 6, 2024 email from counsel for Defendant to counsel for Plaintiffs, which states the following: "As with Mr. O'Brien, Smoothstack stipulates that the Service Commitment Period for Skylar Reed is waived along with any claim for breach of that Service Commitment Period."  Dkt. 96-1 at 1. Defendant also argues that "'fear' of some pending or future contingency is not sufficient to confer standing," and that the mere threat of litigation, "where the underlying claims have been released, regarding payment that never occurred, for wages that never fell below the minimum wage," is insufficient to confer standing.  *Id.* at 11.  The Court will first address the arguments pertaining to whether Plaintiff Reed has established *actual* injury-in-fact; then the Court will address the arguments about whether Plaintiff Reed has established *imminent* injury-in-fact.

As to actual injury-in-fact, the Court finds that Plaintiffs have failed to meet their burden. It is undisputed that Reed—like O'Brien—never actually returned any wages, made any payment to Defendant, or had any wages deducted upon leaving his employment.  Plaintiffs argue in their Opposition, however, that Reed suffered an actual injury-in-fact through "real harms associated with owing, or believing he owed, Smoothstack a nearly $30,000 debt."  Dkt. 95 at 18-19.

Plaintiffs rely on *Stein v. HHGREGG, Inc.*, 873 F.3d 523 (6th Cir. 2017), for this proposition. In *HHGREGG*, the Sixth Circuit held the plaintiffs had "alleged sufficient facts . . . to support their claim that defendants violate[d] the FLSA by continuing to hold their employees liable for draw payments [wages advanced to employees when their commission fell below minimum wage] even upon termination." *Id.* at 536. Without addressing Article III standing, the court stated that "[i]ncurring a debt, or even believing that one has incurred a debt, has far-reaching practical implications for individuals" and "could affect the way an individual saves money or applies for loans." *Id.* at 535. While this Court recognizes that an employee who has been fired for cause or resigns *may* have experienced legitimate harm by believing—pursuant to the TRAP—that they incurred a debt, the Court is unconvinced that merely alleging that Reed experienced "real harms associated with owing, or believing he owed, Smoothstack a nearly $30,000 debt" is sufficient, without more, to establish the kind of "concrete," "not abstract" injury required for Article III standing. *See Spokeo, Inc.*, 578 U.S. at 340. And Plaintiffs' recitation of abstract and hypothetical language from *HHGREGG* cannot fill this gap. *See* Dkt. 95 at 18 (arguing that "[i]ncurring a debt, or even believing that one has incurred a debt, *has far-reaching practical implications for individuals*" and "*could* affect the way an individual saves money or applies for loans" (emphasis added) (quoting Dkt. 44 (quoting *HHGREGG*, 873 F.3d at 535))).

As to imminent injury-in-fact, the Court finds that, although an active threat of litigation may, in some cases, establish the required injury under Article III, Defendant's express written release of Reed from the Service Commitment Period and waiver of any claims against Reed for breach of the same shows that Reed cannot have "an objective and reasonable apprehension of future litigation" sufficient to create Article III standing. *Ketner v. Branch Banking and Tr. Co.*, 143 F. Supp. 3d 370, 383 (M.D.N.C. 2015). Plaintiffs' reliance on *Ketner* and *Volvo* is inapposite

16

as neither found Article III standing based on a "threat of litigation," where the underlying claims have been released in a writing filed with the Court. *See id.* ("BB & T has hired a law firm that has sent Ketner collection letters, demanding payment under the TCA and threatening legal action if payment was not made. BB & T has enforced the TCA against other graduates of the LDP in the past, recovering money from these individuals. Such actions on the part of BB & T demonstrate that Ketner's injury is neither speculative nor hypothetical but is based on BB & T's adverse collection activities and on 'an objective and reasonable apprehension of future litigation' regarding his alleged payment obligations under the TCA." (citations omitted) (quoting *Energy Recovery, Inc. v. Hauge*, 133 F. Supp. 2d 814, 817 (E.D. Va. 2000))); *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 593-94 (4th Cir. 2004) ("When Volvo initiated its declaratory judgment action in North Carolina, it had terminated the Dealer Agreements, it had received the Dealers' litigation threats, and separate suits had been filed against it in Maine and Texas. In these circumstances, Volvo possessed a reasonable apprehension of a multiplicity of litigation and of liability for ongoing damages."). Here, Plaintiffs do not allege any facts that come close to alleging the same factual predicate for standing as in *Ketner* and *Volvo*, especially given Defendant's written waiver of claims.

While it is true that "a defendant's 'voluntary cessation of a challenged practice' will moot a case only if the defendant can show that the practice cannot 'reasonably be expected to recur,'" *FBI v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000)), Defendant's express written waiver satisfies that standard here.[4]  *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 93 (2013)

---

[4] As the parties note, voluntary cessation usually arises in the context of mootness, not standing. Dkt. 95 at 27 n.7; Dkt. 96 at 11 n.11. In this case—where Defendant ceased its allegedly illegal activity after Plaintiffs filed their motion for leave to file the SAC (which attached the

(holding that a defendant met the burden imposed by the voluntary cessation test when it entered into an "unconditional and irrevocable" agreement that prohibited it from returning to the challenged conduct). While Plaintiffs attempt to frame this waiver as a "non-binding statement that [Defendant does] not intend to enforce the TRAP against Plaintiff Reed," this argument is belied by the clear text of the June 6, 2024 email. Dkt. 96-1 at 1 ("As with Mr. O'Brien, Smoothstack stipulates that the Service Commitment Period for Skylar Reed is waived along with any claim for breach of that Service Commitment Period.").

The cases Plaintiffs cite do not contain such an express, written waiver, and they are therefore inapposite. *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n.11 (1982) (holding case was not moot because "the city's repeal of the objectionable language [did] not preclude it from reenacting precisely the same provision" and "the city [had] announced just such an intention"); *Porter v. Clarke*, 852 F.3d 358, 360 (4th Cir. 2017) (holding case was not moot because the defendants "repeatedly [had] refused to rule out a return to the challenged policies"); *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (holding case was not moot because the defendant "vigorously defend[ed] the constitutionality of its race-based program, and nowhere suggest[ed] that if this litigation [were] resolved in its favor it [would] not resume using race to assign students"); *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968) (holding case was not moot because defendants proffered

---

proposed SAC) but before the motion was granted—the same legal authorities apply. *See Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 718 (2007) (applying the voluntary cessation doctrine to standing); *Friends of the Earth, Inc.*, 528 U.S. at 189-92 (acknowledging the distinction between mootness and standing doctrines); *see also U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) ("[M]ootness [is] 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." (quoting Henry P. Monaghan, *Constitutional Adjudication: The Who and When*, 82 Yale L.J. 1363, 1384 (1973))).

only their "own statement that it would be uneconomical for them to engage in any further joint operations"); *Wall v. Wade*, 741 F.3d 492, 497 (4th Cir. 2014) (holding case not moot because defendants "failed to put forth even a single piece of evidence establishing that the practice . . . [had] been terminated once and for all" and that VDOC would not "reinstate the policy following completion of this lawsuit"). Each of the cases cited by Plaintiff left open the possibility that a defendant would return to the conduct that formed the basis for the litigation; here again, however, Defendant has provided a written waiver which is enforceable by Reed and does not leave open that possibility. *See* 13 *Williston on Contracts* § 39:14 (4th ed. 2000) (recognizing that "the right to performance . . . of contractual duties by one party to a contract way be waived" and that "a waiver can be accomplished unilaterally and need not be supported by consideration").

Given that Reed has not made any repayment pursuant to the TRAP, Defendant has not taken legal action against him, and Defendant has released any potential claims against him, Reed cannot demonstrate injury-in-fact sufficient to support standing to assert Counts 3 and 4. His claims are therefore without standing and will be dismissed as such.

## B. Plaintiffs Lack Standing to Assert Counts 5-6.

Counts 5 and 6 are brought on behalf of Plaintiff Reed and the Class pursuant to Virginia common law. Count 5 alleges that the TRAP is an unconscionable contract provision that is "so gross as to shock the conscience." Dkt. 79 ¶¶ 352-53. Count 6 alleges that the TRAP is an unenforceable contract provision. *Id.* ¶¶ 357-361. Plaintiffs seek a declaration stating that the TRAP is unconscionable and unenforceable, as well as injunctive relief. *Id.* ¶¶ 356, 361. In support of dismissal, Defendant again argues that Plaintiffs lack standing to bring these claims because both Reed and O'Brien have been released from the agreements containing the TRAP and because neither is currently employed by Defendant. Dkt. 89 at 15-16. Consequently, Defendant

claims that there is no actual controversy between the parties with respect to Counts 5 and 6 and that Plaintiffs lack a justiciable interest in the challenged provision because "neither Justin O'Brien nor Skylar Reed will be impacted at all" by a ruling on these Counts. *Id.* at 15. Plaintiffs counter that these claims remain justiciable because Defendant has previously threatened to enforce the TRAP against Reed, and that a declaratory judgment would resolve the question of the TRAP's legality. Dkt. 95 at 21. Plaintiffs further contend that the purpose of a declaratory judgment action is to declare rights before they have matured and, as a result, the claims brought need not have fully matured. Dkt. 95 at 21 (citing *Charlottesville Area Fitness Club Operators Ass'n v. Albemarle Cnty. Bd. of Sup'rs*, 285 Va. 87, 98 (2013)).

As discussed above, where "the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 438 (2021) (internal citation omitted). The Court finds that Plaintiffs lack standing to seek the relief sought with respect to Counts 5 and 6 because the named Plaintiffs are no longer parties to contracts containing the provision at issue and have no personal interest in the dispute. *See Noel v. Hudd Distribution Servs., Inc.*, 274 F.R.D. 187, 192-93 (D.S.C. 2011) (explaining that "the Plaintiffs in this action lack standing to seek the declaratory and injunctive relief sought because the named Plaintiffs . . . are no longer parties to leases with the Defendants since their relationships with Defendants had previously ended"). And while this Court is sympathetic to the frustration and angst caused by Defendant's actions, neither O'Brien nor Reed is presently employed by Defendant, neither has made payments to Defendant pursuant to the TRAP, and Defendant released any claims related to the TRAP against them prior to the filing of the Amended Complaint. Given that there is no ongoing relationship between the parties governed by the TRAP or an existing threat of enforcement that would create the requisite

live controversy, the named Plaintiffs cannot seek declarations stating that the TRAP is unconscionable and/or unenforceable because, at this point, they lack a legally cognizable interest in the outcome.  *See Armstrong v. United States*, 7 F. Supp. 2d 758, 763 (W.D. Va. 1998) (explaining that if plaintiffs "have no interest in the Contract, then plaintiffs have no standing to challenge the Contract").  Thus, Counts 5 and 6 will be dismissed because Reed and O'Brien lack the requisite justiciable interest to assert them.

### C.  Plaintiffs Fail to State a Claim for Count 7.

Count 7, brought under Virginia Code § 40.1-28.7:8 and asserted on behalf of Plaintiff Reed and the Class, alleges that the TRAP constitutes an unlawful non-compete clause.  Dkt. 79 ¶¶ 362-368.  Plaintiffs assert that the TRAP "restrains, prohibits, or restricts employees' ability to compete with Smoothstack following the termination of employment by imposing a penalty of up to almost $30,000 for employees who quit their jobs to work for a competitor."  *Id.* ¶ 365.  They seek a declaration that the TRAP is unlawful and unenforceable, as well as actual damages sustained, such as lost compensation.  *Id.* ¶ 368.  Seeking dismissal, Defendant argues that Count 7 fails to state a claim because the TRAP does not, on its face, prohibit an employee from competing with Defendant post-termination of employment.  Dkt. 89 at 10.

Virginia Code § 40.1-28.7:8 defines a "covenant not to compete" as "a covenant or agreement, including a provision of a contract of employment, between an employer and employee that restrains, prohibits, or otherwise restricts an individual's ability, following the termination of the individual's employment, to compete with his former employer."  Virginia Code § 40.1-28.7:8. Here, the TRAP does not contain an express restriction on post-employment competition.  It provides that "[i]n the event that the Employee resigns or is terminated for Cause prior to Commitment Period . . . , the Employee shall pay $23,875 to the Company to reimburse the

21

Company for the Training, Marketing, and On-Boarding Cost."  Dkt. 79, Ex. 2 at 12.  As Plaintiffs concede, the plain language of the TRAP does not prohibit them from working for a competitor or in the same industry following termination.  Dkt. 95 at 15 (observing that "the TRAP does not expressly prohibit employees from competing with Smoothstack upon termination . . .").  Rather, the provision requires repayment of various costs if an employee leaves before completing their commitment period—the clause is indifferent to the employee's next job.

Nonetheless, Plaintiffs argue that the TRAP functions as a *de facto* non-compete due to its deterrent effect on an employee to resign.  This is the crux of Plaintiffs' arguments, and it skews too broadly, because there are many things that may have a deterrent effect on an employee's decision to resign that do not transform such considerations into non-compete clauses.  Moreover, Plaintiff's argument misinterprets the text of the statute.  The focus of Virginia Code § 40.1-28.7:8 is on whether a provision restrains or restricts competition *after* employment ends, not whether the provision creates financial disincentives for early termination.  Virginia Code § 40.1-28.7:8 (defining "covenant not to compete" as one that "restrains, prohibits, or otherwise restricts an individual's ability, *following* the termination of the individual's employment, to compete" (emphasis added)).  While the TRAP may influence an individual's decision on when to terminate employment, it does not affect an individual's ability to compete *following* termination of employment.  Indeed, there is no reference to competition or future employment in the TRAP at all and the TRAP does not limit either a category of employers or the field of employment that individuals may seek after their employment with Defendant ends.

To support their argument that the TRAP constitutes a non-compete provision under Virginia law, Plaintiffs cite two out-of-Circuit decisions that do not rely on an interpretation of Virginia law and, thus, are unpersuasive here.  First, in *Rieves v. Buc-ee's Ltd.*, 532 S.W.3d 845,

850-51 (Tex. App. 2017), the Court of Appeals of Texas held that a repayment clause operated as a non-compete under Texas Supreme Court precedent, stating that Texas's "Covenants Not To Compete" statute applied "not only to provisions that expressly limit a former employee's professional mobility, but also to damages provisions that impose a severe economic penalty on a departing employee." *Id.* at 851 (citing *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 388 (Tex. 1991)).    However, *Reives* was applying Texas's non-compete statute, which differs materially in language and scope from the Virginia statute at issue here.  The Texas statute sets out specific criteria to determine when a non-compete clause is enforceable, including temporal, geographic, and activity-based limitations, so that a repayment provision could only be enforceable under Texas law if it aligned with that criteria.  *See Rieves*, 532 S.W.3d at 850-51 (stating that a non-compete "covenant is enforceable only if . . . 'it contains limitations as to time, geographic area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary'" (quoting Tex. Bus. & Com. Code Ann. § 15.50(a))).  Texas courts have interpreted the language of that non-compete statute to cover repayment provisions in employee agreements.  In contrast, the plain language of Virginia Code § 40.1-28.7:8 explicitly targets covenants placing *post*-employment restrictions on competition, specifically with respect to low-wage workers.  Moreover, Plaintiffs cite no Virginia authority extending the scope of the definition in Virginia Code § 40.1-28.7:8 to training repayment clauses that do not contain explicit post-employment competitive restrictions.  Given that the statutes differ in plain language and scope, the Court finds the *Rieves* case unpersuasive.

Plaintiff's citation to *Heartland Secs. Corp. v. Gerstenblatt*, 2000 WL 303274 (S.D.N.Y. Mar. 22, 2020), is also unpersuasive.  The *Heartland* Court held that the training repayment provision at issue there was an unlawful non-compete provision.  *Id.* at *6-9.  The agreement at

23

issue empowered the employer with the right to demand a refund of training costs if the employee terminated their employment prior to four years of employment. *Id.* at *2. However, the agreement further provided that the company would "lose its right to demand a refund" if the employee had not "[e]ngaged in activities, nor rendered services, directly or indirectly, that are the same as, or substantially similar to, the Services" offered by the company within 48 months of the termination of employment. *Id.* at *2. Thus, the *Heartland* training repayment provision expressly tethered the repayment obligation to competitive activity. Here, unlike the provision in *Heartland*, the TRAP does not tie the obligation to pay the penalty to any post-termination behavior.

In short, because the TRAP is not a non-compete provision within the meaning of Virginia Code § 40.1-28.7:8, Count 7 will be dismissed for failure to state a claim.

### D. Plaintiffs Fail to State a Claim for Counts 10-12.

Counts 10, 11, and 12 are Virginia Consumer Protection Act ("VCPA") claims. Counts 10 and 12 are asserted on behalf of both Plaintiffs and the Class, while Count 11 is asserted on behalf of Plaintiff Reed and the Class. Defendant argues that the VCPA does not apply to an employer-employee relationship because the "VCPA prohibits certain 'fraudulent acts or practices committed by a supplier in connection with a consumer transaction,'" and the employment agreement does not constitute a consumer transaction. Dkt. 89 at 7-8 (citing Va. Code § 59.1–200). The Court agrees.

The VCPA prohibits suppliers from committing a number of fraudulent acts or practices "in connection with a consumer transaction." Va. Code Ann. § 59.1-200(A). To state a claim under the VCPA, a plaintiff must allege: "(1) a fraudulent act (2) by a supplier (3) in a consumer transaction." *BHR Recovery Cmtys., Inc. v. Top Seek, LLC*, 355 F. Supp. 3d 416, 424 (E.D. Va. 2018). Counts 10, 11, and 12 allege that Defendant, a supplier, has run afoul of the VCPA by

24

unlawfully using a liquidated damages clause within the TRAP, attempting to collect unlawful liquidated damages pursuant to the TRAP, and making misrepresentations about Plaintiffs' working conditions in connection with a consumer transaction.  Dkt. 79 ¶¶ 389-422.  Plaintiffs assert that Defendant's training and placement of Plaintiffs with Defendant's clients constitutes a service, and therefore a "consumer transaction" within the meaning of the VCPA.

As Defendant notes, however, the VCPA does not cover an employer-employee relationship.  In *Smith v. Interactive Fin. Mktg. Grp., L.L.C.*, 79 Va. Cir. 158 (Va. Cir. 2009), the Richmond Circuit Court explained that

> Whether these statutes provide public policy protections or not, they are applicable to consumers and not to employees, such as the Plaintiff.  Regarding the Virginia Consumer Protection Act ("VCPA"), the Court holds this statute protects consumers of goods and services, and regulates suppliers of consumer goods and services.  The Plaintiff as an employee, and not a consumer, is not entitled to protection under the VCPA.

*Id.* at *6; *see also Lucker v. Cole Vision Corp.*, 2005 WL 2788882, at *7 (W.D. Va. Oct. 26, 2005) (holding that "Lucker is not within the protective reach of the statute because he was an employee and not a consumer").  Here, as evidenced by the employment agreements containing the TRAP at issue and by the number of times the Amended Complaint references Plaintiffs as Defendant's employees, Plaintiffs were *employees* of Defendant.  *See, e.g.*, Dkt. 79 ¶ 3 ("This lawsuit seeks . . . to invalidate the . . . TRAP that Smoothstack requires its *employees* – all low-wage tech workers – to sign"); *id.* ¶ 6 ("[T]his lawsuit seeks unpaid wages and damages . . . for Smoothstack's failure to pay Plaintiff Reed and other similarly situated current and former *employees*" (emphasis added)).  The Amended Complaint also states that the training program was part of employment. *Id.* ¶ 10 (explaining that "[a]t the start of employment, Smoothstack requires Recruits to undergo an 'intensive' training program . . .").  Therefore, Defendant's training and placement of Plaintiffs with Defendant's clients does not constitute a "consumer transaction" within the meaning of the

25

VCPA because it was provided as part of an employer-employee relationship. Accordingly, Counts 10, 11, and 12 will be dismissed for failure to state a claim.

### E. Plaintiffs' Remaining Claims Are Not Barred by the *DOL Lawsuit*.

Finally, Defendant argues that the FLSA's termination-of-rights provisions require the dismissal of the entire SAC. Dkt. 89 at 6-7. Because the Court has already determined that Counts 3-7 and 10-12 will be dismissed on other grounds, the Court will only address this argument as applied to the remaining counts—i.e., Counts 1, 2, 8, and 9. The Court is unpersuaded by Defendant's argument and will therefore deny the Motion in this regard for the reasons set forth below.

In its Motion, Defendant raises two FLSA termination-of-rights provisions: 29 U.S.C. § 216(b) and 29 U.S.C. § 216(c). 29 U.S.C. § 216(b) provides in relevant part:

> The right provided by this subsection to bring an action by or on behalf of any employee, and the right of any employee to become a party plaintiff to any such action, ***shall terminate upon the filing of a complaint by the Secretary of Labor*** in an action under section 217 of this title in which (1) ***restraint is sought of any further delay in the payment*** of unpaid minimum wages, or the amount of unpaid overtime compensation, as the case may be, owing to such employee under section 206 or section 207 of this title by an employer liable therefor under the provisions of this subsection or (2) ***legal or equitable relief is sought as a result of alleged violations of section 215(a)(3)*** or 218d of this title.

*Id.* (emphasis added). Similarly, 29 U.S.C. § 216(c) provides in relevant part:

> The right provided by subsection (b) to bring an action by or on behalf of any employee to recover the liability specified in the first sentence of such subsection and of any employee to become a party plaintiff to any such action ***shall terminate upon the filing of a complaint by the Secretary*** in an action under this subsection in which a ***recovery is sought*** of unpaid minimum wages or unpaid overtime compensation under sections 206 and 207 of this title ***or liquidated or other damages*** provided by this subsection owing to such employee by an employer liable under the provisions of subsection (b), ***unless such action is dismissed without prejudice on motion of the Secretary***.

*Id.* (emphasis added).   Defendant argues that, pursuant to these provisions, the filing of the *DOL Lawsuit* on July 10, 2024, barred the SAC, which was subsequently filed on July 16, 2024. Plaintiffs, relying primarily on *Floyd v. Excel Corp.*, 51 F. Supp. 2d 931 (C.D. Ill. 1999), disagree. Dkt. 95 at 9.

In *Floyd*, the U.S. District Court for the Central District of Illinois held "that a suit filed by the Secretary bars a subsequently filed private suit under [Section] 216(b) *to the extent that the suits allege the same claims* under the FLSA."  51 F. Supp. 2d at 934 (emphasis added).  To reach this conclusion, the *Floyd* Court first found that the text of the FLSA was "ambiguous as to whether [Section] 216(b) precludes a subsequently filed private suit that is *different* from the Secretary's suit."  51 F. Supp. 2d at 933 (emphasis in original).  The *Floyd* Court acknowledged that a broad reading of the provision—the reading Defendant seeks here—was possible, but determined that such a reading would be absurd: "If the Court were to read the statute extremely broadly, the statute would preclude *all* and any private suits that are filed after the Secretary's suit, regardless of the subsequent suit's substantive and temporal basis."  *Id.* (emphasis in original).  The *Floyd* Court then considered a hypothetical to further support its rejection of the broad reading: "[S]uppose an employer has violated several different provisions of FLSA on several different occasions.  If the Secretary decides to bring suit under Section 217 regarding only one violation—either due to lack of knowledge of other violations or through an exercise of discretion—the other violations could never be adjudicated because the defendant's employees would be precluded from pursuing private suits to enforce the FLSA.  Given that the statute was designed for remedial purposes, it is unlikely that Congress intended such a harsh result."  *Id.*  The *Floyd* Court further reviewed the legislative history to confirm this interpretation.  *Id.* at 933-34 ("As noted in the Senate report, the 'termination of rights' provision was enacted to 'relieve the courts and employers of the burden of

litigating a multiplicity of suits based on the *same violations* of the act by an employer.'" (quoting Sen. Rep. No. 145, 87th Cong., 1st Sess., reprinted in 1961 U.S.C.C.A.N. 1620, 1659)).

A review of the case law supports the approach taken in *Floyd*. *See, e.g.*, *Breuer v. Jim's Concrete of Brevard, Inc.*, 538 U.S. 691, 696 n.1 (2003) ("Under the FLSA, the Secretary of Labor may file a suit on behalf of an employee to recover unpaid wages or overtime compensation, and when the Secretary files such a suit, an employee's right to bring a *comparable* action terminates, *see, e.g.*, 29 U.S.C. § 216(c)." (emphasis added)); *Russum v. Piggly Wiggly, Inc.*, 759 So. 2d 1063, 1066 (Ct. App. La. 2000), *writ denied,* 766 So. 2d 1283 (La. 2000) ("The FLSA does not authorize an employee to file *an identical private civil action* against the defendant once a claim has been filed against the defendant by the Secretary of Labor." (emphasis added)).  Importantly, in *Breuer*, the Supreme Court suggests, in a footnote, that the *Floyd* Court reached the correct result.  Thus, the Court will follow the weight of the case authority on the issue, especially given that Defendant cites no cases at all.  Accordingly, the Court finds that Plaintiffs' claims for unpaid minimum wages (Count 1), unpaid overtime wages (Count 2), O'Brien's individual retaliation (Count 8), and regular rate violation (Count 9) are not barred by 29 U.S.C. § 216(b) because they are "different from the Secretary's suit."  *Id.* (quoting *Floyd*, 51 F. Supp. 2d at 934).[5]

To begin with, under Count 1 of the SAC, Plaintiffs allege traditional minimum wage claims based on the Unpaid Period.  Dkt. 79 at ¶¶ 299-310; *see id.* at ¶ 15 ("During the Unpaid Period, Smoothstack violates the FLSA by failing to pay Recruits any compensation for the work they perform.").  While Count 1 of the *DOL Lawsuit* also styles itself as a claim for "failure to pay minimum wage," the basis for the alleged violation is the TRAP, not the Unpaid Period.  Dkt. 89-

---

[5] Although Defendant argues that these claims arise out of the same "conceptual basis," the Court finds that the specific claims are sufficiently distinct to proceed.

1 at ¶¶ 152-155 ("Defendants' imposition of the TRAP (and related costs to enforce the TRAP) on employees is an illegal request that employees kick back wages to Smoothstack when the TRAP brings employees' pay below the FLSA minimum wage for one or more workweeks and/or is a failure to pay employees, finally and unconditionally or free and clear, at least the minimum wage guaranteed by the Act for all hours worked."  *Id.* at ¶ 154.).

Next, under Count 2 of the SAC, Plaintiffs allege traditional overtime wages claims based on the Underpaid Period.  Dkt. 79 at ¶¶ 311-323; *see id.* at ¶ 15 ("During the Underpaid Period, Smoothstack violates the FLSA by failing to pay Recruits for any of the hours worked in excess of 40 in a workweek, which must be paid at a premium overtime rate of 1.5 times their hourly rate.").  Under Count 9 of the SAC, Plaintiffs allege a regular rate violation on behalf of Reed and the FLSA Collective based on Defendant's failure to pay 1.5x the regular rate of pay for overtime worked during the Assignment Period.  Dkt. 79 at ¶¶ 376-388; *see id.* at ¶ 89 ("While working at Accenture, or his Assignment Period, Plaintiff Reed worked over 40 hours per week, including during the weeks of February 26, 2024, and March 4, 2024.  Smoothstack did not pay Plaintiff Reed for these hours of work at a rate of 1.5x his regular rate of pay and instead only paid him at his regular rate of pay.").  As with Count 1, while Count 2 of the *DOL Lawsuit* also styles itself as a claim for "failure to pay overtime," the basis for the alleged violation is again the TRAP, not the Underpaid Period or the Assignment Period.  Dkt. 89-1 at ¶¶ 156-159 ("Defendants' imposition of a TRAP (and related costs to enforce the TRAP) on employees is an illegal request that employees kick back wages to Smoothstack when the TRAP brings employees' pay below the required overtime compensation of one and one-half times their regular rate of pay for one or more workweeks in which they worked over 40 hours and/or is a failure to pay employees, finally and

29

unconditionally or free and clear, the wages required by the Act for all hours worked in overtime workweeks." *Id.* at ¶ 158.).

Finally, under Count 8 of the SAC, Plaintiffs allege an individual retaliation claim on behalf of O'Brien based on Defendant (a) removing O'Brien from his contract with Accenture, (b) reducing O'Brien's wages, and (c) terminating O'Brien's employment, after O'Brien complained to Defendant about his and others' unpaid minimum and overtime wages. Dkt. 79 at ¶¶ 369-375. Again, while Count 3 of the *DOL Lawsuit* styles itself as a claim for "retaliation," the basis for the alleged violation is the incentive structure imposed by contractual provisions, not specific actions taken by Defendant toward any employee. Dkt. 89-1 at ¶¶ 160-165 ("As a result of Defendants' waiver, confidentiality, non-disclosure, and non-disparagement provisions, coupled with the threat of termination or a significant monetary fee, a reasonable employee would be dissuaded from engaging, or preparing to engage, in activity that is protected by the Act, such as speaking freely to the Department of Labor's investigators, participating in the Department of Labor's investigation, filing a complaint, obtaining back wages due as part of an investigation, or otherwise asserting or complaining about their rights under the FLSA." *Id.* at ¶ 161.).

Thus, the Court finds that Plaintiffs' claims for unpaid minimum wages (Count 1), unpaid overtime wages (Count 2), O'Brien's individual retaliation (Count 8), and regular rate violation (Count 9) are not barred by 29 U.S.C. § 216(b).

## IV. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that Defendant's Motion to Dismiss (Dkt. 88) is GRANTED-IN-PART and DENIED-IN-PART. The Motion is granted with respect to Counts 3-7 and 10-12. The Motion is denied insofar as it seeks a stay and with respect to Counts 1, 2, 8, and 9; and it is

FURTHER ORDERED that Counts 3-7 and 10-12 of the Amended Complaint (Dkt. 79) are DISMISSED WITHOUT PREJUDICE; and it is

FURTHER ORDERED that a scheduling order will issue promptly.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to all counsel of record.

It is SO ORDERED.

Alexandria, Virginia
July 11, 2025

/s/
Rossie D. Alston, Jr.
United States District Judge